UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 19 CV 8345

SAMANTHA SIVA KUMARAN
THE A STAR GROUP, INC d/b/a TIMETRICS

Write the full name of each plaintiff.

\_\_\_\_\_CV_____
(Include case number if one has been assigned)

-against-

NORTHLAND ENERGY TRADING, LLC
HEDGE SOLUTIONS, INC
RICHARD M. LARKIN

**COMPLAINT**

Do you want a jury trial?
☒ Yes   ☐ No

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

2019 SEP -6 PM 4:31   RECEIVED SDNY PRO SE OFFICE

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐   **Federal Question**

☑   **Diversity of Citizenship**

### A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

### B.  If you checked Diversity of Citizenship

#### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , ___SAMANTHA   SIVA KUMARAN_____ , is a citizen of the State of
(Plaintiff's name) THE A STAR GROUP, INC

___NEW YORK_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _NORTHLAND ENERGY TRADING HEDGE SOLUTIONS RICHARD LARKIN_, is a citizen of the State of
(Defendant's name)

NEW HAMPSHIRE

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _NORTHLAND ENERGY TRADING HEDGE SOLUTIONS_, is incorporated under the laws of

the State of _NEW HAMPSHIRE_

and has its principal place of business in the State of _NEW HAMPHIRE_

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _SOO. N. COMMERCIAL STREET MANCHESTER, NH 03101_

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

SAMANTHA                    SIVA    KUMARAN
First Name          Middle Initial       Last Name
THE A STAR GROUP, INC
119   WEST   72nd   Street   # 204
Street Address
NEW YORK            NY          10023
County, City                State        Zip Code
646 221 4363        samantha@timetricbrisk.com
Telephone Number           Email Address (if available)   astargrap@
                                                          yahoo.com

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:   NORTHLAND ENERGY TRADING LLC

First Name                          Last Name

Current Job Title (or other identifying information)

500 N. COMMERCIAL STREET

Current Work Address (or other address where defendant may be served)

NEWHAMPHIRE   MANCHESTER   03101

County, City                        State                  Zip Code

Defendant 2:   HEDGE SOLUTION

First Name                          Last Name

500 N. COMMERCIAL STREET

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

MANCHESTER   NH   03101

County, City                        State                  Zip Code

Defendant 3:   RICHARD LARKIN

First Name                          Last Name

President

Current Job Title (or other identifying information)

32 HELEN COURT

Current Work Address (or other address where defendant may be served)

GOFFSTOWN   NH   03101

County, City                        State                  Zip Code

Defendant 4:

_____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                    State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:   *See Attached Complaint*

Date(s) of occurrence:   _____

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

*See Attached Complaint*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

See Attached Complaint
_____

_____

_____

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

See Attached Complaint
_____

_____

_____

_____

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| 9/6/2019 | B |
| Dated | Plaintiff's Signature |
| Samantha | Siva kumaran |
| First Name          Middle Initial | Last Name |
| 119   West   72nd Street   #204 | |
| Street Address | |
| New York          NY          10023 | |
| County, City          State          Zip Code | |
| +1 646 221 4363          astargroup@yahoo.com | |
| Telephone Number          Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☒ Yes    ☐ No

   If you do consent to receive documents electronically, submit the completed form with your
   complaint. If you do not consent, please do not attach the form.

IN THE UNITED STATES DISTRICT COURT

SOUTHTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE A STAR GROUP, INC.<br>d/b/a/ TIMETRICS, and<br>SAMANTHA SIVA KUMARAN, | )<br>)<br>) | |
| | ) | Case No: |
| *Plaintiffs,* | ) | |
| -against- | ) | **COMPLAINT** |
| | ) | |
| NORTHLAND ENERGY TRADING, LLC<br>HEDGE SOLUTIONS, INC.,<br>RICHARD M. LARKIN | )<br>)<br>) | |
| *Defendants,* | ) | |

Plaintiffs The A Star Group, Inc. d/b/a/ Timetrics ("Timetrics") and Samantha Siva Kumaran ("Kumaran") (herein collectively called "Plaintiffs") , allege for its complaint as follows:

### PRELIMINARY STATEMENT

1.     This is a civil action under New York State law for breach of contract, fraudulent inducement, misappropriation of trade secrets, unjust enrichment, and common law fraud, seeking disgorgement of wrongfully-derived profits brought by Plaintiffs against Defendants; the primary contract at issue is a settlement agreement  hereinafter the ("Settlement") which resolved a prior dispute filed before this court, which contained provisions which were binding upon Defendants subsequent to the execution of the settlement.

2.     As alleged more fully below, Defendants breached the contract by retaining the valuable and proprietary Intellectual Property, which includes without limitation Plaintiff's risk management tools, trading strategies, designs, models, processes, techniques, algorithms, hedging methodologies, Timetrics Software and other Confidential Information, (hereinafter "IP"), which

Defendants explicitly represented and warranted as part of the Settlement that they would not retain or subsequently use, and which the Settlement explicitly prohibited the retention and use of, as well as the subsequent reverse engineering, preservation and modification, or in all other ways subsequent development from principles, methodologies and techniques contained within the protected IP.

3.     As the inclusion of such protections was a vital negotiated term of that Settlement Agreement and essential to the foregoing, without which Plaintiffs would not have entered into any settlement, Defendants fraudulently induced Plaintiffs into entering into the Settlement by their knowing and intentional breach of this term in particular, Defendants' representation and warranty that they disclaimed and would not retain, use, duplicate, reverse engineer, or otherwise misappropriate Plaintiff's IP, or right, title, and/or interest in and to Plaintiff's IP, was a nullity as of the moment the Settlement  was executed and at no point after execution of the Settlement did Defendants act to comply with that term of the Settlement, instead knowingly and willingly retaining, concealing, developing, modifying, and ultimately utilizing Plaintiff's IP.

4.     Plaintiffs are entitled to damages for the improper and unlicensed use of the Plaintiff's valuable IP and service, as well as disgorgement of profits, garnered by Defendant's improper use of Plaintiff's valuable Ip and service in the marketplace.

5.     Defendant's conduct additionally should be declared unlawful and enjoined, was intentional, knowing,  with the wanton disregard of Plaintiffs rights, with deliberate intent to deprive Plaintiffs rights to the of the fruits of their labor, and rights in and to its IP, and justifies an award of punitive damages.

**JURISDUCTION AND VENUE**

6.    Plaintiffs bring this action to recover damages for breach of contract and other causes of action which arose as of the date that contract was executed, which was in this case the Settlement dated May 9th, 2016. Plaintiffs first uncovered or learned of the breaches and other causes on September 8th , 2016 and was unaware of the activities until after that date.

7.    This Court has jurisdiction pursuant to 28 USC 1332 based upon diversity, as Plaintiffs are citizens of the State of New York, and defendants are citizens of the State of New Hampshire, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

8.    Venue is proper in this District under 28 U.S.C. 1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and in addition by way of Section 16 of the Settlement, which states "Choice of Forum": In the event of a breach of this Agreement or any other dispute arising out of this Agreement, the Parties agree that such dispute shall be resolved through a court of competent jurisdiction in the state of New York."

## PARTIES

9.    Plaintiff The A Star Group, Inc d/b/a Timetrics is a corporation, formed under the laws of the State of New York, with a principal place of business in New York City, County of New York, and State of New York. Principle address is 119 West 72nd Street, #204, New York NY 10023

10.   Plaintiff Samantha Siva Kumaran ("Kumaran") is an individual residing at 240 West 74th Street, New York, NY 10023, and a United States citizen..

11.   Upon information and belief, Defendant Northland Energy Trading, LLC ("Northland") is a limited liability corporation formed under the laws of the State of New Hampshire with its principal place of business 500 N. Commercial Street, Suite 302A, Manchester, NH, 03101. Upon further information and belief, Northland's majority Managing Member and principal owner is

Richard M. Larkin , a citizen of the State of New Hampshire, who exercises majority and sole dominion over the affairs over Northland.

12.   Upon information and belief, Defendant Hedge Solutions ("Hedge") is a corporation formed under the laws of the State of New Hampshire with its principal place of business 500 N. Commercial Street, Suite 302A, Manchester, NH, 03101. Upon further information and belief, Hedge is an affiliate of defendant Northland, with which it shares a common owner, Richard Larkin who exercises sole dominion and control over the affairs over Hedge.

13.   Richard M. Larkin ("Larkin) is an individual residing at 32 Helen Court, Goffstown, New Hampshire and upon information and belief is the 100% owner and President of Hedge Solutions and the CEO and Managing Member of Northland Energy Trading, LLC with majority of the membership interest.  Upon information and belief, Larkin exercises sole dominion and control over both entities, and is an agent of both Northland Hedge.

14.   All of the acts, omissions, self-dealing, misrepresentations, and conduct to bind Northland, and Hedge were the acts, omissions, representations, self-dealing and conduct of Richard M. Larkin, acting in hits personal and individual capacity, and also as their agent and/or principle, CEO and President and/or Managing Member of the Company(s), and further made payments of personal checks from his individual bank accounts on behalf of representations made on behalf of the Company(s) Northland and Hedge, and made representations and promises of futures payments to Plaintiffs from Northland and Hedge, in consideration of his own personal gain, and interests and  for the purposes of claims asserted against him individually and personally in this Complaint.

FACTS

15.   On or around approximately May 9th, 2016, Plaintiffs in the instant case entered into a "Mutual Release and Settlement Agreement" (hereinafter the Settlement") with Defendants in the instance

case, who were also parties to the same agreement. That agreement arose out of and resolved an action initiated by Plaintiffs in the New York State Supreme Court. County of New York, designated case number 651629/2015, and thereafter removed to the United States District Court for the Southern District of New York, there designated as case number 15-cv-04660. The Settlement is attached hereto as Exhibit 1.

16.   Among the several provisions of the Settlement, Section 4 established that although several "Engagement Contracts" at issue in the underlying lawsuit would be terminated pursuant to the Settlement, "the Parties agree, however to the intellectual property and related provisions set forth on Exhibit A, attached hereto and made a part hereof, which provisions shall survive. "In particular, Defendants Northland and Hedge, "represented and warranted" as follows:

> [T]hat neither of them has in their possession any of the Timetrics software that was involved in the Lawsuit ("The Timetrics Software"); they each agree that The A Star Group owns the Timetrics Software, and hereby disclaim and shall not retain or asset any right, title or interest in and to the Timetrics Software and they each agree not to use, duplicate, reverse engineer or otherwise misappropriate any Timetrics Software, and that they are not using and will  not utilize in the future any strategies learned from the trading recommendations from the Timetrics Software to improve NT Parties trading or hedging revenue and/or any other consulting recommendations provided by Timetrics under the Engagement Contract to improve NT Parties trading or hedging revenues.

17.   "Timetrics Software refers to a proprietary suite of various enterprise risk management and analytic technologies, the underlying quantitative processes and analytical engines, methods, techniques, for hedging and managing risk, and mathematical algorithms developed by Samantha Siva Kumaran for use in creating new hedging strategies for exchange traded commodity derivatives, primarily in markets for oil and natural gas futures, electricity transmission contracts, and other energy futures."

18. The hedging strategies, know-how, methods, processes, and proprietary information and IP including but not limited to the Timetrics Software are the valuable trade secrets of Plaintiffs.

19. Samantha Siva Kumaran, is a British born, U.S. Citizen, who has had over twenty years' risk experience in the risk management software and services sector, in the financial services and energy industry as a professional risk management consultant, and has earned First Class Honors Masters and Bachelors in Applied Math and Theoretical Physics, from University of Cambridge's Trinity College, UK Her businesses are minority-woman-owned small businesses.

20. Samantha Siva Kumaran passed the Series 3 on or about July 1st, 2016 and became a registered commodities trading advisor CTA on April 4th 2017.

21. Ms. Kumaran developed the Trade Secrets and its business Timetrics over a period of 25 years, since founding her company in 1993. Samantha Siva Kumaran is the sole owner and has developed and owns the Timetrics software, service and products which were developed over decades to calculate enterprise wide risk management. Plaintiffs, through Kumaran's specialized and unique math expertise, has charged significant consulting fees and commercial license fees to clients and customers for the use, access and design of these proprietary tools, which provide a competitive advantage in the market place.

22. Samantha S. Kumaran is also the sole owner of the Timetrics Software and all associated trade secrets, including under assignment from and license to The A Star Group, Inc.

23. Samantha Siva Kumaran's risk management consulting experience, has primarily been in the Energy and Commodities sector, and includes oversight of risk management departments, development of customized risk management, hedging and risk management analytics and software, risk audit, development of advanced market risk measures for trading floors, and advanced derivatives and options strategies to mitigate risk and increase revenue. Ms. Kumaran

spent several years as the Chief Risk Officer at Niagara Mohawk Energy Marketing, Inc in Syracuse, responsible for deployment and enforcement on all aspects of Enterprise Wide Risk Management, and reporting on a C-level.

24.  In 2018, Timetrics was featured as a Top 10 Enterprise Trading Risk Management ETRM risk management service provider and solution in CIO Insights.

25.  Plaintiff's products and services, include Timetrics Software, customized risk management strategies, designs, reports and license to their IP. Plaintiffs' IP were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, were used to design and compile the programs and to generate the math algorithms and output, to give Plaintiffs a commercial competitive analytical advantage.

26.  At all times Plaintiffs have protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the express rubric of its own restrictive non-disclosure agreement. Further Plainitffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

27.  Defendants acknowledged in agreements, that Plaintiffs' IP shall be considered without exception Confidential and Proprietary Information of Plaintiffs.. and they further acknowledged and agreed that Plaintiffs IP *constitutes trade secrets*, Confidential and/or Proprietary Information of Plaintiffs and its suppliers, licensors or subcontractors.. including further acknowledgement that Plaintiff's IP is the *competitive intellectual property of Plaintiffs and is the crux of commercial value and sale price of Plaintiffs' business models and services*.

7

28.  Plaintiffs began, in 2011, to license the  trade secrets, proprietary methods, techniques, methods, and software suite under express "Non-Disclosure Agreements", for licensees, the above-referenced lawsuit involved allegation of non-payment of various fees involved for the licensing of the Timetrics Software to particular Defendants, who are the same as the name Defendants in the instant case. The Settlement resolved any and all such claims, *subject to, however,* the above representation that Defendants were bound to honor the Intellectual Property rights of Plaintiffs in the several ways outlined above, but generally to concede Plaintiffs' ownership of the various aspects of Plaintiffs Intellectual Property, to not retain or use Plaintiffs' IP, and to not subsequently attempt to duplicate, reverse engineer, or otherwise misappropriate the property of Plaintiffs on an ongoing basis, as the Defendants generally acknowledged that the hedging strategies, software, programs, design, techniques, methods and models of Plaintiffs encompassing their IP and Timetrics Software were valuable trade secrets, designed to improve revenue and profitability of clients, and from which Plaintiffs derived substantial economic value.

29.  The several in-depth "Intellectual Property Provisions" to which Defendants agreed were attached to the above referenced Settlement on Exhibit A.

30.  The Settlement acknowledge in Section 9 that Defendants "have carefully read this Agreement, and understand its terms and conditions without reservation[,]" of which "Exhibit A" was a constituent part of the terms and conditions of the whole agreement.

31.  Subsequent to the execution of the Settlement, Defendants and Plaintiff continued to engage in business together, in part because Defendants had previously, and were willing to continue to provide Plaintiffs with staff, infrastructure and capital in exchange for services. However, at no point subsequent to the execution of the Settlement did Plaintiffs re-license or otherwise permit or

warrant Defendants right, title or interest, to utilize their IP or Timetrics Software, without compensation to Defendants.

32. On or around September 8th 2016, as a result of both in person discussions and emails, in particular in an email dated September 8th 2016, Plaintiff Kumaran learned that Defendant had continued to utilize, and was presently using protected Plaintiffs' IP, as countenanced by the prior Settlement, without a license. Particularly, Plaintiffs discovered that Defendants had not retained, but created derivative techniques, processes, methods, software, hedging strategies of Plaintiff's IP, in part by first obtaining or inducing disclosure under restrictive non-disclosure agreements, retaining protected Plaintiffs IP, and elsewhere by reverse-engineering other aspects of Plaintiff's IP which were not retained subsequent to the Settlement; and for both prior to and subsequently modifying, and internally developing and improving upon the models to create similar models and methods and to adapt the principles and methods originally encompassed by and covered within the terms of the original Settlement concerning Plaintiff's IP.

33. The above-reference course of action was in violation of the Settlement agreement, constituted a breach of confidentiality and unlicensed use which Defendants had explicitly represented and warranted they would discontinue, and whereby Plaintiffs were damaged by the improper use and disclosure of their valuable IP and the profits derived from its use.

34. On information and belief, Plaintiffs learned that Defendants had – through the use of Plaintiffs' IP and the modified and similar developed processes, methods, analytics tools, strategies and software - profited in excess of $1 million dollars, through the present date, by utilizing the analytics and hedging strategies generated in Defendants' business operations, to trade commodities and energy futures.

9

35.  On information and belief, given Defendants' acknowledgement of careful reading and full understanding of the terms of the Settlement and the subsequent retention of the protected Plaintiffs IP, in derogation of the terms, Defendant's course was willful, knowing, and purposeful; in addition, Defendants subsequent development, modification, and reverse engineering of the Plaintiffs' IP, Timetrics Software, strategies, designs, processes, models, analytics, and software was concealed from Plaintiffs in order to be successfully implemented by Defendants as a trading and hedging strategy.

36.  Specifically as part of the fraudulent conduct, in meetings had at Margot Café at 230 West 74th Street, New York, NY on or around May 7th 2016, Larkin met with Kumaran in person and continued to make false statements and representations that Plaintiffs were not using revised hedging strategies and reverted back to their old methodologies. Such states were false at the outset and contained material omissions about the real business activities which was being concealed by Defendants to induce the Settlement.

37.  Defendants, in full knowledge of the duties imposed upon Defendants by the prior Settlement, fraudulently concealed their improper retention, subsequent development modification, and reverse-engineering of the Plaintiffs models, analytics, methods, techniques and software from Plaintiffs until approximately September 8th, 2016.

38.  As stated in Section 15 of the Settlement, "[any] dispute arising out of this Settlement shall also be governed by the laws of the State of New York."

39. Subsequent to the Settlement in or around early September 2016, the parties agreed to formulate new business agreements, with Larkin acting in his personal capacity, as a party to those arrangements. In these arrangements, the Larkin made promises to provide additional capital to Kumaran, in the launch of various new businesses and affiliates and also represented and as a

10

bilateral part of that agreement, represented and agreed Defendants Northland and Hedge would also make payments and renumerations to Plaintiff and in exchange Plaintiffs continued services, software and access to their IP and trade secrets.

40.  All discussions, disclosure and confidential dealings related to the new business arrangements were made pursuant to a confidential agreement, which was executed on March 21st, 2011 that the parties entered into an executed Timetrics Non-Disclosure Agreement (*"**Timetrics NDA**"*) attached hereto, which terms and conditions remain in full force and effect in perpetuity as defined under Section 4 and otherwise defined therein, and survived and remain in effect (*See* **Exhibit 2**)

41.  While Plaintiffs have performed all its obligations under the Timetrics NDA, it was also learned on or about or after September 8th, 2016, Defendants were knowingly in breach of the following specific provisions of the Timetrics NDA, including but not limited to (i) Section 2.b (ii) Section 3a and Section 3.b (iii) as well as other obligations contained therein to protect and not-use Confidential Information. Defendants, via the CEO Larkin, however continued to assure Plaintiffs that compensation was forthcoming, and royalties, license fees and other renumeration would be made effective immediately between the period September 2016 until March 2017 and also in full reinstatement of previously foreseeable renumerations after April 2017, to continue to induce further disclosure of IP and trade secrets.

42.  These telephonic phone calls and emails that occurred on September 8th 2018, and September 9th, 2018 and numerous other days and times in the month of September and October 2016, Richard M. Larkin phoned Plaintiffs from either his office or home located at 32 Helen Court, Goffstown, New Hampshire using his cellphone to Ms. Kumaran who received the phone calls on the telephone number who was located at her home and office located at 240 West 74th Street, New York, NY. 10023.

43.  Plaintiff also alleges that numerous telephone communications occurred during the period September 2016  and December 2017, including meetings at the Marriott Hotel, located in New York City and at the Tavern on the Green in New York City.

44.  As part of the new business arrangements, Larkin agreed and represented and promised that in his personal and individual capacity, that in exchange for Larkin's personal payments, and capital contributions, Defendants would make numerous renumerations of compensation for services, salary bonuses, software, license and Plaintiff's IP, including but not reinstate various engagement contracts effective April 2017 at previously agreed upon commercial terms and rates from Northland and Hedge.

45.  In or around September 2016 and during numerous phone calls and emails therefore, Larkin represented that Defendants would honor numerous compensations agreements, salary bonus structures and reinstatement of software license fees, in exchange for services, and substantial profit sharing in hedging improvements.

46.  However, again manifesting this pattern of deceit, this representation were false at the onsite. Larkin, acting in his capacity as CEO Of Northland and President of Hedge Solutions, when he these material representations, Larkin was concealing his material representations and business transactions from other employees, officer, directors, including the Controller, CCO and others, in potential violation of the law and the regulatory framework under which his business operates.

47.  Larkin, acting in his capacity as CEO of Northland and President of Hedge Solutions, falsely made those material representations to Plaintiffs to induce Plaintiffs to continued to provide IP and disclose services and software, and knew at the onset his representations were false, and that Northland, by his fraudulent concealment of the activity had no intention of paying Plaintiffs for their work.

12

48. Defendants have a long standing policy of deceptive business practices, and concealing information from others, and a record of regulatory and compliance violations.

49. These misrepresentations were made for the purpose of inducing Plaintiffs entering into the continued services under an "Implied Agreement" – with compensation being paid directly by Larkin personally in binding of Northland and Hedge, and to continue to disclose more IP, trade secrets, and confidential information and continue providing services, software, design improvements, trades, contributions to Defendants, that were subsequent to the Settlement, and such services. Manifestation of Larkin's assent to the implied agreement, includes but not limited to his personal initial payments from his personal bank accounts, and numerous emails and communications between Larkin and Kumaran documenting the extensive services, software, labor, risk management and hedging techniques and improvements of financial value provided to Defendants.

50. Given the short deadlines that Defendants represented were for the trading live during the months of various activities at Northland during September 2016-March 2017, Plaintiffs accelerated its timeline to provide services, software, risk management and hedging techniques and improvements of financial value to Defendants reliant on the compensations schedules.

51. Further, reliant on the representations, Plaintiffs during the period September 2016 until March 2017 continued to provide excessive hours, labor, manpower, services, software and other upgrades, design and recommendation in hedging strategies to Northland, and disclose IP, Confidential Information and Trade Secrets, to Defendants, reliant on the promises of renumeration.

52. All services were performed in the City of New York and State of New York. Larkin personally met with and conferred with Plaintiffs Kumaran in the City and State of New York,

further manifesting his assent to these services at meeting including but not limited to The View in Times Square on August 4th 2016, The Marriott Hotel on West 57th Street on December 14th 2016, and Tavern on the Green on December 14th 2016. At these times and dates and locations, including at numerous emails and telecommunications, made to Kumaran's residence in New York City, further making fraudulent representations about his payments, Larkin made repeated promises and representations of personal contributions and payments to Kumaran and Plaintiffs.

53.   Further all payments were made by Richard Larkin personally, from his individual bank account to Kumaran's affiliates, and fedexed to locations in New York City, in order to conceal the business dealings from Northland and Hedge. Further his pattern of material obfuscations and concealment, including making various payments to third parties, including a Jonathan Flak, on or around December 14th, 2016, in cash (so as to avoid a paper trail) in New York City, at the Marriott Hotel on West 57th Street, as part of his manifestation to "conceal" and deceit and misrepresentations to Northland and Hedge of his true conduct.

54.   Further, Plaintiffs reasonably relied on Larkin's representations in deciding to enter into the further services under an Implied Agreement, and proceeding to provide services, software, risk management and hedging upgrades and techniques, disclose further IP, and dilute its time management from the other activities to assist Defendant's business, reliant on the cashflow and revenue incentive compensations that were promised by Defendants.

55.   Plaintiff's had been engaged by Defendants before for a period of about four (4) years, and reasonably expected these payments to be made, under the terms of the previous Software License Agreements, and Consulting Services agreements which were to be reinstated.

56.   Plaintiffs fulfilled their obligations under the Implied Agreements and Timetrics NDA,

57. Further with reckless disregard for the truth, it is clear that Larkin and Defendants had no intention of making payments to Plaintiffs, as Larkin  and Defendants were not willing to comply with the FCM's regulatory compliance laws, was acting with concealment and deceit from Northland employees, officers and directors, and had no intention of properly compensating Plaintiffs, but utilizing the services for his self-gain, profit and benefit and self-dealings in the Northland company.

58. Therefore Defendants knew at the onset that his representations were false, and that compensations through Northland and Hedge could not have been made, and intended to deceive Plaintiffs to induce free services, wrongfully acquire by fraudulent inducement more trade secrets and their valuable IP, Confidential Information, provide services and proceed with the Implied Agreement, while all the time increasing profits and revenue to Defendants. Emails during this period of time, evidence Plaintiffs providing proprietary risk mitigations techniques in excess of $700,000 of benefit to Northland and Hedge, reliant on Larkin's promises and representations.

59. Larkin in or around November 2nd 2018, in bad faith, then breached the Implied Agreements, continued to unilaterally change the terms of compensation, after services were provided, and proceeded to use and incorporate and retain the benefits of the services and disclosed IP without compensation to Plaintiffs. Defendants knew that Plaintiffs and Kumaran would be financially harmed, as they were reliant on the representations of numerous financial contributions to launch new businesses, and had already agreed via various Implied Agreements.

60. Defendants knew that Plaintiffs would suffer substantial financial losses, Since Defendants represented they would be making significant financial capital contributions to launch various new businesses, with fully calculable monetary rewards and profits incentives, and by withdrawing those incentives, Plaintiffs would not be able to reap the fruits and benefits of their excessive hours

15

of labor or launch the businesses under the timelines contemplated, causing operational losses and delays.

61.   Defendants actions were with wanton and disregard for Plaintiff's right, and with willful intention to harm Plaintiffs' businesses, as well as its affiliates, if it did not meet commercially unreasonable demands,   continue excessive hours of work, without compensation and signed agreements. Further Defendants, in bad faith,  have threatened to breach numerous confidentiality provisions, related to Kumaran's other businesses, as retribution and retaliation, should Plaintiffs pursue action against them.

62.  Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Implied Agreements, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder in amounts in excess of $1 million dollars.

63.  To this date, Defendants have continued to retain the benefits of the IP, services, software, trade secrets and other benefits fraudulently procured by Plaintiffs, and have failed to honor their end of the compensation schedules, and continued to this date, their breaches of the Settlements Agreement and Non-Disclosure Agreements. Defendants have therefore been unjustly enriched at the Plaintiffs' expense.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

64.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra,* as if fully set forth at length herein.

65. The Settlement dated May 9th, 2016 was a valid and binding contract upon all parties, including Defendants, supported by adequate consideration.

66. Plaintiffs fully performed all duties and obligations under the contract.

67. Defendants represented and warranted that they did not have in their possession and would not retain, or use, or modify, reverse engineer, or otherwise misappropriate Plaintiffs' IP, as previously and further described by the full language of the contract contained within Exhibit 1, attached hereto.

68. Defendant's materially breached the contract by violating the several provisions concerning the Plaintiffs' IP and specifically by retaining, using, modifying, reverse engineering, and in other ways misappropriating Plaintiffs' IP, in derogation of their express representations and warranties contained within the contract.

69. Defendants, through their retention, modification, and use of misappropriated Plaintiffs' IP, profited while engaging in trading commodities and futures, as a direct and proximate result of the improper use of the Plaintiffs' IP, and Plaintiffs improper development and modification thereto, those profits were in an amount not yet fully ascertained, but believed to be not less than $1 million to be determined at trial.

70. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1million dollars.

71. In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendant's breach of contract, in an amount to be determined at trial, but believed to be in excess of $1 million.

72. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

73.   Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

SECOND CAUSE OF ACTION
**FRAUDULENT INDUCEMENT**

74.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein.

75.   "The elements of a claim for fraudulent inducement are :1) a false representation of material fact, 2) known by the utterer to be untrue, 3) made with the intention of inducing reliance and forbearance from further inquiry, 4) that is justifiably relied upon and 5) results in damages[1]

76.   Defendants represented and warranted that they did not have in their possession, and would not retain, or use, modify, reverse engineer, or otherwise misappropriate the Plaintiffs' IP, as previously, and further described by the full language of the contract contained within Exhibit 1, attached hereto.

77.   Defendants knew, however, that Defendants did have the Plaintiffs' IP in their possession.

78.   Defendants made this representation in order to induce Plaintiffs to agree to and execute the Settlement.

79.   Defendants, through their retention, modification, and use of misappropriated Plaintiff's IP, profited while engaging in trading commodities and futures and as a direct and proximate results of the improper use of Plaintiff's IP, and Defendant's improper development and modification

---

[1] MBIA Ins. Corp v. Credit Suisse Securities (USA) LLC No. 603751/09 927 N.Y.S. 2d 517, 530, 32 Misc, 3d 758, 773, 2011 N.Y. Slip Op. 21191, 2011 WL 2162811 (Sup Ct, June 01,2011)

thereto; those profits were in an amount not yet fully ascertained, but believed to be not less than $1 million to be determined at trial.

80.   By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1 million.

81.   In the alternative, by reasons of the foregoing, Plaintiff is entitled to disgorgement of any and all profits improperly derived from Defendants' fraudulent inducement, in an amount to be determined at trial, but believed to be in excess of $1 million.

82.   Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

83.   Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### THIRD CAUSE OF ACTION
### FRAUD (COMMON LAW)

84.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein.

85.   The elements of a cause of action for fraud require a material representation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the Plaintiff and damages. [2]

86.   "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful deceit, breach of trust or under influence, the circumstances constituting the wrong shall be stated in detail."[3]

---

[2] Eurycleia Partners, LP v. Seward & Kissel, LLP 910 N.E. 2d 976, 979, 883, N.Y.S.2d 147,150, 12 N.Y.3d 553,559 [NY 2009]
[3] N.Y. CPLR 306 (McKinney 2018) ("Particularly in specific actions")

87.  Defendants represented and warranted that they did not have in their possession, and would not retain, or use, modify, reverse engineer, or otherwise misappropriate Plaintiff's IP, as previously and further described by the full language of the contract contained with Exhibit 1, attached hereto.

88.  Defendants knew, however, that Defendants did have Plaintiffs IP in their possession.

89.  Defendants made this representation in order to induce Plaintiffs to agree to and execute the Settlement.

90.  Plaintiffs in reliance on Defendant's representations, did in fact agree to and execute the Settlement.

91.  In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendants' fraud, in an amount to be determined at trial, but believed to be in excess of $1 million.

92.  Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

93.  Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.


## FOURTH CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS

94.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

95.  The Plaintiffs IP as well as its risk management strategies, hedging techniques, know-how, methods, models processes and techniques constitute trade secrets and confidential and proprietary

information. Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. This information is a valuable asset of Plaintiffs and has independent economic value.

96.   Recipients have acknowledged and identified that Plaintiffs possessed trade secrets that shared under agreements of obligations of confidences, were shared with Defendants and were the crux of Plaintiff's commercial value.

97.   Plaintiffs' IP are  (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value from not being known to other persons[4]

98.   To succeed on a claim for misappropriation of a trade secret under New York law, a plaintiff "must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."[5] New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret.[6]

99.   Under this definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b, at 5 (1939) (*quoted in Ashland,* 82 N.Y.2d at 407, 624 N.E.2d at 1013, 604 N.Y.S.2d at 918). "[I]t is

---

[4] *See* New York law (*see e.g., Schroeder v. Pinterest,* 133 A.D.3d 12 (2015); and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq.*

[5] *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir. 1990) (citation and quotation marks omitted) (citing cases and Restatement (First) of Torts § 757 cmt. b (1939) (quoted in *Ashland Mgmt. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ) ).

[6] *See Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012, 604 N.Y.S.2d 912, 917 (1993); *Delta Filter Corp. v. Morin,* 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3d Dep't 1985) (per curiam); *see, e.g., Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dep't 1982).

not simply information as to single or ephemeral events in the conduct of the business"; rather, it "is a process or device for continuous use in the operation of the business." *Id.*

100. In particular, Plaintiffs' IP derives independent economic value, actual or potential from not being generally known to other persons, who can obtain economic value from its disclosure or use. of the information. Plaintiffs took and takes reasonable measures to maintain the secrecy of Plaintiffs' IP. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

101. Defendants misappropriated Plaintiffs IP by deliberate actions which include but not limited to : (1) the acquisition of Plaintiff's IP using improper means, including by fraudulent inducement of various agreements including the Settlement Agreement and Implied Agreements (2) breach of their confidential relationship with Plaintiffs to maintain the secrecy and restrictive covenants of Plaintiff's IP, including but not limited to the restrictions and confidential obligations in the various non-disclosure agreements and Settlement Agreement; (3) ongoing use and profit of Plaintiffs IP for their own economic benefit without the express or implied consent of Plaintiffs; all in violation of New York law, and the Defend Trade Secrets Act "DTSA".

102. Based on the willful and intentional misappropriation of Plaintiffs' IP: (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' IP until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's IP; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ; (3) an equitable accounting for all profits or benefits arising out of such breach (4) exemplary damages including but not limited to all

special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees.

103. Further, since Defendants have utilized and disseminated trade secrets across state lines, where disclosures were made and accessed from Plaintiff in New York, and  New Hampshire Defendants are liable for misappropriation across interstate lines of commerce under the Defend Trade Secrets Act.

104. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

105. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## FIFTH CAUSE OF ACTION
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

106. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, supra, as if fully set forth at length herein.

107. Defendants only had access to the Plaintiffs' IP because of the relationship between the parties, which was governed expressly by confidentiality restrictions, including but not limited to those in the Settlement. Defendants did not have access to the same information without this relationship because otherwise they would not have the "guidance" and reference from which to migrate their hedging strategies, and build trading strategies, methods, techniques, processes, models with similar functionality and design to the Plaintiffs IP, and improve profits.

23

108. The primary focus of a misappropriation of confidential information claim is "the relationship of the parties at the time of disclosure and the intended use of the information". ID. Thus, it is the parties' relationship and expectations that are key, whereas for a trade secret claim the focus is on the nature of the information that a party seeks to protect. (see **MCS vs. Dell Opinion**) Defendants did not have access to the same information without this relationship with Plaintiffs, because otherwise they could have created their product without the necessity of engaging with or requiring disclosure from Plaintiffs.

109. Plaintiff also asserts misappropriation of other Confidential Information, for Defendants unjust enrichment and gain, 3ven if information at issue is (in part) publicly available, and so does not "rise to the level of a trade secret" it may still be protectable as confidential and proprietary information. (**Lamorte vs. Burns NJ**). The contracts also clearly specified that the terms and payment of licensee fees under which the contracts were materially negotiated were under a confidential license, including the output of the software.

110. Further Defendants are in the competitive risk management business, and offer their use provides a competitive benefit, at the expense of Plaintiffs. Further they breached their independent duties of confidentiality to protect and not use the information. Finally Defendants have misappropriated Plaintiff's IP for their own personal benefit. Plaintiff also alleges that Defendants have been unjustly enriched based upon the misappropriation of the Confidential Information. [7]

111. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

---

[7] SRM BEAUTY CORPORATION, Plaintiff, v. SOOK YIN LOH and Trendy Beauty Spa, Inc., Defendants. No. 20273 2010.Feb. 14, 2011.

112. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT

113. Plaintiffs repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

114. Defendants have profited over $1 million a year, and retained other economic value and benefit, including but not limited to non-payment of Plaintiffs for services, license fees, royalties and profit sharing commissions, as well as incurred other cost savings, other renumeration and benefits. and without fair and just compensation to the Plaintiff for its misappropriation and violations of the Settlement.

115. Further, both prior to and subsequent to the Settlement, Defendants have incorporated system design improvements, software functionality features, methods, processes and techniques, and in-house models, under express restrictions of doing so, reliant on the Defendant's promises of renumeration under an Implied Agreement. Plaintiff has not received compensation for such services, software, IP royalties, licensee fees or royalties, for the performances made after September 2016, yet Defendant's have benefitted in amounts in excess of $1 million dollars.

116. Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges "(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." [8] The essential fact necessary to prove such a claim is that "one party has

---

[8] Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (citation and internal quotation marks omitted); accord Paramount Film Distrib. Corp. v. State of N.Y., 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 2 N.E.2d 695 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."), cert. denied, 414 U.S. 829, 94 S.Ct. 57, 38 L.Ed.2d 64 (1973).

received money or a benefit at the expense of another." Kaye, 202 F.3d at 616 (citation and internal quotation marks omitted)

117. The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another. [9] Under New York law, a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust. [10]

118. Plaintiff may plead this cause, in the alternative since unjust enrichment applies even where the parties have an express contract *if:* (1) the plaintiff cannot recover under the contract because the plaintiff is guilty of breach of contract, and (2) the defendant would nevertheless be unjustly enriched by keeping the plaintiff's services or money without some payment. [11]

119. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

120. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

SEVENTH CAUSE OF ACTION
**PROMISSORY ESTOPPEL**

121. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

---

[9] *Miller v. Schloss,* 218 N.Y. 400, 113 N.E. 337 (1916).
[10] *See Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982). Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 263 (2d Cir. 1984)
[11] *Vines v. Orchard Hills, Inc.,* 181 Conn. 501, 435 A.2d 1022, 1028 (1980) Fabri v. United Technologies Int'l, Inc., 387 F.3d 109, 128 (2d Cir. 2004)

122. To establish a promissory estoppel it must be shown that the Defendant made a clear and unambiguous promise upon which the plaintiff reasonably relied to his or her detriment".[12]

123. Plaintiffs allege that they relied on repeated promises of payment by Defendants, including but not limited to after the Settlement, foregoing other work so that they could devote a substantial number of man hours" towards work for Defendants, including disclosing valuable system designs model improvements, and hedging strategies Defendants promises of compensation, were relied upon, in order for them to have performed such services, software, IP, and other contributions of value to Defendant's business. Defendants made numerous promises of Payments, in or after September 2016 upon which Plaintiffs relied, prior to engaging in further business dealings with them. Injustice can be avoided only by enforcing Northland's promise of payment.

124. After the Settlement Agreement, Plaintiffs provided a variety of services, software licenses, and work product, and disclosed trade secrets and confidential information over a four to six period with a reasonable expectation of remuneration that never materialized. Defendants on the other hand, retained the benefit of those services, including recommendations that increased profits and improved hedging and risk management in amounts in excess of $1 million dollars.

125. Defendants benefitted materially from Plaintiff's services, and that, as a result of multiple emails, phone calls and verbal assurances between Plaintiffs invested significant resources in Northland, relying on the promise and prospect of compensation. These allegations give a factfinder a basis to find Northland liable under one or more of the quasi-contract theories alleged, including but not limited to promised compensation and return of license fees.

---

[12] (*Roufaiel v. Ithaca Coll.*, 241 A.D.2d 865, 869, 660 N.Y.S.2d 595 [1997] [citations omitted]; *see Bunkoff Gen. Contrs. v. Dunham Elec.*, 300 A.D.2d 976, 978, 753 N.Y.S.2d 156 [2002] ). )

126. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

127. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

EIGHTH CAUSE OF ACTION<br>
<b>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING</b>

128. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

129. New York law implies a covenant of good faith and fair dealing in all contracts.[13] This provision "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989). The duty is violated when one party acts to deprive the other of the right to receive the benefits under the agreement.[14]

130. Defendant has failed to act in good faith in its execution and misrepresentations regarding the Settlement agreement. Defendants were fully aware of the conduct which they were undertaking to replicate and create shadow systems and trading programs, reverse-engineering the Plaintiff's IP, and intended to material conceal and obfuscate that activity from Plaintiff, to deny them the fruits of their labor, and their correct royalties, profits sharing and compensation.

---

[13] *Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991); *Russo v. Banc of America Securities, LLC,* 2007 WL 1946541 *6 (S.D.N.Y.2007).

[14] *E*TRADE Financial Corp. v. Deutsche Bank AG,* 631 F.Supp.2d 313, 388 (S.D.N.Y.2009); *Don King Productions, *226 Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990). Schroeder v. Capital One Fin. Corp., 665 F. Supp. 2d 219, 225-26 (E.D.N.Y. 2009)

131. Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included[15] Even if a party is not in breach of its express contractual obligations, it "may be in breach of the implied duty of good faith and fair dealing ... when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain"[16]

132. Defendants acted with bad faith and with deliberate intent to circumvent his obligations under the agreements to deprive and or significantly reduce Plaintiffs' of their share of the incentive compensations and bonuses and other deprivation of commercial benefits that were relied upon as consideration of the bargain. A new arrangement to deprives it of the fruit, or benefit, of its labor is considered bad faith.[17]

133. Further Defendants violated an obligation that is not inconsistent with the other terms of the previous Engagement Contracts between the Defendants and the Plaintiffs.[18]

---

[15] (*see New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763; *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289; *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86; *Outback/Empire I, Ltd. Partnership v. Kamitis, Inc.*, 35 A.D.3d 563, 825 N.Y.S.2d 747).

[16] (*Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.*, 23 Misc.3d 1129[A], *8, 2009 WL 1425252, 2009 N.Y. Slip Op. 50997[U]; *see Moran v. Erk*, 11 N.Y.3d 452, 456, 872 N.Y.S.2d 696, 901 N.E.2d 187; *Dalton v. Educational Testing Serv.*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289). Elmhurst Dairy v Bartlett Dairy, No. 12116/11, 2011-08774, 949 N.Y.S.2d 115, 118, 2012 N.Y. Slip Op. 05720, 2012 WL 3024000 (N.Y.A.D. 2 Dept., July 25, 2012)

[17] (*see Moran v. Erk*, 11 N.Y.3d at 456, 872 N.Y.S.2d 696, 901 N.E.2d 187; *see Dalton v. Educational Testing Serv.*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289; *see also* UCC 2–306[2]; *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F.Supp. 1004, 1009). Elmhurst Dairy v Bartlett Dairy, No. 12116/11, 2011-08774, 949 N.Y.S.2d 115, 118, 2012 N.Y. Slip Op. 05720, 2012 WL 3024000 (N.Y.A.D. 2 Dept., July 25, 2012)

[18] (*see Dalton v. Educational Testing *785 Serv.*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289; *Phoenix Capital Invs. LLC v. Ellington Mgt. Group, L.L.C.*, 51 A.D.3d 549, 550, 859 N.Y.S.2d 46), and it is not duplicative of the cause of action alleging breach of contract. Elmhurst Dairy v Bartlett Dairy, No. 12116/11, 2011-08774, 949 N.Y.S.2d 115, 118–19, 2012 N.Y. Slip Op. 05720, 2012 WL 3024000 (N.Y.A.D. 2 Dept., July 25, 2012)

134. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

135. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## NINTH CAUSE OF ACTION
## BREACH OF IMPLIED-IN-FACT CONTRACT

136. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

137. Subject to the disclosures subsequent to the Settlement Agreement that the parties would consummate a purpose and business relation of mutual benefit, the parties initiated an Implied Agreement in or around September 2016. But for the express restrictions and disclosures under the Implied Agreement, Timetrics would not have entered into the Implied Agreement or performed services thereunder. This contract was enacted upon by the parties in action, and memorialized in various email exchanges, and payments made by Defendant Larkin personally.

138. For a contract to exist, it need not be memorialized in a written form. Even if an express written contract does not exist, a contract may be "implied in fact" as a result of "an inference from the facts and circumstances of the case." [19] "[A]lthough not formally stated in words," an implied-

---

[19] _Leibowitz v. Cornell Univ._, 584 F.3d 487, 506 (2d Cir. 2009) (quoting _Jemzura v. Jemzura_, 36 N.Y.2d 496, 369 N.Y.S.2d 400, 330 N.E.2d 414, 420 (1975)). However, "[a] contract cannot be implied in fact where there is an express contract covering the subject matter involved." _Saeed v. Kreutz_, 606 F. App'x 595, 597 (2d Cir. 2015) (summary order) (quoting _Julien J. Studley, Inc. v. N.Y. News, Inc._, 70 N.Y.2d 628, 518 N.Y.S.2d 779, 512 N.E.2d 300, 301 (1987)). "The terms of an implied-in-fact contract turn on the conduct of the parties." _Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc._, 448 F.3d 573, 582 (2d Cir. 2006) (citing _Watts v. Columbia Artists Mgmt. Inc._, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (3d Dep't 1992)).

in-fact contract "is derived from the presumed intention of the parties as indicated by their conduct." *Id.* at 506–07.

139. The parties operated under an implied-in-fact contract—the Implied Agreement—pursuant to which Defendants committed to contribute various capital contributions and other renumeration to Plaintiff Kumaran and Plaintiffs . Plaintiffs also provided services, work product, disclosed confidential information in exchange for Defendant's compensation schedules, which were also made personally and individually by Larkin, on behalf of Defendants.

140. The parties operated under the Implied Agreement for about six months, during the period September 2016 – March 2017, subsequent to the Settlement Agreement, where Plaintiffs provided services, software license fees, and disclosed other Plaintiff's IP and were Defendant's had started making payments to Plaintiffs.

141. This alleged course of conduct, accepted as true, suffices to establish the existence of an implied-in-fact contract.[20]

142. There was no express contract regarding the services, software licensee being provided by Plaintiffs during the period of September 2016 – March 2017, and services were provided relied on the Implied Contract.[21] Under New York law, the "manifestation or expression of assent necessary to form a contract may be by word, act, or *conduct* which evinces the intention of the parties to contract." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (citing *Maffea v.*

---

[20] *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977) (holding that courts should look to "objective manifestations of the intent of the parties as gathered by their expressed words and deeds" to determine the existence of a binding contract).

[21] *See Nwachukwu v. Chem. Bank*, No. 96-CV-5118 (KMW), 1997 WL 441941, at *8 (S.D.N.Y. Aug. 6, 1997) (observing that, under New York law, a "plaintiff's assertion of a claim based upon an implied contract" may only be dismissed if "[t]he existence of an express contract" has been definitively established).

*Ippolito*, 247 A.D.2d 366, 367 (N.Y. 2d Dep't 1998)). Thus, "[a] party's conduct indicates assent when he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* (citation omitted).

143. Plaintiffs has alleged, including based on the parties' conduct, the existence of at least an implied agreement with Defendants' under which Defendants would compensate Plaintiffs for their ongoing provision of services, software, design improvements, hedging techniques and IP disclosures to Defendants.

144. Plaintiffs performed their obligations under the Implied Agreement but Defendants breached the Implied Agreement in multiple ways including but not limited to making payments to Plaintiffs under the Agreements. Plaintiffs have suffered injury in lost revenue, failure to receive compensation for its services, software and incentive compensations, and salary bonuses, and losses in the capital contributions.

145. Defendant's conduct was also a breach of the duty of commercial reasonableness is a breach of contract claim.[22]

146. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

147. Defendants, jointly and severally, conduct was intentional, dishonest, fraudulent, wilful and intentional to harm Plaintiffs, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## TENTH CAUSE OF ACTION
## FRAUDULENT INDUCEMENT OF IMPLIED-IN-FACT CONTRACT

---

[22] See Beninati v. F.D.I.C., 55 F. Supp. 2d 141, 147 (E.D.N.Y. 1999)

148. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein;

149. Under New York law, a plaintiff must allege four elements to state a claim for fraudulent inducement: (1) a material misrepresentation of a presently existing or past fact; (2) an intent to deceive; (3) reasonable reliance on the misrepresentation by the plaintiff; and (4) resulting damages. *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012).

150. Plaintiffs allege that Larkin, acting in his capacity as CEO of Northland and President of Hedge Solutions, and Northland and Hedge, falsely made material representations to Plaintiffs in or around September 2016, at specific dates, times and places as alleged herein, and thereafter, that Defendants would honor numerous compensations agreements, salary bonus structures and reinstatement of software license fees, in exchange for services, and substantial profit sharing in hedging improvements. In making these statements, Larkin was acting as President of Hedge Solutions and CEO of Northland Energy and was representing Northland as a whole.

151. Plaintiff alleges that in telephonic phone calls and emails that occurred on September 8th 2018, and September 9th, 2018 and numerous other days and times in the month of September and October 2016, Richard M. Larkin phoned Plaintiffs from either his office or home located at 32 Helen Court, Goffstown, New Hampshire using his cellphone 603-315-3908 to Ms. Kumaran who received the phone calls on the telephone number 212-431-5098 who was located at her home and office located at 240 West 74th Street, New York, NY. 10023.

152. Plaintiff also alleges that numerous telephone communications occurred during the period September 2017 and December 2018, including meetings at the Marriott Hotel, located in New York City and at the Tavern on the Green in New York City.

33

153. Defendants have a long standing policy of deceptive business practices, and concealing information from others, and a record of regulatory and compliance violations. Manifesting this pattern of deceit, Larkin, acting in his capacity as CEO Of Northland and President of Hedge Solutions, these material representations were false, as Larkin was concealing his representations and business transactions from other employees, officer, directors, including the Controller, CCO and others.

154. These misrepresentations were made for the purpose of inducing Plaintiffs entering into the Implied Agreement and to continue to disclose more IP, trade secrets, and confidential information and continue providing services, software, design improvements, contributions to Defendants, that were subsequent to the Settlement. Defendants are therefore liable for fraudulent inducement.

155. Further, reliant on the representations, Plaintiff's continued to provide services, software and other upgrades, design and recommendation in hedging strategies, and disclose IP, Confidential Information and Trade Secrets, to Defendants. Further, Plaintiffs reasonably relied on Larkin's representations in deciding to enter into the Implied Agreement, and proceeding to provide services, software, risk management and hedging upgrades and techniques, disclose further IP, and dilute its time management from the other activities to assist Defendant's business, reliant on the cashflow and revenue incentive compensations that were promised by Defendants.

156. Plaintiff's had been engaged by Defendants before for a period of about four (4) years, and reasonably expected these payments to be made, under the terms of the previous Software License Agreements, and Consulting Services agreements which were to be reinstated.

157. Given the short deadlines that Defendants represented were for the trading live during the months of September 2016-March 2017, Plaintiffs accelerated its timeline to provide services,

software, risk management and hedging techniques and improvements of financial value to Defendants reliant on the compensations schedules.

158. Further with reckless disregard for the truth, Defendants had no intention of making payments to Plaintiffs, as Larkin was not willing to comply with the FCM's regulatory compliance laws, of mandatory reporting of CTA's, and the Managed Account with full and transparent disclosures of incentive payments, and it would not have been possible.

159. Therefore Defendants knew at the onset that his representations were false, and that compensations through Northland and Hedge could not have been made, and intended to deceive Plaintiffs to turn over more IP, Confidential Information, provide services and proceed with the Implied Agreement, while all the time increasing profits and revenue to Defendants.

160. Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Implied Agreements, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder.

161. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

162. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT (TIMETRICS NDA)

163. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein.

164. The Timetrics NDA dated March 22nd, 2011 was a valid and binding contract upon all parties, including Defendants, supported by adequate consideration.

165. Plaintiffs fully performed all duties and obligations under the contract.

166. Defendants represented and warranted that they it would only use Plaintiffs IP for mutual benefit, would not retain, or use, or modify, reverse engineer, or otherwise misappropriate Plaintiffs' IP, as previously and further described by the full language of the contract contained in Section 2, Section 3 and otherwise therein.

167. Defendant's materially breached the contract by violating the several provisions concerning the Plaintiffs' IP and specifically by retaining, using, modifying, reverse engineering, and in other ways misappropriating Plaintiffs' IP, in derogation of their express representations contained within the contract, including but not limited to those under Section 3.a and 3.b.

168. Defendants, through their retention, modification, and use of misappropriated Plaintiffs' IP, profited while engaging in trading commodities and futures, as a direct and proximate result of the improper use of the Plaintiffs' IP, and Plaintiffs improper development and modification thereto, those profits were in an amount not yet fully ascertained, but believed to be not less than $1 million to be determined at trial.

169. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1million dollars.

170. In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendant's breach of contract, in an amount to be determined at trial, but believed to be in excess of $1 million.

171. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.

172. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

RELIEF REQUESTED

WHEREFORE, Plaintiffs The A Star Group, Inc d/b/a Timetrics and Samantha Siva Kumaran

demands that this Court render a judgment against Defendants, jointly and severally;

173. Enjoining Defendants, their offices, employees, agents, successors, and all other persons in

active concert or participation with them, from:

      a.    Continuing to use or engaging in any and all trading activities of commodities or

futures products, which are in any way derivatives of the possession, use or derivative

modification, development, or reverse-engineering of Plaintiffs' IP, as described in the

Settlement Agreement.

174. Awarding:

      a.    Compensatory damages in an amount to be determined at trial, but believed to be
           in excess of $1 million;

      b.    Costs and disbursements;

      c.    Attorneys fees, in an amount to be determined, as provided for in the Settlement
           should Plaintiffs be the prevailing party;

      d.    Exemplary damages including  but  not  limited to all special, indirect,
           punitive, consequential or other damages; [INSERT]

      e.    Pre-judgment and post-judgment interest; and

      f.    Such other relief as is just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY

Dated: New York, New York

September 6th 2019.

JS 44C/SDNY
REV. 06/01/17

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS    SAMANTHA SIVA KUMARAN
THE A STAR GROUP, INC

DEFENDANTS    NORTHLAND ENERGY TRADING LLC
HEDGE SOLUTIONS, INC
RICHARD M. LARKIN

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)    ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

BREACH OF CONTRACT, SETTLEMENT AGREEMENT

Judge Previously Assigned

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ]

If yes, was this case  Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ]  If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No [x]    Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)    NATURE OF SUIT

## TORTS

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[x] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**

[ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**PERSONAL INJURY**

[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING

[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**

[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**

[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**

[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**IMMIGRATION**

[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

## ACTIONS UNDER STATUTES

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**SOCIAL SECURITY**

[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**

[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE

[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS

[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION

[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

DEMAND $_____ OTHER _____ JUDGE _____ DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO    NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

(PLACE AN x IN ONE BOX ONLY)

**ORIGIN**

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from (Specify District)
[ ] 6 Multidistrict Litigation (Transferred)
[ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. all parties represented

[ ] b. At least one party is pro se.

[ ] 8 Multidistrict Litigation (Direct File)

(PLACE AN x IN ONE BOX ONLY)

**BASIS OF JURISDICTION**

*IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [X] 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [X] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [X] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [X] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [X] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

SAMANTHA SIVA KUMARAN
THE A STAR GROUP, INC
119 WEST 72nd STREET #204
NEW YORK, NY 10023

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

NORTHLAND ENERGY TRADING, LLC
HEDGE SOLUTIONS, INC
500 N. COMMERCIAL STREET
MANCHESTER, NY 03101

RICHARD M. LARKIN
32 HELEN COURT
GOFFSTOWN, NH

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [X] MANHATTAN

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)

RECEIPT # _____   Attorney Bar Code # _____

*PRO SE OFFICE*

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)