IN THE UNITED STATES DISTRICT COURT
SOUTHTERN DISTRICT OF NEW YORK

_____

SAMANTHA SIVA KUMARAN                  )
THE A STAR GROUP, INC.                  )
d/b/a/ TIMETRICS, and                   )        Case No: 1:19-CV-08345-LBS-DCF
,                                       )        Judge: Lorna B Schofield
                    *Plaintiffs,*        )        Magistrate Judge: Debra C. Freeman
                                        )
                                        )
       -against-                        )        **FIRST AMENDED**
                                        )        **COMPLAINT**
NORTHLAND ENERGY TRADING, LLC           )
HEDGE SOLUTIONS, INC.,                   )
RICHARD M. LARKIN                        )
DANIEL LOTHROP                           )
DOMENIC BRAMANTE                         )
                    *Defendants*         )*,*

_____

Pursuant to Federal Civil Rule 15 (1) (A) Plaintiffs Samantha Siva Kumaran ("Kumaran") and

The A Star Group, Inc. d/b/a/ Timetrics ("Timetrics") (herein collectively called "Plaintiffs") ,

submit a first amended complaint, which alleges as follows:

## PRELIMINARY STATEMENT

1.   This is a civil action under New York State law for breach of contract, fraudulent inducement,

misappropriation of trade secrets, unjust enrichment, and common law fraud, seeking

disgorgement of wrongfully-derived profits brought by Plaintiffs against Defendants;

2.   Plaintiffs are in the business of consulting and developing computer software used by

commodities traders to increase profits and reduce hedging risks by using advanced mathematical

tools and procedures.  Defendants are two commodities trading firms, their owner and employees,

all of whom specialize in the hedging of large volumes of fuel oil.

3.   Defendants engaged in an extensive and well-orchestrated fraudulent scheme to steal

Plaintiffs valuable trade secrets and intellectual property and to cut Plaintiffs out of their fair share

of IP and Software License Fees and not pay their share of Trading Royalties.

First Amended Complaint, Page 2

4.    Under the express restrictions of a Timetrics NDA ("Timetrics NDA)", as well as a Timetrics Software End User License Agreement ("EULA"), and numerous other \engagement letters, Plaintiffs disclosed and provided limited license use of its proprietary hedging strategies, software and techniques which are the valuable trade secrets of Plaintiffs' commercial livelihood. Plaintiffs during its twenty years of risk management consulting and software design, had spent hundreds of person-hours developing methods, techniques and formulations and were protected from disclosures by NDA's and limiting use and access by employees, which are the valuable trade secrets of its businesses. The EULA and NDA has numerous restrictive covenants, including but not limited to not creating Derivative Works, and not using the IP to replicate systems onsite.

5.    Between 2011 – 2015, Defendants approached Plaintiffs to implement advanced risk management frameworks and design improved hedging strategies, for which, Defendants promised that large profits sharing, and lucrative incentives and licensee fees would be made in exchange for the use and disclosure of Plaintiffs' IP, software and strategies.

6.    Defendants specifically approached and subsequently retained Plaintiffs as they admitted they could not develop the risk management models  or hedging strategies internally themselves, and needed Plaintiffs to fill a gap in their internal capabilities. Defendants also retained Plaintiffs to make financial improvement to what they certified it had previously achieved as an audited Baseline P&L.

7.    Defendants however, after several beta and demos of Plaintiffs' methodologies and IP, and observing the potential profitability of the Plaintiff's IP intentionally and with scienter, set about a plan, to cut Plaintiff out of its fair share of royalties and  license fees. Larkin, together with two employees Daniel Lothrop ("Lothrop") and Domenic Bramante ("Bramante") at Northland and Hedge, hatched a plan to create a clone copy of Plaintiffs' software and IP, supplement missing risk management infrastructure, tools, models and capabilities, to illicitly transfer onsite to Defendants' businesses, in breach of the express IP restrictions under the Timetrics NDA, EULA and other agreements.

First Amended Complaint, Page 3

8.   The plan was simple: first, approach Plaintiffs under the false pretense that Defendants were interested in purchasing lucrative long term licenses to use the Plaintiff's IP and Software under the IP License Agreement ("License Fees") and offer substantial royalties and profit incentives ("Profit Sharing"); second, gain access to the Plaintiffs' IP and Software including details of inner workings under a "FAT" Test, during which they obtained detailed disclosure of multiple improvements to their business operations; and last, create a copycat product for use, which they called the "OBT Book", which was fraudulently concealed from Plaintiffs.

9.   However, unknown to Plaintiffs, around 2014 Defendants had already launched its copycat OBT Book System for use in a risk management, production and trading environment. implementing hedging gallons from its Heating Oil book, and transferred an estimated several millions of gallons over to replicate the hedging strategies from Plaintiffs, reaping profits to Defendants without making payments to Plaintiffs.

10. Lothrop, Bramante and Larkin, made numerous fraudulent statements, included herein in Affidavit 1-3, in order to brazenly misappropriated Plaintiffs programs and IP, including the risk monitoring framework, in express breach of the all agreements, EULA, Timetrics NDA – calling their copy-cat system the "OBT Book" a Derivative Work with willful infringement of Plaintiffs' IP and breach of the EULA and NDA.

11. Defendants plans backfired, after Lothrop and Larkin encumbered the account with numerous unauthorized synthetic futures, resulting in miscalculations of margin calls along with notorious absences from the trading floor.

12. After a chronic pattern of late payments, Defendants then failed to pay outstanding invoices, an action initiated by Plaintiffs for non-payment of invoices in New York State Supreme Court. County of New York, designated case number 651629/2015, thereafter removed to the United States District Court for the Southern District N.Y., designated as case number 15-cv-04660.

13.   With full knowledge that Larkin had infringed the IP protection provisions of the EULA, and Timetrics NDA, Larkin made fraudulent representation and warranties to induce Plaintiffs to the

Settlement, where the invoices were paid in full together with Plaintiffs attorney fees, to terminate

the prior engagements; to avoid his liabilities to pay the ongoing license fees and royalties.

14.   Reliant on fraudulent representations by Larkin, who was materially concealed the OBT

book, on May 9th, 2016, Plaintiffs enter into a "Mutual Release and Settlement Agreement"

(hereinafter the Settlement") with Defendants, The Settlement is attached hereto as Exhibit 1.

15.   Defendants however at the time were already in breach of the contract by retaining the

valuable and proprietary IP  which includes without limitation Plaintiff's risk management tools,

hedging strategies, designs, models, processes, techniques, algorithms, hedging methodologies,

graphical interfaces, decision support tools, Timetrics Software and other Confidential

Information, (hereinafter "IP"), creating from this Derivatives, which Defendants explicitly

represented and warranted as part of the Settlement that they would not retain or subsequently use,

and which the Settlement explicitly prohibited the retention and use of, as well as the subsequent

preservation and modification, or in all other ways subsequent development from principles,

methodologies and techniques contained within the protected IP.

16.   As the inclusion of such protections, was a vital negotiated term of that Settlement Agreement

and essential to the foregoing, without which Plaintiffs would not have entered into any settlement,

Larkin, Northland and Hedge fraudulently induced Plaintiffs into entering into the Settlement by

their knowing and intentional breach of this term in particular, Defendants' representation and

warranty that they disclaimed and would not retain, use, duplicate, or otherwise misappropriate

Plaintiffs' IP, or right, title, and/or interest in and to Plaintiffs' IP, was a nullity as of the moment

the Settlement was executed and at no point after execution of the Settlement did Defendants act

to comply with that term of the Settlement, instead knowingly and willingly retaining, concealing,

developing, modifying, and ultimately utilizing Plaintiff's IP for ongoing profit.

17.   After now implementing their version of the copycat "OBT Book", Larkin desired to study

and replicate new functionalities, technical improvements, and updates Plaintiffs' programmed

between 2015-2017 into the Plaintiffs IP and software, and trading strategies – all of which was

borne from significant investment and development by Plaintiffs. Even though Defendants had

First Amended Complaint, Page 5

already illicitly cash-flowed benefits in excess of one million dollars annually, without compensation to Plaintiffs. Defendants recognized the OBT Book was still inferior to the Plaintiffs IP and original Timetrics Software, in being able to full maximize the hedging improvements and create revenue and realized that further proprietary information and trade secrets were needed to obtain Plaintiff's unique updates and strategies ("Missing Pieces").

18. In September 2016 after the Settlement Agreement, once again, Larkin in his individual capacity, but representing himself as CEO of Northland and Hedge, re-established business relations with Kumaran, and instead, negotiated and agreed with Kumaran, to provide him the Missing Pieces, in exchange for both (a) substantial financial contributions in his personal capacity to launch various hedge funds, which were as yet unformed and (b) promises and assurances that Plaintiffs would receiving ongoing license fees effective April 2017 and revert back to the Profit Sharing previously agreed upon from Northland and Hedge.

19. Continuing a pattern of deceit and fraud, this time Larkin was now concealing his activities from his own employees Lothrop, Bramante, CFO and others employees at Northland and Hedge.

20. Reliant on these representations, and renewed business relations, under the express restrictions of the Timetrics NDA, from September 2016 until around March 2017, Kumaran invested hundreds of hours of work for Defendants Larkin, Northland and Hedge, provided software, IP and services, disclosed trade secrets, that amassed significant financial improvements to the hedging strategies OBT Book, for which to date it still has not received compensation.

21. Kumaran, under the express terms of the signed agreement *Timetrics NDA* disclosed with express promises of renumeration of the IP and Software License Fees, and Trading Royalties, provided Larkin during the period of around September 2016 until around March 2017 disclosure of advanced features, designs, functionality of Trade Secrets and IP which Larkin acknowledged and accepted use of improvements to Defendants. Defendants, Larkin, Northland and Hedge have failed to make payments for those enhancements, improvements and features as promised and continued to use and incorporate them in their business without compensation to Plaintiffs.

First Amended Complaint, Page 6

22.   Defendants implemented, used and profited from those improvements in New Hampshire, used trade secrets in interstate commerce in violation of the Defend Trade Secrets Act. The Missing Pieces and trade secret information were disclosed under the express restrictions of the Timetrics NDA. Larkin never fulfilled his commitments of providing the capital he promised, and despite hundreds of hours of services to Defendants Northland and Hedge, Larkin failed to make the compensations that were assured in royalties, profit sharing and license fees. In fact Larkin had no intention of making those payments, as Larkin was concealing all his activities from his own employees Lothrop and Bramante, and was only trying ti acquire further trade secrets and IP from Plaintiffs, and then resign, fraudulently inducing Plaintiffs to numerous hours of eservices and disclosures of software design features..

23.   Plaintiffs are entitled to damages for the improper and unlicensed use of the Plaintiff's valuable IP and service, as well as disgorgement of profits, garnered by Defendant's improper use of Plaintiff's valuable IP and service in the marketplace.

24.   Defendants' conduct additionally should be declared unlawful and enjoined, was intentional, knowing,   with the wanton disregard of Plaintiffs' rights, with deliberate intent to deprive Plaintiffs' rights to the of the fruits of their labor, and rights in and to its IP, and justifies an award of punitive damages.

## JURISDICTION AND VENUE

25.   Plaintiffs bring this action to recover damages for breach of contract, misappropriation of trade secrets, fraud and other causes of action arising out of the Timetrics NDA, Settlement Agreement dated May 9th 2016, EULA, and other agreements, as well as an Agreement in Principle during September 2016 until around March 2017 for services provided in New York.  Plaintiffs first uncovered or learned of the misappropriation and other causes on September 8th , 2016 and was unaware of the activities until after that date.

26.   This Court has jurisdiction pursuant to 28 USC 1332 based upon diversity, as Plaintiffs are citizens of the State of New York, and defendants are citizens of the State of  New Hampshire, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

First Amended Complaint, Page 7

27.   Venue is proper in this District under 28 U.S.C. 1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and in addition by way of Section 15 and 16 of the Settlement.[1]

28.   This Court also has jurisdiction under the provision under the Timetrics NDA. Paragraph 7 which identifies exclusively Choice of Law and Venue of, New York.[2]

29.   This Court also has jurisdiction under the provision under the EULA, which states in Paragraph 24 and 25, jurisdiction and venue is exclusively  in New York, New York.[3]

## PARTIES

30.   Plaintiff The A Star Group, Inc d/b/a Timetrics is a corporation, formed under the laws of the State of New York, with a principal place of business in New York City, County of New York, and State of New York. Principle address is 119 West 72nd Street, #204, New York NY 10023

31.   Plaintiff Samantha Siva Kumaran ("Kumaran") is an individual residing at 240 West 74th Street, New York, NY 10023, and a United States citizen..

32.   Upon information and belief, Defendant Northland Energy Trading, LLC ("Northland") is a limited liability corporation formed under the laws of the State of New Hampshire with its principal place of business 500 N. Commercial Street, Suite 400A, Manchester, NH, 03101. Upon further information and belief, Northland's majority Managing Member and principal owner is Richard M. Larkin , a citizen of the State of New Hampshire, who exercises majority and sole dominion over the affairs over Northland.

---

[1] Section 16: "Choice of Forum": In the event of a breach of this Agreement or any other dispute arising out of this Agreement, the Parties agree that such dispute shall be resolved through a court of competent jurisdiction in the state of New York."

[2] Recipient hereby  attorns to  the exclusive jurisdiction  of the State of New York, City of New York in the rough of Manhattan and hereby waives any jurisdiction, venue and/or inconvenient forum objections to any state or federal court sitting in the State of New York, City of New York, Borough of Manhattan, and Recipient agrees to submit to the jurisdiction of said courts for all purposes.

[3] Licensee hereby agrees to attorn to and submit to the exclusive jurisdiction and venue of the State or Federal courts of New York City in the Borough of Manhattan, in the State of New York, and Licensee hereby waives any jurisdiction, venue and/or inconvenient forum objections to any state or federal court sitting in the City of New York, Borough of Manhattan, in the State of New York and Licensee agrees to submit to the jurisdiction of said courts for all purposes. The parties intend that this EULA shall be enforced to the greatest extent in time, area and degree of participation, as is permitted by law.

33.  Upon information and belief, Defendant Hedge Solutions ("Hedge") is a corporation formed under the laws of the State of New Hampshire with its principal place of business 500 N. Commercial Street, Suite 400, Manchester, NH, 03101. Upon further information and belief, Hedge is an affiliate of defendant Northland, with which it shares a common owner, Richard Larkin who exercises sole dominion and control over the affairs over Hedge.

34.  Richard M. Larkin ("Larkin) is an individual residing at 32 Helen Court, Goffstown, New Hampshire and upon information and belief is the 100% owner and President of Hedge Solutions and the CEO and Managing Member of Northland Energy Trading, LLC with majority of the membership interest.  Upon information and belief, Larkin exercises sole dominion and control over both entities, and is an agent of both Northland and Hedge.

35.  Daniel Lothrop ("Lothrop") is an individual residing in New Hampshire and upon information and belief is an employee of Northland Energy Trading, LLC, and works simultaneously for both Northland and Hedge Solutions. Upon information and belief, Lothrop is an  agent of both Northland and Hedge. His email account (daniel@hedgesolutions) however is managed by the affiliate Hedge Solutions, who share infrastructure, capital and resources including financial benefits from the agreements. Lothrop was one of the primary employee involved in the services and software licenses during the period March 2014 - March 2015 which is the period of dispute and the recipient of Plaintiffs IP and Trade Secrets during the which the misappropriations and unjust enrichment alleged in the Complaint first started to take place.

36.  Lothrop was individually a party to the EULA, his own direct acts and omissions and fraud, involved in the services and software licenses, was individually a party and liable for the acts, omissions and fraud which is the period of dispute and the recipient of Plaintiffs IP and Trade Secrets during the which the misappropriations and unjust enrichment alleged in the Complaint first started to take place.

37.  Domenic Bramante ("Bramante") is an individual residing in New Hampshire and upon information and upon belief is a full time employee of Northland Energy Trading, LLC, and works simultaneously for both Northland and Hedge Solutions.  Bramante is a party to a Software License

First Amended Complaint, Page 9

Agreement with Plaintiffs in his capacity as employee.  Upon information and belief, Bramante is an employee and agent of both Northland and Hedge.

38.  Bramante was individually a party to the EULA, his own direct acts and omissions and fraud, involved in the services and software licenses during the period March 2014 - March 2015, was individually a party and liable for the acts, omissions and fraud which is the period of dispute and the recipient of Plaintiffs IP and Trade Secrets during the which the misappropriations and unjust enrichment alleged in the Complaint first started to take place.

39.  The Plaintiff's IP and Timetrics Software were licensed to Defendants, exclusively under the EULA which contained numerous restrictions and covenants for which Lothrop and Bramante are expressly bound as an individuals[4]. Both Bramante and Lothrop made numerous fraudulent statements and omissions into New York City, as identified in Affidavits 1-3.

40.  The acts, omissions, self-dealing, misrepresentations, and conduct to bind Northland, and Hedge were also the acts, omissions, representations, self-dealing and conduct of  Larkin, acting in hits personal and individual capacity, and also as their agent and/or principle, CEO and President and/or Managing Member of the Company(s), and further made payments of personal checks from his individual bank accounts on behalf of representations made on behalf of the Company(s) Northland and Hedge, and made representations and promises of futures payments to Plaintiffs from Northland and Hedge, in consideration of his own personal gain, and interests and  for the purposes of claims asserted against him individually and personally in this Complaint.

41.  The acts, omissions, misrepresentation and fraud, to enact the plan to misappropriate technologies, software and IP onsite was made by Lothrop, Bramante, individual parties and in their personal capacity, who wer jointly and severally parties to the EULA.

42.  Samantha Siva Kumaran, is a British born, U.S. Citizen, who has had over twenty years' risk experience in the risk management software and services sector, in the financial services and

---

[4] Section 1.1 of the EULA defines  **"Licensee"** shall mean collectively Northland Energy Trading LLC and Hedge Solutions, Inc both New Hampshire Corporations, with offices at 500 N. Commercial Street, Suite 302A, Manchester, NH, 03101 **and its Operators, officers, directors, employees and owners all jointly and severally defined as Licensee.**

energy industry as a professional risk management consultant, and has earned First Class Honors Masters and Bachelors in Applied Math and Theoretical Physics, from University of Cambridge's Trinity College, UK. She has been an entrepreneur for her entire professional life and her businesses are minority-woman-owned small businesses

43.  Kumaran's risk management consulting experience, has primarily been in the Energy and Commodities sector, and includes oversight of risk management departments, development of customized risk management, hedging and risk management analytics and software, risk audit, development of advanced market risk measures for trading floors, and advanced derivatives and options strategies to mitigate risk and increase revenue.  Kumaran spent several years as the Chief Risk Officer at Niagara Mohawk Energy Marketing, Inc in Syracuse, responsible for deployment and enforcement on all aspects of Enterprise Wide Risk Management, and reporting on a C-level.

44.  Plaintiffs have performed risk management consulting services for Fortune 500 companies and other clients, including Credit Suisse First Boston, AIG, Spectron Oil, FEA, Niagara Mohawk Energy Marketing, Nomura Securities, Manitoba Hydro, ABN Amro, JPMorgan, Duke Energy Field Services, Enron, Bristol Myers Squibb, Louis Dreyfus Commodities, Nexant, Fuji Securities, Market Arts Software, Risk Advisory Canada, Blue Rock Energy, Giro Credit, UMS Advisory and Winhall Consulting.

45.  In 2018, Kumaran and Timetrics was featured as a Top 10 Enterprise Trading Risk Management ETRM risk management service provider and solution in CIO Insights. Subsequent to the Settlement, Kumaran passed the Series 3 on or about July 1st, 2016 and became a registered commodities trading advisor ("CTA") on April 4th 2017, to start several new businesses.

46.  Larkin is also a Series 3 holder, and a registered CTA. Subsequent to the Settlement Agreement, Larkin and Kumaran have directly competitive interests in CTA performance and revenue creation and are competitors where performance results of hedging and trading strategies directly ties to commercial and economic value.

First Amended Complaint, Page 11

## FACTS

### TRADE SECRETS

47.  Plaintiff's products and services, include Timetrics Software, customized risk management strategies, designs, reports and license to their IP. Plaintiffs' IP were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, were used to design and compile the programs and to generate the math algorithms and output, to give Plaintiffs a commercial competitive analytical advantage.

48.  Timetrics Software refers to a proprietary suite of various enterprise risk management and analytic technologies, the underlying quantitative processes and analytical engines, methods, techniques, for hedging and managing risk, and mathematical algorithms developed by Kumaran for use in creating new hedging strategies for exchange traded commodity derivatives, primarily in markets for oil and gas futures, electricity transmission contracts, and other energy futures.

49.  Kumaran developed the trade secrets and its business Timetrics over a period of 25 years, since founding her company in 1993. Kumaran is the sole owner of the intellectual property and at no time assigned ownership, rights to any of its corporations. All intellectual property rights and trade secrets are exclusively owned by Kumaran.

50.  The hedging strategies, know-how, methods, processes, and proprietary information and IP including but not limited to the Timetrics Software are the valuable trade secrets of Plaintiffs. Kumaran is also the sole owner of the Timetrics Software and all associated trade secrets, including under assignment from and license to The A Star Group, Inc.

51.  Kumaran a has developed and owns the Timetrics software, service and products which were developed over decades to calculate enterprise wide risk management. Plaintiffs, through Kumaran's specialized and unique math expertise, have charged significant  consulting fees and commercial license fees to clients and customers for the use, access and design of these proprietary tools, which provide a competitive advantage in the market place.

52.  At all times Plaintiffs have protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of

express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the express rubric of its own restrictive non-disclosure agreement. Further Plaintiffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

53.   Defendants acknowledged in agreements, that Plaintiffs' IP and Software (as defined in the EULA ¶27 [5]and Timetrics NDA) shall be considered trade secrets (as defined by statute at 18 U.S.C. sec. 1839(3)), and without exception Confidential and Proprietary Information of Plaintiffs.. and they further acknowledged and agreed that Plaintiffs IP constitutes trade secrets, of Plaintiffs and its suppliers, licensors or subcontractors.. including further acknowledgement that Plaintiff's IP *is the competitive intellectual property of Plaintiffs and is the crux of commercial value and sale price of Plaintiffs' business models and services*. (Timetrics NDA ¶2.b, EULA 27)

54.   Hedge is a software company that also licenses risk management software products to its retail heating oil clients, as well as prices options for hedging price risk to customers, using a product called Hedge Insite. Northland is an over the counter options trading company that sells customized options to small retail heating oil distributors in the North East, and aggregates the physical obligations. It then hedges its exposure by trading options in the Nymex market.

55.   Northland's and Hedge's profits are derived from both the pricing at which they sell to retail customers (with a mark-up a premium) as well as their internal associated hedging strategies to purchase and offset options in the heating oil markets, using risk management processes. Defendants wanted to improve the profitability of their hedging strategies, (as explained more fully below) as their internal hedging strategies had previously achieved a certain Baseline P&L consistently over ten years.

---

[5] **(ii) Trade Secrets:** Licensee further acknowledges and agrees that the licensed materials as defined by Timetrics Software and Timetrics Property constitute Trade Secrets ((as defined by statute at 18 U.S.C. sec. 1839(3)), intellectual property and/or copyrighted material of Timetrics and/or its suppliers, licensors or subcontractors. Timetrics Trade Secrets shall without exception, be considered Confidential and/or Proprietary Information. As such Timetrics Software and Timetrics Property are the valuable Trade Secrets, commercial property and crux of Timetrics competitive advantage. Licensee further acknowledges and agrees that the Timetrics Property is the competitive intellectual property of Timetrics and is the crux of commercial value and sale price of Timetrics business models and services

56.  Plaintiffs provided unique software, risk management models, as well as a proprietary Decision Support Tool, which are all the trade secrets at issue in this case. A Decision Support Tool enables a client, to change how it makes decisions to purchase and sell a commodity. Using an analogy,  a decision support tool on whether to buy an umbrella when its supposed to rain, could tell you to make the purchase 3 days in advance, when the first forecast of rain is out. An alternate Decision Support Tool, could recommend you wait for the day of the forecast, and buy the umbrella an hour before it rains, and hence either save money or reduce risk. The same principle applies to the purchase and sale of heating oil. Plaintiffs proprietary Decision Support Tools, uniquely change the timing, pricing, nature, volume, and strikes of which heating oil options to purchase and how to measure the risk on that purchase, containing proprietary monitoring and graphical interface, and risk framework  designs unique to Plaintiffs, that previously never existed at Defendants. Previously, Defendants certified in the Baseline P&L they only used an internal methodology called Avi's Spreadsheets and Avis Hedging (as described more fully below)

57.  These trade secrets, especially in the use of the Decision Support Tool, can generate and save clients, like Northland and Hedge, millions of dollars for a user, and substantially improve their operations, which is why Plaintiffs charge substantial license fees, and only disclose the information in exchange for profit sharing from the improvements and derive substantial economic value to its business, *See* 18 U.S.C. § 1839(3) (defining trade secret as "information [that] derives independent economic value ... from not being generally known to ... another person who can obtain economic value from the disclosure or use of the information").

58.  Defendants approached Plaintiffs after stating that for over twenty years they had reviewed many software vendors, none of which provided the features, capabilities and design of Timetrics. Use of these Decision Support Tools, in turns allows Northland and Hedge to price more competitively, generate more profits as it has stated it intends to sell its business at a profit, and also gives it in turn a competitive advantage. Since Larkin and Kumaran are both CTA's, Defendants use of the hedging strategies, to credit its own CTA record, directly creates an unfair

competitive advantage in their ongoing use of the strategies and harm to Plaintiffs, in a competitive environment. Plaintiffs always maintain its information in secret.

## ASSIGNMENT

59.  Kumaran is also the sole owner, author and inventor of the IP and the Timetrics Software and, by virtue of assignment and succession, all associated trade secrets, including under assignment from and license to The A Star Group, Inc d/b/a Timetrics.

60.  In or around 2016, Kumaran began to form various new businesses Timetrics affiliates for the purpose of launching various hedge funds. Those businesses were formed during the period December 2015 and May 2018 and are all to operate under the common brand name Nefertiti.

61.  Because Kumaran was migrating to a new business, it was commercially reasonable for Nefertiti not to have to purchase or redevelop all the IP, Software and trades secrets. Therefore AStar agreed to reassign all IP back to Kumaran, to the extent those rights did not already belong to Kumaran, in her individual and personal capacity .

62.  Kumaran was the sole author, inventor and creator of Intellectual Property, Software and trade secrets of AStar during the period 1993-2016. To avoid any ambiguity, and to the extent they did not already belong to Kumaran, AStar and Kumaran assigned and succeeded all intellectual property and trade secrets rights for the IP and trade secrets back to Kumaran for individual ownership, so that they can be all individually owned by Kumaran and at its sole option, re-licensed to the new businesses. ("IP Assignment Agreement") which was dated September 29th, 2016.

63.  Under the IP assignment as of September 29th, 2016. (i) all rights, title and ownership of Plaintiffs IP and Software, as well as right to enforce prior agreements, including the EULA, Timetrics NDA, and all outstanding contracts reverted to its owner and creator Kumaran and (ii) all rights, title and interest to Plaintiff's IP, and Trade Secrets are solely and exclusively owned by. Kumaran. Such rights included assignment and succession of all rights to prior obligations.

64.  This assignment was performed for the activities and transition to several new businesses, for which the Plaintiff's IP and Software would be utilized by Kumaran for advancement in its new businesses, hedging, trading and risk management and under license and would be considered an

First Amended Complaint, Page 15

Intellectual Capital Contribution to the new LLC's All rights, title and interest of all agreements with Defendants, including the Settlement, and to the Plaintiffs IP, trade secrets, are therefore, after September 29th  2016, now solely and exclusively owned by Kumaran in her individual capacity including the rights in and to the contracts that are the subject matter of this action.. Kumaran is individually a party to the Timetrics NDA and Settlement.

65.  All contracts, including the Timetrics NDA, Settlement and EULA and engagement permit assignment, succession and benefit to those successors and assigns.

66.  Since 2016 there has been no assignment by or any sale of any rights to the IP or Software  by Kumaran to any other business entity and Kumaran remains the sole owner of same.

### A - BACKGROUND

67.  In or around March 2011 Defendants approached Plaintiffs to provide use of its proprietary risk management programs and hedging strategies, in order to improve revenues at Defendant's business. Defendants Northland, Hedge and Larkin, approached Plaintiffs to develop specific risk management tools, methodologies, software and hedging strategies as they specifically established, identified and advised Plaintiff they as they did not have such capabilities onsite and could not fulfil internally.

68.  On March 21st, 2011 that the parties entered into an executed Timetrics Non-Disclosure Agreement (***Timetrics NDA")*** attached hereto, which terms and conditions remain in full force and effect in perpetuity as defined under Section 4 and otherwise defined therein, and survived and remain in effect (*See* **Exhibit L1).**

69.  During the period from about November 2011 until March 2015 Plaintiffs provided services and software,  disclosed IP and trade secrets to all Defendants, under the numerous engagement letters, a Terms and Conditions, and s a Timetrics Software End User License Agreement. ("EULA") (See **Exhibit L2)**

70.   The Plaintiff's IP and Timetrics Software were licensed to Defendants, exclusively under the EULA which contained numerous restrictions and covenants and for which Lothrop, Larkin,

First Amended Complaint, Page 16

Bramante are expressly bound as an individuals are directly a party, as an employee who is jointly and severally defined as Licensee.[6].

71.     The EULA and Timetrics NDA contain numerous restrictive covenants and obligations related to the protection of IP and prohibit Defendants from creating Derivative Works. Amongst other provisions EULA ¶6.2 and ¶6.3 states that Licensee shall not…. (v) refer to, obtain guidance from or otherwise use any of the Timetrics Property *as part of an effort to develop a model, spreadsheet, or program having any functional attributes, visual expressions, analytic components or other features similar to those of the Timetrics Property*. The Timetrics NDA and EULA also expressly prohibited the Defendants from creating Derivative Works  See also EULA ¶1.7, Timetrics NDA ¶ 2, 3a and 3b

72.     Defendants further executed promises of highly lucrative profit sharing, ongoing license fees, with substantial royalties payable for any revenue improvements made to Defendants business. The agreements of those revenue sharing compensations was memorialized in Engagement Letter signed, executed and dated October 28th 2011 and also Engagement Letter 5, dated March 1st, 2014, which determined the provisions of revenue sharing, trading royalties, and license fees, upon which Plaintiffs relied in moving forward with the commercial engagements.

### B – DEFENDANTS PRIOR ART AND BASELINE P&L

73.  For a period of about  ten years prior, 2001-2011 Defendant's had relied upon their trader Aviral Chopra ("Chopra") who had been responsible for all hedging strategies and spreadsheets and decisions on the trading floor. had been the exclusive "trader" at Northland Energy,  was solely responsible for the hedging strategies of the Defendants. Defendant's prior hedging strategies, were exclusively performed under a pre-existing model developed by Chopra called "**Avi's Spreadsheets**". Using these spreadsheets their sole decision support tool, Defendants implemented their own prior hedging strategy called "**Avi's Hedging Strategies**"

---

[6] Section 1.1 of the EULA defines  **"Licensee"** shall mean collectively Northland Energy Trading LLC and Hedge Solutions, Inc both New Hampshire Corporations, with offices at 500 N. Commercial Street, Suite 302A, Manchester, NH, 03101 **and its Operators, officers, directors, employees and owners all jointly and severally defined as Licensee.**

74.  Avi's Spreadsheets and Avi's Hedging Strategies were the only basis of hedging strategies and risk management that were used by the Defendant in the management of risk and hedging prior to the engagements with Plaintiffs in 2011. The models, spreadsheets and hedging strategies, graphical interfaces, visual expressions, formulae and approach used by Defendants in Avi's Spreadsheets and Avi's Hedging Strategies were vastly different from and did not contain any of the Plaintiff's IP and were developed independently and implemented before Plaintiffs were hired to work for Northland.

75.  Larkin also admitted that Defendants had reviewed dozens of software vendors over twenty years, none of whom actually provided fresh or innovative thinking or solutions they could use, and identified that Plaintiffs; solutions were unique. In exchange for this, Larkin by signature in Engagement Letter 5 dated March 1st, 2014 in Appendix B.

76.  Of specific value Plaintiffs added were both the risk management frameworks, but also a new and revolutionary Decision Support system that Defendants had not conceived, which changed the (a) timing (b) strategy (c) graphical interfaces (d) execution such as volumes and strikes, all of which are the trade secrets of Plaintiffs, which are designed to improve revenues at Defendants, for which Defendants had allured Plaintiffs to disclose in exchange for substantial profit sharing, all of which are the trade secrets of Plaintiffs

77.  Defendants, admitted and certified in the engagement letters, that they had previously not used any other hedging strategies for the management of their heating oil book other than Avi's Spreadsheets and Avi's Hedging Strategies from which they were anxious and keen to review  and obtain disclosure of Plaintiff's IP and trade secret methodologies and techniques to improve their revenue, from which both parties, would have long term profit of mutual benefit, constantly promising substantial profits sharing, incentive bonuses and lucrative license fees, as part of a multi-million dollar long term contract.

78. Defendants also acknowledged that they did not possess and did not have any risk management systems, tools or analytics or Middle Office controls, with no independent risk tools, as  oversight  to  supervise  the  activities  of  the  trader.  Therefore  Plaintiffs  were  retained  and

disclosed its IP and Software, in response to a need that Defendants specifically identified and advised Plaintiffs it could not fulfill internally and were missing capabilities onsite.

79.   Therefore Plainttiff's hedging strategies, IP and software program were licensed, provided by Plaintiffs specifically in response to a need the Defendants admitted they did not have prior to Plaintiff's retention, and to fill a need and gap in their internal hedging strategies, models and spreadsheet capabilities, and to improve their Decision Support.  Further acknowledging that they did not have or use such processes prior to the engagements with Plaintiff, were specifically retained to improve existing hedging strategies, which were based on internal models developed by a former trader Chopra and called "Avi's Spreadsheet" and "Avi's Hedging Methodologies", and which was used as the basis of the audit of the Baseline P&L.

80. Because of the performance of Plaintiff's IP and Software needed to be quantified, for Northland to honor the performance incentive compensations, as part of the engagements, during the periods approximately between February 2013 until February 2014, under Engagement Letters 3 and 4, services included a detailed audit of Avi's Spreadsheet and Avi's Hedging Strategies from which a **Baseline P&L** could be determined, from which any improvements made using Timetrics Software and Plaintiff's IP would be made.

81.   The Baseline P&L reflected the previous profits and losses over the prior years what the Northland and Hedge had generated in profitability from their existing hedging strategies, using Avi's spreadsheet and Avi's hedging strategies on a per gallon basis. Therefore this measurement of Baseline P&L was material and fundamental in the consideration and agreement to provide services, software and disclose its trade secrets and Plaintiff's IP.

82.   The final Baseline P&L was signed and agreed to by the parties in Engagement Letter 5, in *Appendix B* on March 1st, 2014 as the performance metric of Baseline P&L upon which any improvements made by Plaintiffs revenue to Defendants would be measured, and from which all damages are accountable from. The Baseline P&L was calculated from a detailed and comprehensive book audit which spanned a period of about 12 months, from which the parties both executed an agreement on its calculation, which Larkin signed and certified as accurate.

83.   The contracts explicitly agreed that any improvement made to Northland's revenue over and above the certified Baseline P&L, Plaintiffs were entitled to compensation in the form of a Monthly Trading Royalty which was calculated as a percentage of the Monthly Trading Improvement, as well as ongoing, License Fees on a quarterly basis, in perpetuity for their ongoing use. Given that significant volume and gallons were to be placed onto the book, Defendant's contracts demonstrated substantial economic value, and was part of a multi-million dollar contract.

84.   In 2013, continuing to be satisfied and pleased with performance, Defendants continued to request further use and disclosure of the IP and software. In several meetings, including but not limited to at the Ritz Carlton in Battery Park City in New York City, Plaintiffs met with  Larkin in or around March 2013, and provided him detailed descriptions of the revised framework for hedging, and risk management software for Northland's license. The design, graphical interfaces and approaches had been built, based on two decades of dedicated risk management experience, Kumaran's unique skills in applied mathematics, from which Plaintiffs had built a proprietary risk consulting company boutique over two decades and were trade secret techniques of Plaintiffs

85.   These in depth description were proprietary knowledge, know-how were intended to make substantial revenue improvements to Northland which, reliant on the significant profit sharing and License Fees Plaintiffs explained in detail to Larkin based on his allure and promises of significant Monthly Trading Royalties and IP and License Fees and were disclosed subject to the express restrictions of non-use under the Timetrics NDA, EULA and other engagement letters. Planitiffs at all times performed and met its obligations under the Engagement Letters.

## C - MISAPPROPRIATION BEGINS

86.   In or around June 2014, after Chopra's resignation and now needing to fill numerous gaps in internal resources and capabilities, Defendants had no intention of using the PILOT for its intended use, but instead hatched a scheme, to  mis-use the PILOT of Plaintiffs' IP and Software to instead misappropriate and secretively replicate duplicate a shadow spreadsheet onsite to supplement their risk management capabilities, in express breach of EULA, Timetrics NDA and other agreements . (*See EULA, Para 1,7, 6.2,6.3, Timetrics NDA 2, 3a, 3b*).

First Amended Complaint, Page 20

87.   In accordance with the Engagements and EULA in or around June and July 2014,  the parties conducted a Factory Acceptance Test ("FAT Test") on various components of the Timetrics Software, as defined under Section 9.6 of the EULA, for the sole purpose of Defendants certifying their acceptance before use in a trading floor environment.

88.   Defendants expressly agreed the FAT Tests would not be used to develop a duplicate system. and if they were to misuse such detailed disclosures during the FAT Test to supplement internal risk management models and spreadsheets onsite, License Fees would be retroactively payable to Plaintiffs from August 2014. *See Eng Ltr* L5, P17,  *EULA, P9.6,  P6.2, 6.3, NDA Para 3*

89.   In accordance with the Engagements and EULA, starting around June 2014,  and reliant on the restrictions therein, Plaintiffs provided line-by-line source code and detailed formula and testing of its IP and software, called a Factory Acceptance Test ("FAT Test") for Defendants to certify their acceptance of the hedging and risk programs for use in a production and trading environment.

90.   However, using the FAT Test as a "guidance" system, Unknown to Plaintiffs at the time, brazenly violating the EULA, Timetrics NDA and Engagement Letters, Lothrop and Larkin misappropriated Plaintiffs programs and IP using the FAT Test as a "guidance system" from which to create Derivative Works, create a replicated spreadsheet model, to mimic the functions, design of Plaintiff IP and Software, including the risk monitoring framework, in express breach of the all agreements – misappropriated Plaintiffs programs and IP.  Defendant went further to call its copy-cat system the "OBT Book" – a Derivative Work and willful infringement of Plaintiffs' IP and breach of the EULA and NDA. all fraudulently concealed.

91.   Larking and Lothrop materially breached the EULA, Timetrics NDA, created a copycat risk monitoring and hedging systems, as well as Derivative Works, transferring the capabilities into internal Licensee's systems and spreadsheet to secretly work as a shadow-system onsite at Northland's New Hampshire offices, without Plaintiffs' knowledge and consent.

92.   Lothrop was instrumental in the misappropriation, duplications and creation of the Derivative Works, in unlawfully creating, modifying and adapting the OBT Book, which were wholly based

on the IP and Trade Secrets provided by Plaintiffs under the express restrictions governed by the EULA, Timetrics NDA and other engagements. Acting in concert with Larkin,  Lothrop also materially breached  the agreements to create a "shadow system" for his own personal use and gain, them modifying, adapting, and making alternative versions, to supplement his own lack of internal technologies.[7]

93. Defendants knew they did not have the internal systems or risk management tools, or training from Chopra's systems, and intentionally sought to migrate Plaintiffs IP onsite for ongoing internal use, creating Derivative Works of the software to supplement the lack of technology that previously did not exist onsite at Northland and Hedge.

94. Larkin recognized that Lothrop may have been a lower cost human resource, acted with willful and malicious intent and scienter, to cut Plaintiff's out of their License Fees and Monthly Trading Royalties. He sought to keep the fraudulent activities concealed from Plaintiffs and intended to eventually migrate the technologies onsite for Lothrop to use, with willful intention to not pay the Licensee Fees for onsite use or for the Derivative Works.

95. Larkin and Lothrop conducted testing of the  Derivative Works and it eventually became operational in August 2014 to secretly work as a "shadow system" alongside Plaintiffs' IP aided and abetted by Bramante, the Derivative Work became as a full production system in 2015 thereby depriving Plaintiffs of their license fees, royalties and share of trading profits.

96.   Once the program was slated for a Pilot during the period August 2014 to March 2015, Larkin, Lothrop and Bramante, instead of complying with the express conditions of the Pilot test, designed to benchmark profitability, then set about a plan to both sabotage the results, and in parallel run a clone program. The actions to sabotage, notably by employee Lothrop, in fact backfired and caused significant losses and damages to Defendant's business, after he breached numerous aspects of the engagement, while trying to create his duplicate clone, placing dozens of unauthorized trades into

---

[7] **Para 17 states,** Northland expressly agrees and understands that it shall not replicate the reports delivered … into Licensee's spreadsheets or Licensee Systems … for use in an ongoing manner by virtue of the work done in the FAT Test. Should such replication occur for ongoing use, License Fees shall immediately be charged at the License Fee Type B rate, retroactive to the date of replication and shall be perpetual for all ongoing use.]

First Amended Complaint, Page 22

the account, miscalculating margin and cashflow and violated regulatory compliance laws for "speculating" and not "hedging" in an FCM account.

97.  No sooner had the PILOT started, Lothrop transferred dozens of unauthorized transactions into the dedicated FCM account, rendering it impossible to reconcile margin, cashflow and performance on Plaintiffs IP, and leveraging value from the PILOT for out-of-scope services for Northland's sole benefit and reduce compensation to Plaintiffs, rendering performance impossible.

98.  Defendants, without Plaintiffs knowledge, had in fact already deployed the copycat risk monitoring system, which had become  operational and functional, in August 2014 to secretly work as a "shadow system" alongside Plaintiffs IP without my knowledge and consent, so that Defendants so that they could misuse the PILOT to conduct parallel testing, and simultaneously use the efforts to support other activities from Northland business, without compensating Plaintiffs for their share of royalties and license fee.

99.  As stated with peculiarity in Affidavits 1-3, and incorporated herein, during the period August 2014 – March 2015 Lothrop, Bramante and Larkin made repeated fraudulent statements, on specific dates and times, to misrepresent the use of the PILOT, conceal the OBT Book, and also conceal the dozens of unauthorized transactions, which were synthetic futures.

100. Completely unaware of the onsite duplicate efforts to create and implement the OBT Parallel system, and misled to believe that the books matched exactly with Plaintiffs, Plaintiffs reported consistently in Weekly Revenue Share reports, that Larkin and Bramante certified and accepted, after months of dedicated, over and above time and effort, Plaintiffs reported on Nov 3 2014, P&L Trading improvements of over  272% and 390% relative to Northland's certified. Baseline  P&L, Bramante and Larkin certified these as correct and "OK" and "approved" by Northland.

101. On  November 21, 2014, Defendants further agreed and certified  on the Weekly Revenue Share report, increased trading revenue to Northland by about 625% and 862% such amounts again were agreed as certified as accepted and OK by Northland in email by use of  to Plaintiffs hedging strategies.

102. At no time did Larkin or anyone at Northland dispute or question the Weekly Revenue Share statements, the significant financial improvements made to Northland, the trading royalties due to

First Amended Complaint, Page 23

Plaintiffs and other reported measures of cashflow and margining – all of which were accepted as satisfactory in writing by Bramante and "OK" by Northland. Larkin further did not ever dispute a trading royalty statement as required by the Engagement Letter 5 Sec 9.c.(i),(ii)(ii), thereby rendering the account stated.

103. Defendants knew they wanted to acquire more IP and trade secrets, as well as study and examine the hedging strategies, and intended to propagate the fraud for the entire PILOT, concealing the activities so that Plaintiffs would continue to provide improvements and recommendations to business operations.

104. These willful and malicious actions were orchestrated and conducted by Lothrop, Bramante and Larkin, in express breach of Eng Ltr 5, which was intended isolate and benchmark the performance of the PILOT the parties agreed  so that it would be paid its fair share of royalties and License Fees.

105. On February 3rd, 2015, Defendants certified and accepted that using Plaintiffs IP and Hedging Strategies and Software, had generated profits over a 766% improvement from the Baseline P&L- more than seven (7x) times what was previously achieved by Northland on similar gallons. From this Defendants were obligated to pay substantial trading royalties. This was achieved despite recovering a significant loss, caused by Lothrop attending a Webinar, leaving the trading floor unsupervised, and subsequently having to perform out-of-scope services.

106. Nonetheless, signifying a long pattern of chronic late payments, Defendants then failed to pay the royalties and profit sharing that were due timely in early February and no later than February 15th, 2015 even though they had admitted the profits had been achieved in this account.

107. Lothrop , Bramante's and Larkin's efforts to derail Plaintiff's share of the profits, by not transferring premium, were also  sabotaging performance of program, requesting out of scope of services without consent, to expand benefit for Northland unauthorized activities, diminishing the share of revenues to Plaintiffs and misusing the technologies for their internal profits.

108. As a result of the obstructions, delays and duplications by Lothrop, Bramante and Larkin and believing the clone was adequate to cut Plaintiffs out of their futures Licensee Fees and Royalties,

Defendants tried to take over the program, by withholding both gallons and customer premium to lower Plaintiff's share of profits.

109. Defendants plans however again backfired, through the negligence and unauthorized trading of Lothrop when they failed to meet an intraday margin call, and Northland had failed to operate the account with the necessary customer premium and upon belief incurred significant losses as they were unable to post margin on the combined book resulting in an avoidable loss. (Lothrop Premium Loss).

110. On or around February 18th, it was uncovered in email and IM, that Defendants had in fact continued their fraud to conceal numerous unauthorized synthetic futures, in the FCM account with negative balances, and were also violating the Commodities Exchange Act, to speculate and not hedge, in numerous activities in margin management, solely Bramante and Larkin's responsibilities. (*See* Affidavit 1-3)

111. After a long pattern of chronic late payments, Defendants then failed to pay numerous invoices to Plaintiffs in 2015. This resulted in a Plaintiffs bringing action in state court, transferred to Federal Court in this Southern District, in the aforementioned action, to collect on the non-payment of invoices and the parties entered into Settlement discussions.

### D – SETTLEMENT

112. The parties during their Settlement negotiation had numerous discussions directly. During telephonic phone calls that occurred on April 2016 until May 2018 and numerous other days and times, including May 2nd, May 4th and May 8th 2016. Larkin phoned Kumaran from either his office or home located at 32 Helen Court, Goffstown, New Hampshire or his office at 500 North Commercial Street, Manchester, New Hampshire using his cellphone 603-315-3908 to Ms. Kumaran who received the phone calls on the telephone number 212-431-5098 who was located at her home and office located at 240 West 74th Street, New York, NY. 10023 to make these statements, that denied Defendants had migrating their hedging strategies to a Derivative Work, now called OBT Book, to mimic Plaintiffs strategies.

First Amended Complaint, Page 25

113.  In making these statements, Larkin, acting as President of Hedge  and CEO of Northland and was representing Northland and Hedge as a whole. Manifesting this pattern of deceit, these material representations were false, as Larkin was concealing the derivative and duplicative version of the OBT Book, which Lothrop,  Larkin, Bramante and Defendants had deliberately replicated starting in or around August 2014, had transferred approximately 10,000,000 gallons, and were cash-flowing improvements without compensation to Plaintiffs. His representations, were fraudulently concealing the willful breaches of the Timetrics NDA and EULA and other agreements.

114. Those statements were false as Defendants were at the time of the fraudulent statements already incurring benefits and profitability also well over 700% over their Baseline P&L, having studied, observed from Plaintiffs PILOT, carefully mimicking the strategies, which Larkin wanted to conceal from the Settlement discussions, so that Plaintiffs would not pursue discovery and without knowledge of the activities would accept a quick "hit and run" payments, and to cause financial harm to Plaintiffs to not pay them the License Fees and Royalties.

115. Specifically as part of the fraudulent conduct, in meetings had at Margot Café at 230 West 74th Street, New York, NY on or around Monday May 9th 2016, Larkin met with Kumaran in person where Larkin, continued to make false statements and representations that Defendants reverted back to their old methodologies, under Avi's Spreadsheets and Avi's Hedging Methodologies and were not using revised hedging strategies , risk management frameworks and IP and Software disclosed by Plaintiffs. Such states were false at the outset and contained material omissions about the real business activities which was being concealed by Defendants to induce the Settlement.Further, with full knowledge of the OBT Book, in this  meeting at Café Margot Larkin further provided false information and materially omitted that all Defendants had in fact *referred to, obtained guidance from or otherwise use any of the Timetrics Software as part of an effort to develop a program (or have a third party develop a program) having any functional attributes, reports formats, visual expressions, analytic components or other features similar to those of the Timetrics Software (see Eula 6.2, 6.3)*

116.  Further, on May 9th 2016, in meetings in New York City, Larkin met with Plaintiffs, Kumaran and also their counsel, including at their offices on 42nd Street, Larkin, Northland and Hedge, represented and warranted that they did not have in their possession, and would not retain, or use, modify, reverse engineer, or otherwise misappropriate the Plaintiffs' IP, as previously, and further described by the full language of the contract contained within (See Exh. L3)

117. In addition to the meeting  at the Café Margot at 230 West 74th Street, specifically on or around May 9th 2016, and also during numerous telephone conversations from his Defendant Larkins cellphone on May 4th, May 6th and other dates to Plaintiff's residences in New York City, Defendant Larkin continued to make material omissions, fraudulently conceal, mislead, and misrepresent that Defendants had created an OBT Book, to migrate portions of their business into Derivative Works of Plaintiffs IP to improve their hedging strategies, instead specifically misleading Plaintiffs that they had solely reverted back to Avi's Spreadsheets and Avi's Hedging Methodologies. This information was false when stated and intended to mislead..

118. Defendants knew, however, that Defendants did have Plaintiffs IP and Software and hedging strategies in their possession, and were in fact using Plaintiffs IP as a Derivative Work called the OBT Book by cloned by Lothrop, Larkin and Bramante to generate substantial  profit in their business, without compensating Plaintiffs for its share of the royalties and IP Licenses.

119. Defendants made these representation and warranties in order to induce Plaintiffs to agree to and execute the Settlement, notably provision 4, which was intended to cut Plaintiff out of its fair share of their license fees, royalties and profits sharing.. Plaintiffs in reliance on Defendants' representations and warranties, did in fact agree to and execute the Settlement.

120. Because of the fraudulent conduct of all Defendants described hereunder, to materially conceal the OBT Book and Derivative Works and replications of IP for close to two years, Plaintiff's did not have full knowledge in May 2016, of the facts related to misappropriation and unjust enrichment, or the existence of the OBT Book and spreadsheet risk management clones, that they have subsequently learned after September 8th, 2016,and the fraudulent representations and warranties made by Larkin (see supra) in May 2016 to induce the Settlement, Plaintiffs were

fraudulently induced by concealment to execute the Settlement, therefore dd not pursue discovery on the claims in the original claim for February Invoices, which Larkin presumably knew and wanted to avoid, purposefully, and intentionally fraudulently executing a quick Settlement.

121. On May 9th, 2016, Plaintiffs entered into a "Mutual Release and Settlement Agreement" (hereinafter the Settlement") with Defendants Larkin, Northland and Hedge.

122. As material consideration of Plaintiff's agreement to even enter into the aforementioned Settlement Agreement, was the representations and warranties made by Defendants, that they had not and were not using Plaintiff's IP, which included trading strategies, hedging strategies, and Derivative works of Plaintiff's IP, which they had acquired by the Timetrics Software Licenses.

123. But for all Defendants intentional, malicious and fraudulent acts to conceal the OBT Book, and profits derived therefrom for a period of about two years, and still conceal it at the time of may 2016, no settlement would have occurred, and neither would Plaintiffs have agreed to Section 4.

124. Reliant on the misrepresentations, Plaintiffs wrongfully were induced to agree to several provisions of the Settlement, including but specifically Section 4 that established that although several "Engagement Contracts" at issue in the underlying lawsuit, (except and specifically excluding the Timetrics NDA) would be terminated pursuant to the Settlement, "the Parties agree, however to the intellectual property and related provisions set forth on Exhibit A, attached hereto and made a part hereof, which provisions shall survive. "In particular, Larkin, Northland and Hedge, "represented and warranted" as follows:

> [T]hat neither of them has in their possession any of the Timetrics software that was involved in the Lawsuit ("The Timetrics Software"); they each agree that The A Star Group owns the Timetrics Software, and hereby disclaim and shall not retain or asset any right, title or interest in and to the Timetrics Software and they each agree not to use, duplicate, reverse engineer or otherwise misappropriate any Timetrics Software, and that they are not using and will not utilize in the future ***any strategies learned from the trading recommendations from the Timetrics Software to improve NT Parties trading or hedging revenue and/or any other consulting recommendations provided by Timetrics under the Engagement Contract to improve NT Parties trading or hedging revenues***.

125. The Settlement while it attempted to prima facie resolve any and all such claims, such resolution was *subject to, however,* the above representation that Defendants were bound to honor the Intellectual Property rights of Plaintiffs in the several ways outlined above, but generally to

concede Plaintiffs' ownership of the various aspects of Plaintiffs Intellectual Property, to not retain or use Plaintiffs' IP, and to not subsequently attempt to duplicate, mimic, reverse engineer, or otherwise misappropriate the property of Plaintiffs on an ongoing basis, as the Defendants generally acknowledged that the hedging strategies, software, programs, design, techniques, methods and models of Plaintiffs encompassing their IP and Software were valuable trade secrets, designed to improve revenue and profitability of clients, and from which Plaintiffs derived substantial economic value.

126. The several in-depth "Intellectual Property Provisions" to which Defendants agreed were attached to the above referenced Settlement. .

127. The Settlement acknowledges in Section 9 that Defendants "*have carefully read this Agreement, and understand its terms and conditions without reservation[,]*" of which "Exhibit A" was a constituent part of the terms and conditions of the whole agreement. Defendants concealment of the OBT Book and Derivative works, revised hedging strategies and risk management modules copied from Plaintiff's IP and Software was therefore willful, intentional, malicious, intentional, foreseeably calculated  to not pay Plaintiff's their license fees, royalties and profit sharing.

### E – RENEWED BUSINESS

128. After now implementing their version of the copycat "OBT Book",  Larkin stayed in communications as Kumaran acquired it Series 3, and became a registered commodities trading advisory ("CTA") Larkin who is also a registered CTA. Larkin desired to study and replicate new functionalities, technical improvements, and updates Plaintiffs' programmed between 2015-2016 into the Plaintiffs IP and software, and trading strategies – all of which was borne from significant investment, cost, time  and development by Plaintiffs.

129. Even though Defendants had illicitly already cash-flowed benefits in excess of one million dollars annually, without compensation to Plaintiffs, and fraudulently concealing the activities from Plaintiffs, Larkin, Northland and Hedge recognized their Derivative Work OBT Book was still inferior to the Plaintiffs IP and original Software, in being able to fully maximize hedging

improvements and create revenue and realized that further proprietary information and trade secrets were needed to obtain Plaintiff's unique updates and strategies ("Missing Pieces").

130. In September 2016 after the Settlement Agreement, Larkin in his individual capacity, once again, re-established business relations with Kumaran, and instead, negotiated and agreed with Kumaran, to provide him the Missing Pieces, in exchange for both (a) substantial financial contributions in his personal capacity to launch various hedge funds and (b) promises and assurances that Plaintiffs would receiving ongoing license fees effective April 2017 and revert back to the Profit Sharing previously agreed upon.

131. Subsequent to the Settlement in or around early September 2016, the Parties, agreed to formulate new business agreements, with Larkin acting in his personal capacity, as a party to those arrangements. In these arrangements, the Larkin made promises to provide additional capital to Kumaran, in the launch of various new businesses and affiliates and also represented and as a bilateral part of that agreement, represented and agreed Defendants Northland and Hedge would also make payments and renumerations to Plaintiff and in exchange Plaintiffs continued services, software and access to their IP and trade secrets.

132. However, at no point subsequent to the execution of the Settlement did Plaintiffs re-license or otherwise permit or warrant Defendants right, title or interest, to utilize their IP or Timetrics Software, without compensation to Plaintiffs.

133. All discussions, disclosure and confidential dealings related to the new business arrangements were made pursuant to executed the *Timetrics NDA* which terms and conditions remain in full force and effect in perpetuity as defined under Section 4 and otherwise defined therein, and survived and remain in effect.  Under the Timetrics NDA, Plaintiffs disclosed information about Timetrics affiliates, is protected under Paragraph 2.

134.    On or around August 4th 2016 at The View Restaurant in New York City, where Larkin and Kumaran reconvened, Larkin admitted the value that Plaintiffs had  brought to the Defendants in their fresh and innovative thinking and stated that in his twenty years of business he had met

several other software vendors and none of them had deliver or licensed products that actually created value.

135.     The parties also discussed the losses that had been caused, in trying to recovered Lothrop's Webinar Loss, and the extended cashflow and margin risk that had been approved by Larkin which was out of scope. Both parties recognized that without having to recover the Lothrop Webinar Loss, these events would not have transpired and these losses could have been avoided.

136.     Without either party's admission of blame, and in  an effort to repair relations, and reliant on the promise that Larkin now personally agreed to contribute substantial capital to personally assist Kumaran launch a hedge fund and because the trading strategies and programs had demonstrated they could recover such losses in short turn around times Kumaran agreed, as part of the bilateral deal that any prior loss could be recovered, regardless of who incurred it.

137.     Larkin however, at all times fraudulently concealed and materially omitted from Kumaran at The View, and in subsequent telephone conversations during August 2016, and September 6th 2016 from his home in Goffstown NH to Plaintiffs home in NYC (including calls on August 16th, September 4th 2016) that Defendants had in fact implemented and gone live with a Derivative Work clone, which they had called the OBT Book, already recovering Lothrop's losses. These omissions were fraudulent and material to reenact an Agreement in Principle, for the Plaintiffs to continue to disclose valuable hedging strategies and software designs and IP.

138.     Larkin fraudulently concealed, that all Defendants had in fact "gone live" and started transacting  with migrating part of their book, into the new Derivatives Works created from Plaintiff's IP, and were and had been cash-flowing profits to Defendants business, without paying previously agreed upon license fees and profits sharing to Plaintiffs.

139.     During communications both in emails and phone call, including specifically those on September 6th, 2019, Larkin intentionally and materially misrepresented that Kumaran's reengagement with Northland and Hedge, would be to "re-hedge" Lothrop existing deals at previous Baseline P&L margin, which had reverted to Avi's spreadsheets and Avi's hedging strategies, materially concealing the Derivative Works. In fact, Larkin continued to insist that

Lothrop not know about his plans to have Kumaran re-hedge the deals and Kumaran even offered to take the deals out of the money.

140.   Therefore Kumaran was still misled to believe, that Defendants had not modified their hedging strategy or created derivative works, and its bilateral deal was to perform services that Larkin was dissatisfied with on Lothrop's original hedges and Baseline P&L. Larkin also set about a plan to keep his dealings confidential from Lothrop and Bramante, and stated he wished to have Kumaran manage aspects of Northland's book in separate and concealed FCM Accounts.

### F – AGREEMENT IN PRINCIPLE

141.   As material considerations of the renewed business, Kumaran and Larkin etched out an Agreement in Principle during the months of August 2016 – September 2016 which had several material components. They included (a) Larkin would contribute on a significant financial capital contribution to start a hedge fund, as yet unformed, under the name Nefertiti Asset Management, LLC ("NAM"), which was finally formed in May 2018. The material provisions were that Larkin had no ability to terminate his capital contribution for two years at-will. (b) Larkin would become a principle and fiduciary of these entities and own more than 10% of  the Delaware LLC. (c.) Larkin would sign NDA's  directly with the new entity and abide by confidentiality and arbitration provisions with the new entities. The parties expressly agreed to resolve any differences under Arbitration, and the hedge funds operating agreement would have mandatory arbitration.

142.   Further, as part of the bilateral deal, in consideration of Larkin's substantial full non-terminable capital contribution for two years to launch the hedge fund, Plaintiffs would provide services for Northland and Hedge, in exchange for (d) salary bonuses at target milestones of performance, and (e) would disclose further IP and trade secrets (subject to the Timetrics NDA) with the original License Fees and Royalties being  reverted to from April 2017 from Northland and various profits sharing at original rates, and (f.) the trading programs, would recover the Lothrop 2015 loss, after which further revenue sharing would occur, effective immediately from September 2016.

143. On or around September 8th 2016, as a result of both telephonic communications and emails, in particular in an email dated September 8th 2016, Plaintiffs learned that Defendant had continued to utilize, and was presently using protected Plaintiffs' IP, as countenanced by the prior Settlement, Timetrics NDA, EULA and also by improper acquisition of trade secrets, and in violation of the DTSA and New York law without a license.

144. By admission on this date Larkin admitted that Defendants, had gone on to utilize the cloned OBT Book version to use in a production environment, and Larkin promised that Northland and Hedge would  reinstate software license fees and trading royalties at previously negotiated rates, effective April 2017.

145. Particularly, Plaintiffs discovered that Defendants had not just retained, but created derivative techniques, processes, methods, software, hedging strategies of Plaintiff's IP, in part by first obtaining or inducing disclosure under restrictive non-disclosure agreements, retaining protected Plaintiffs IP, and elsewhere by duplicating, mimicing, creating derivative works and other aspects of Plaintiff's IP which were not retained subsequent to the Settlement; and for both prior to and subsequently modifying, and internally developing and improving upon the hedging strategies, spreadsheets,   models to create similar models and methods and to adapt the principles and methods originally encompassed by and covered within the terms of the original Settlement concerning Plaintiff's IP.

146. The above-reference course of action was in violation of the Settlement agreement, a violation of the Timetrics NDA, EULA and all other Engagement Letters, and constituted a breach of confidentiality and unlicensed use which Defendants had explicitly represented and warranted they would discontinue, and whereby Plaintiffs were damaged by the improper use and disclosure of their valuable IP and the profits derived from its use. Plaintiffs learned that Defendants had – through the use of Plaintiffs' IP and the modified and similar developed processes, methods, analytics tools, strategies and software  - profited in excess of $1 million dollars, through the present date, by utilizing the analytics and hedging strategies generated in Defendants' business operations, to trade commodities and energy futures.

First Amended Complaint, Page 33

147. Given Defendants' acknowledgement of careful reading and full understanding of the terms of the Settlement and the subsequent retention of the protected Plaintiffs IP, in derogation of the terms, Defendant's course was willful, knowing, and purposeful; in addition, Defendants subsequent development, modification, and of the Plaintiffs' IP, Timetrics Software, strategies, designs, processes, models, analytics, and software was concealed from Plaintiffs in order to be successfully implemented by Defendants as a and hedging strategy and to supplement missing risk management monitoring tools, without paying for the license it.

148. Defendants, in full knowledge of the duties imposed upon Defendants by the prior Settlement, fraudulently concealed their improper retention, subsequent development modification, and of the Plaintiffs models, analytics, methods, techniques and software from Plaintiffs until approximately September 8th, 2016.

149. Further this conduct also expressly violated the Timetrics NDA. While Plaintiffs have performed all its obligations under the Timetrics NDA, it was also learned Defendants were knowingly in breach of the following specific provisions of the Timetrics NDA, including but not limited to (i) Section 2.b (ii) Section 3a and Section 3.b (iii) as well as other obligations contained therein to protect and not-use Confidential Information.

### G – UNPAID SERVICES AND RELIANCE

150. Larkin, acting as the CEO of the Defendants Northland and Hedge, as an individual, however continued to assure Plaintiffs that compensation was forthcoming, and royalties, license fees and other renumeration would be made effective immediately between the period September 2016 until March 2017 and also in full reinstatement of previously foreseeable renumerations after April 2017, to continue to induce further disclosure of IP and trade secrets.

151. In In telephonic phone calls and emails that occurred on September 8th 2018, and September 9th, 2018 and numerous other days and times in the month of September and October 2016, Richard M. Larkin phoned Kumaran from either his office or home located at 32 Helen Court, Goffstown, New Hampshire, or his office at 500 North Commercial Street, Manchester, New Hampshire using his cellphone to Ms. Kumaran who received the phone calls on the telephone

First Amended Complaint, Page 34

number 212 431 5098 who was located at her home and office located at 240 West 74th Street, New York, NY. 10023, Larkin promised and assured the parties would move forward from the past, and that license fees, royalties and profit sharing would be reinstated by Northland

152. As part of the new business arrangements, Larkin agreed and represented and promised that in his personal and individual capacity, that in exchange for Larkin's individual and personal [payments, and] capital contributions, Northland and Hedge would make numerous renumerations of compensation for services, salary bonuses, software, license and Plaintiff's IP, including but not reinstate various engagement contracts effective April 2017 at previously agreed upon commercial terms and rates from Northland and Hedge.

153. Furthering Larkin's misrepresentations and promises of renumerations, numerous telephone communications occurred during the period September 2016 and December 2016, including after-hours meetings with Kumaran and Larkin at The View at Times Square New York City, on August 4th, 2016, the Marriott Hotel on West 57th Street, in New York City, on or around December 16th 2016, located in New York City and at the Tavern on the Green in New York City.

154. Reliant on Northland, Hedge's and Larkin's promises and commitments, Kumaran disclosed numerous confidential information of Timetrics affiliates (as defined) about the proposed launch of several hedge funds, and associated management companies, investment advisors and trading vehicles. This proposed business ventures, including proprietary company valuations and rights to membership interests, were disclosed under the express provisions of the Timetrics NDA – which specifically are protected confidential information (See Timetrics NDA, Para 1,2,3)

155. In or around September 2016 and during numerous phone calls and emails therefore, Larkin represented that Defendants Northland and Hedge would honor numerous compensations agreements, salary bonus structures and reinstatement of software license fees, in exchange for services, and substantial profit sharing in hedging improvements.

156. However, again manifesting this pattern of deceit, this representation were false at the onsite. Larkin, (acting in his capacity as CEO of Northland and President of Hedge, when he these material representations, Larkin was concealing these material representations and business transactions

from other employees, officer, directors, including the Controller, CCO and others, in potential violation of the law, rules and regulationsunder which his business operates.

157. Larkin, acting in his capacity as CEO of Northland and President of Hedge , falsely made those material representations to Plaintiffs to induce Plaintiffs to continue to provide IP and disclose services and software, and knew at the onset his representations were false, and that Northland and Hedge, by his fraudulent concealment of the activity had no intention of paying Plaintiffs for their work.

158. Larkin has now demonstrated a pattern of conducting aspects of his business, by concealing information from others, and deceptive conduct, skirting regulations on the trading floor, resulting in regulatory and compliance violations. Manifesting this pattern of deceit, Larkin, acting in his capacity as CEO Of Northland and President of Hedge, made material representations to Plaintiffs that were false, as Larkin was now fraudulently concealing his representations and business transactions from other employees, officer, directors, including the Controller, CCO and others.

159. These misrepresentations were made for the purpose of inducing Plaintiffs entering into an Agreement in Principle, that were subsequent to the Settlement, and providing continued services– with compensation being promised directly by Larkin personally in binding of Northland and Hedge, and to continue to disclose more IP, Software, trade secrets, and confidential information and continue providing services, software, design improvements, trades, contributions to Defendants, ,

160. Manifestation of Larkin's assent to the Agreement in Principle, includes but not limited to his personal initial payments from his personal bank accounts, and numerous emails and communications between Larkin and Kumaran documenting the extensive services, software, labor, risk management and hedging techniques and improvements of financial value provided to Defendants, from which he gladly retained the benefit and the fruits of the labor and services..

161. Given the short deadlines that Defendants represented were for the trading live during the months of September 2016-March 2017, Plaintiffs accelerated its timeline to provide services, software, risk management and hedging techniques and improvements of financial value to

First Amended Complaint, Page 36

Defendants reliant on the compensations schedules, and took time away for its other operations and opportunities to earn revenue.

162. Further, reliant on the representations, Plaintiffs during the period accelerated, expedited, provide excessive hours, labor, manpower, services, software and other upgrades, design and recommendation in hedging strategies to Larkin, Northland and Hedge and disclose IP, Confidential Information and Trade Secrets, treliant on the promises of renumeration, and subject to the restrictions of the Timetrics NDA, Reliant on these representations, and renewed  business relations, Kumaran invested hundreds of hours of work for Defendants, provided software, IP and services, disclosed trade secrets, that amassed improvements to the OBT Book.with cost savings of over $700,000 to the Defendants, for which to date it still has not received compensation. Defendants implemented, used and profited from those improvements in New Hampshire, used trade secrets in interstate commerce in violation of the Defend Trade Secrets Act.

163. The Missing Pieces and trade secret information were disclosed under the express restrictions of the Timetrics NDA. Continuing a pattern of deceit and fraud, and now concealing his activities from his own employees Lothrop and Bramante, Larkin once again failed to honor the financial terms, that he had personally promised on behalf of Northland and Hedge, and then in bad faith, unilaterally attempted to change the terms of the agreement, to reduce Plaintiffs profits share. Unless Plaintiff met new, undiscussed terms, Larkin "withheld" the financial capital contributions from the hedge funds, and make bad faith and usurious demands for Plaintiffs to disclose more strategies and IP, or he would "resign"

164. All services were performed in the City and State of New York. Larkin personally met with and conferred with Kumaran in the City and State of New York, further manifesting his assent to these services at meeting including but not limited to The View in Times Square on August 4th 2016, The Marriott Hotel on West 57th Street on December 14th 2016, and Tavern on the Green on December 14th 2016. At these times and dates and locations, including at numerous emails and telecommunications, made to Kumaran's residence in New York City, further making fraudulent

representations about his payments, Larkin made repeated promises and representations of personal contributions and payments to Kumaran and Plaintiffs.

165. In furtherance of the Agreement in Principle, payments were made by Larkin personally, from his individual bank account to Kumaran's affiliates, and fedexed to locations in New York City, in order to conceal the business dealings from Northland and Hedge. Further his pattern of material obfuscations and concealment, including making various payments to third parties, including a Jonathan Flak, on or around December 14th, 2016, in cash  (so as to avoid a paper trail) in New York City, at the Marriott Hotel on West 57th Street, as part of his manifestation to "conceal" and deceit and misrepresentations to Northland and Hedge of his true conduct.

166. Further, Plaintiffs reasonably relied on Larkin's representations in deciding to enter into the further services under the Agreement in Principle, and proceeding to provide services, software, risk management and hedging upgrades and techniques, disclose further IP, and dilute its time management from the other activities to assist Defendant's business, reliant on the cashflow and revenue incentive compensations that were promised by Defendants.

167. Plaintiff's had been engaged by Defendants before for a period of about four (4) years, and reasonably expected these payments to be made, under the terms of the previous EULA and other agreements which were to be reinstated.

168. Plaintiffs fulfilled their obligations under the Agreement in Principle  and Timetrics NDA.

169. Further with reckless disregard for the truth, Defendants Larkin, Northland and Hedge had no intention of making payments to Plaintiffs, as they  were not willing to comply with the FCM's regulatory compliance laws, of mandatory reporting of CTA's, and the Managed Account with full and transparent disclosures of incentive payments, and it would not have been possible to do so without compliance. In fact, manifesting his deceit, Larkin was acting with fraud and concealment from his own Northland employees, officers and directors, and  had no intention of properly compensating Plaintiffs, but utilizing the services for his self-gain, profit and benefit and self-dealings in the Northland company.

170. Therefore Larkin, Northland and Hedge knew at the onset that their representations were false, and that compensations through Northland and Hedge could not have been made, and intended to deceive Plaintiffs to induce free services, wrongfully acquire by fraudulent inducement to disclose more trade secrets and their valuable IP, Confidential Information, provide services and proceed with the Agreement in Principle while all the time increasing profits and revenue to Defendants.

171. Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Agreement in Principle, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder in amount in excess of $1 million dollars.

## H – MORE TRADE SECRETS

172. On or around dates including September 27th, September 28th, October 2nd, October 6th, 2016, October 8th, 2016 and other dates, via email communications and phone calls, Plaintiffs emailed numerous trade secrets features, advancements, including specific trades and upgraded design features, to Larkin, reliant on the promises and commitment in the Agreement in Principle, and also subject to the Timetrics NDA.

173. Specific improvements, re-designed the layout of the then-existing OBT Book, to include separate viewing frameworks, which were previously concealing exposures and risks in excess of several hundred thousand dollars and contained formulaeric and graphical modelling improvements on the computation of risks, which are contained in the proprietary design features and trade secrets of Plaintiffs IP and Software. These disclosures were made again reliant on the express representations of no-termination funding of financial capital, renewal of Licensee Fee payments starting April 2017, salary bonuses that Defendants Northland were to pay, and royalty sharing payments, and all confidential disclosure were made subject to the Timetrics NDA.

174. Larkin, Northland and Hedge  used, implemented, adopted the improvements and design features, modifying and updating the OBT Book for Defendants use, profit and gain and retaining the financial benefits, after Plaintiffs were induced to provide the IP and Software under the promises of forthcoming compensation, substantial royalties, License Fees, and salary bonuses,

none of which were ever paid as well as in expectations of his -no-termination-capital contribution for the hedge funds.

175. While Plaintiffs have performed all its obligations under the Timetrics NDA, Defendants were knowingly in breach of the following specific provisions of the Timetrics NDA, including but not limited to (i) Section 2.b (ii) Section 3a and Section 3.b (iii) as well as other obligations contained therein to protect and not-use Confidential Information.

176. Larkin then made more fraudulent representations to Kumaran, notably on dates October 4th, October 9th, and October 15th 2016 from via email and telephone communications from his offices in New Hampshire to Kumaran's residences in New York City. Specifically he stated, that Northland would quantify and include as part of the revenue share basis for compensation to Plaintiffs, any financial improvements that both removed stress risk to Northland and reduced the amount of spend at the FCM.

177. Reliant on those representations, Kumaran invested hundreds of hours modifying its programs and performing services to meet those milestones and demonstrated techniques that could achieve those modifications which Larkin incorporated that more than achieved the targets and milestones recovered Lothrop's losses.

178. Once demonstrated, Larkin then breached the Agreement in Principle and sought to inequitably, and unfairly remove these payment terms of benefit to Plaintiffs, unilaterally change the terms again, for only Northland to reap the benefit of the foregoing improvements and once again reduce Plaintiffs share that he had promised and represented in writing would be paid.

## I - BREACH OF AGREEMENT IN PRINCIPLE

179. Kumaran passed the Series 3 on or about July 1st, 2016 and became a registered commodities trading advisor ("CTA") on April 4th 2017 Larkin is also a Series 3 holder, and a registered CTA. The commodities trading advisor business is highly competitive, and all CTA's are compensated based on performance of their hedging and trading strategies. Therefore, Larkin and Kumaran are direct competitors in this business as registered CTA's and subject to strict compliance and disclosure regulations.

180. In or around October 6th 2016 and other dates  Larkin took action to open under Northland's name yet another dedicated FCM Account, for the purpose that Kumaran, as a registered CTA, would trade the Northland account. Larkin made specific requests from the FCM, that this activity be fraudulently concealed from Lothrop and Bramante and other employees and CFO at Northland.

181.  In emails on October 16th and October 19th, October 25th and October 26th, 2016 the parties discussed the arrangements, and the FCM provided various forms to Northland and  Kumaran to comply with the signature required on the  CTA Managed Account forms, for Kumaran to have authorization to trade the Northland account.

182. One such material regulation requirement was to provide the compensation schedule to the FCM of the CTA's performance, On or around October 26th 2016 and other dates, Northland then refused to comply with the FCM's regulatory requirements to sign the forms related to disclosing compensation of Kumaran as a CTA, which were material obstructions to performance. Instead, Larkin's new scheme was for  Kumaran as a CTA, teach him all the trades, so that he could pretend he was sole CTA on the account, and never honor any compensations in an unfair competition scenario so that Larkin and Northland and not Kumaran would gain the performance credit of the activity.

183. Larkin yet again, in bad faith, then demanded to unilaterally change the terms, upon which Kumaran had relied prior to disclosing IP and providing services, that instead, wished Kumaran not disclose its compensation as a CTA in violation of regulatory statues. Because the conduct was illegal,  Kumaran refused to trade an account without the required forms disclosed to the FCM. era

184. This activity would not only violate regulatory compliance laws, to not disclose its activities on a Managed Account as a CTA but further supported that Larkin and Defendants had no intention of compensating Plaintiffs for their services and strategies.

185. Further under Larkin's new scheme, Larkin and Defendants would have no "paper trail" with the FCM, in order not to compensate Kumaran for its services, and report CTA performance as required by the law. As such Kumaran refused to participate in any activities that would violate compliance laws and would not adhere to  Larkin's bold instructions to violate the regulatory laws,

First Amended Complaint, Page 41

which Northland had been fined for in the past. Further Larkin in ongoing deceit, was materially deceiving his own employees, Lothrop and Bramante for which conduct may also have been fraudulent. Kumaran insisted the forms be signed as required by the FCM.

186. Larkin then demanded that unless Kumaran participate in these illegal and non-compliant terms, it would withhold financial capital, and intentionally cause Plaintiffs and their businesses financial losses, and would not honor the previous compensations of the non-termination funding in the Agreement in Principle, reneg. on the salary bonuses and royalties and compensations, while already reaping benefits to Northland and breached the Agreement in Principle, enacting its threat to withhold relied upon financial capital, and now refusing to honor any of the previously agreed upon payments for services, IP and software that Kumaran had contributed.

187. Larkin, after refusing to comply with regulatory requirements, in or around November 2nd 2016, then breached the Agreement in Principle, enacted its plan to withhold its payments that were past due, in bad faith, and commercially unreasonable, continued to unilaterally change the terms of compensation, after services were provided, and proceeded to use and incorporate and retain the benefits of the services and disclosed IP without compensation to Plaintiffs.

188. Such actions were also a breach of Larkin's fiduciary duties to act as a Member and Principle since he was to own 10% of the fund, and was instead self-dealing in the operations of the fund for his own personal gain, and acting in bad faith, to sabotage Kumaran's operations.

189. Larkin breached the "Agreement in Principle" and acted in bad faith, by unilaterally attempting to change the terms of the agreement after reaping the benefits of the services by taking commercially unreasonable actions such as (a) demanding the salary bonuses are removed which were material to Kumaran's consideration; (b) purporting the reduce the scope and volume of the gallons so that after incorporating the improvements, Defendants could reduce Plaintiffs share, and removing months such as Nov, Dec upon which improvements had already been made (c.) not complying with the CFTC rules and regulations to sign necessary forms with the FCM, and then requesting Kumaran then do the same, in violation of the Commodities Exchange Act; (d) materially changing the payments terms of the capital contributions, including the no-termination

clauses, without which Kumaran would not have agreed to perform services or disclose IP (e.)

materially changing the formula for the baseline, which the parties had already agreed to

substantial work had been done, and implementing commercially unreasonable terms to continue

to change the scope of work; all the while reaping the benefits of skills, labor, services, IP and

software for Defendants without compensation.

190. Defendants knew that Plaintiffs would be financially harmed, as they were reliant on the

representations of numerous financial contributions to launch new businesses, and had already

agreed via various Agreements in Principle to launch the funds.

191. Defendants Larkin Northland and Hedge knew that Plaintiffs would suffer substantial

financial losses, Since Defendants Larkin, Northland and Hedge represented they would be making

significant financial capital contributions to launch various new businesses, with fully calculable

monetary rewards and profits incentives, and by withdrawing those incentives, Plaintiffs would

not be able to reap the fruits and benefits of their excessive hours of labor or launch the businesses

under the timelines contemplated, causing operational losses and delays

192. Defendants actions were with wanton and disregard for Plaintiff's right, and with willful

intention to harm Plaintiffs' businesses, as well as its affiliates.. Larkin continued to hold Plaintiffs'

confidential information as "leverage", obstruct and delay Kumaran registration of businesses, by

withholding signature on various agreements and regulatory registrations, unless it if meets

Larkin's  commercially unreasonable demands,. Which included waiving all claims to Plaintiffs

intellectual property for Defendants' ongoing use, profit and unjust enrichment.

193. Emails during this period of time, evidence Plaintiffs providing proprietary risk mitigations

techniques in excess of several hundred thousand dollars of benefit to Northland and Hedge, reliant

on Larkin's promises and representations of payments and licenses.

194. Larkin failed to honor the financial commitments he had personally promised on behalf of

Northland and Hedge, and then in bad faith, unilaterally attempted to change the terms of the

agreement, in bad faith, to reduce Plaintiffs profits share. Unless Plaintiff met new commercially

unreasonable terms Larkin "withheld" the financial capital contributions from the hedge funds,

and in breach of fiduciary duties to his partners. After violating numerous  and make bad faith and usurious demands for Plaintiffs to disclose more strategies and IP, or he would "resign" from the hedge fund and cause substantial  commercial harm to the hedge fund.

195. Larkin, in his personal capacity was making payments, on the Agreement in Principle, representing himself as the CEO of Northland and Hedge that payments and compensation were forthcoming, Plaintiffs acted in reliance on his commitments to not terminate, and acting in reliance, disclosed IP, provided services, software and trade secrets, that Defendants knew were valuable and confidential, and once improvements were made, Larkin lied again, and tried to remove the compensations due that he had promised. Kumaran was misled to believe it had a no-termination partner in a hedge fund, however once, Larkin started to acquire value that only he and Defendants could profit from, and did profit one, he lied and changed the terms again to cut Plaintiffs out of the agreed upon salary bonuses, profits sharing and license, using his financial capital contributions as "leverage" in bad faith and breach of his fiduciary duties.

196. After he resigned, Larkin stated with specificity threatened he would "publish confidential and trade secrets" of Plaintiffs, and obstruct or harm Plaintiff's businesses and hedge fund as "leverage", or further encumber the hedge fund to try and damage its good will and reputation, unless Plaintiff waives its rights to its IP and trade secrets. Such actions were material breaches of his fiduciary obligations and Larkin has caused substantial, delays, damages by breaching his commitments to invest substantial capital and attempts to obstruct Plaintiffs businesses,.

197. Larkin has misappropriated hundreds of hours of unpaid labor, skills, services, and expenditures during the period, for  continue excessive hours of work, without compensation and signed agreements and as a competitor and CTA used these skills to further his own CTA business Further Defendants, in bad faith,  have threatened to breach numerous confidentiality provisions, and publish and disseminate trade secrets and confidential information, and Larkin has impeded registrations of the hedge funds, and failed to comply with management, to attempt to destroy the reputation and good will of Plaintiff's businesses as retribution and retaliation, should Plaintiffs pursue action against them.

198. Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Agreement in Principle, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder in amount in excess of $1 million dollars.

## J. 2017 – PRESENT DATE

199.     Larkin's threats included using confidential information as leverage and making trade secrets public. On or around January 15th, 2017 and on several other occasions, via telephone call to Plaintiff Kumaran in New York on February 14th, 2017 and June 21st, 2017 Larkin stated with specificity and peculiarity that Larkin would "publish confidential and trade secrets" of Plaintiffs, and obstruct Plaintiff's businesses and hedge fund as "leverage", unless Plaintiff waives its rights to its IP and trade secrets. Such actions were material breaches of his fiduciary obligations and Larkin has caused substantial, delays, damages by breaching his commitments to invest substantial capital and attempts to obstruct Plaintiffs businesses, and rights to .

200.   On several dates and times, over the exhaustive span of over two (2) years, including but not limited to in emails both to Defendant Larkin and its former counsel Bracewell, on July 31st, 2017, February 23rd, 2018, August 7th, 2018, October 2nd 2018 and June 5th, 2019, Kumaran sought Larkin's resolution of his resignation, signature on an NDA, as a fiduciary and principal, for participation in the hedge-funds, under terms that he had agreed.  Kumaran sent non-disclosure agreements that are required under the Operating Agreements of various hedge funds, which are Timetrics affiliates, compromised, and in good faith met all Larkin's terms for operating participation in hedge funds.

201.     On each and every separate occasion Larkin, failed to act in good faith to either provide a mark-up, or propose a suitable alternative Non-Disclosure Agreement for the hedge funds and *Timetrics affiliates,* and have blanket refused to sign and agree to any terms, in his willful and malicious attempt to both obstruct Kumaran's businesses and hedge fund business and/or use, make use of, publicize and distribute Plaintiff's confidential information as "leverage" if Kumaran

does not wrongfully assign IP and software rights to Larkin, which he has not paid for, in quantum meruit.

202.    To this date, Defendants have continued to retain the benefits of the IP, services, software, trade secrets and other benefits fraudulently procured by Plaintiffs, and have failed to honor their end of the compensation schedules, and continued to this date, their breaches of the Settlements Agreement and Non-Disclosure Agreements. Defendants have therefore been unjustly enriched at the Plaintiffs' expense.

## CLAIMS

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT – SETTLEMENT AGREEMENT

#### Against Defendants Larkin, Northland and Hedge

203. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein. Plaintiffs restate and copy in full Section D ¶112-127, Section F ¶143-149 supra herein,

204. The Settlement dated May 9th, 2016 was a valid and binding contract upon all parties, including Defendants, supported by adequate consideration. Plaintiffs fully performed all duties and obligations under the contract.

205. Defendants Larkin, Northland and Hedge represented and warranted that they did not have in their possession and would not retain, or use, or modify, reverse engineer, or otherwise misappropriate Plaintiffs' IP, as previously and further described by the full language of the contract contained within Exhibit 1 of the Settlement.

206. Defendants materially breached the contract by violating the several provisions concerning the Plaintiffs' IP and Software and specifically by retaining, using, modifying, adapting, reverse engineering and in other ways misappropriating Plaintiffs' IP and Software, in derogation of their express representations and warranties contained within the contract.

207. Defendants, through their retention, modification, and use of misappropriated Plaintiffs' IP and Software, profited while engaging in trading commodities and futures, as a direct and

proximate result of the improper use of the Plaintiffs' IP and Software, and Plaintiffs improper development and modification thereto, those profits were in an amount not yet fully ascertained, but believed to be not less than $1 million to be determined at trial.

208. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1million dollars.

209. In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendants' breach of contract, in an amount to be determined at trial, but believed to be in excess of $1 million.

210. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### SECOND CAUSE OF ACTION
### FRAUDULENT INDUCEMENT – SETTLEMENT AGREEMENT
### Against All Defendants, Lothrop, Larkin, Bramante, Northland and Hedge

211.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein. Plaintiffs restate and copy in full Section D ¶112-127 supra and Affidavit 1-3 herein.

212. The elements of a claim for fraudulent inducement are :1) a false representation of material fact, 2) known by the utterer to be untrue, 3) made with the intention of inducing reliance and forbearance from further inquiry, 4) that is justifiably relied upon and 5) results in damages[8]

213.   During the period August 2014 until March 2015, all Defendants, Larkin, Lothrop and Bramante, materially omitted, and intentionally concealed by omission that they had created a clone OBT Book, utilized Plaintiff's IP to duplicate risk monitoring systems, and acted with deliberate intent to conceal their onsite replications, to fraudulently mislead and omit from disclosure they had created Derivative Works.

---

[8] MBIA Ins. Corp v. Credit Suisse Securities (USA) LLC No. 603751/09 927 N.Y.S. 2d 517, 530, 32 Misc, 3d (Sup Ct, June 01,2011)

214.    Lothrop, Bramante and Larkin concealed their activities as part of a scheme to cut Plaintiffs out of their License Fees, Royalties and to transfer value, benefit to Defendant's businesses. Defendants knew their actions were in breach of the EULA, Timetrics NDA and other agreements, and made overt attempts to conceal the replication.

215.  Defendants, through their retention, modification, and use of misappropriated Plaintiff's IP and Software, profited while engaging in trading commodities and futures and as a direct and proximate results of the improper use of Plaintiff's IP and Software, and Defendant's improper development and modification thereto; those profits were in an amount not yet fully ascertained, but believed to be not less than  $1 million to be determined at trial.

216. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1 million. In the alternative, by reasons of the foregoing, Plaintiff is entitled to disgorgement of any and all profits improperly derived from all Defendants' fraudulent inducement, in an amount to be determined at trial, but believed to be in excess of $1 million.

217. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

**THIRD CAUSE OF ACTION**
**FRAUD (COMMON LAW)**

**Against Defendants Larkin, Lothrop and Bramante, Northland and Hedge**

218. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, including attached Affidavits, as if fully set forth at length herein. Plaintiffs restate and copy in full Section C ¶86-111,  Section G ¶150-171 and Section H ¶172-178 and Affidavit 1-3 herein.

219. Elements of a cause of action for fraud require a material representation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the Plaintiff and damages. [9]

---

[9] Eurycleia Partners, LP v. Seward & Kissel, LLP 910 N.E. 2d 976, 979, 883, N.Y.S.2d 147,150,12  [NY 2009]**

First Amended Complaint, Page 48

220. On multiple dates between June 1st 2014 and March 31st 2015, *all* Defendants using phone, email and other instant messenger communications from their offices at 500 N. Commercial Drive, in New Hampshire to Plaintiffs in their offices at 154 Reade Street, New York, NY, 10013, including specifically on dates September 13th 2014, November 26th 2015, Dec 1st 2014, and numerous other dates Lothrop, Bramante and Larkin materially concealed from and fraudulently omitted that they had, by virtue of misuse of a FAT Test, Defendants had created duplicate and derivative works, in express breach of the EULA, Timetrics NDA and other engagement letters

221. Simultaneously, on multiple dates between June1st 2014 and March 31st 2015, all Defendants as stated Supra in using phone, email and other instant messenger communications from their offices at 500 N. Commercial Drive, in New Hampshire to Plaintiffs in their offices at 154 Reade Street, New York, NY, 10013, including specifically on dates September 13th 2014, November 26th 2015, Dec 1st 2014, and numerous other dates committed fraud and made material misrepresentation to Plaintiffs by  (a) fraudulently concealing the unauthorized transactions from a prior FCM  (b) fraudulently certifying that position and risk reports from Plaintiffs software reconciled with Defendants broker statements, when they had full knowledge (c.)fraudulently misrepresenting that the unauthorized transactions had been completely removed from the Pilot book, (d) fraudulently concealing that they had set up a Derivative Works, and OBT Book to replicate Plaintiffs' IP which Lothrop was expanding as a shadow system based on Plaintiff's IP, and making representations that only Plaintiffs book was active (e.) fraudulently misrepresenting and making false statements that the cashflow and margin being reported match Plaintiffs' reports, as material actions to obscure the misappropriations and misuse of Plaintiffs IP and technologies.

222. These fraudulent statements, were part of an ongoing scheme to deplete the success and performance of Plaintiff's IP and technologies, misuse the PILOT to provide cashflow for Northland's other business activities, and deceitfully lower Plaintiff's rights to renumeration, profits sharing, incentive compensations, license fees, and royalties so as to sabotage the PILOT and harm Plaintiff's  rights to compensation, and set up Derivative Works, called the OBT Book to transfer technologies onsite.

223. Defendants continued their fraud by materially omitting that they had developed a shadow Derivative Work as a spreadsheet model, which replicated the approach, graphs, functionality, calculations, and hedging strategies and methodologies of Plaintiffs IP, from which Lothrop was creating derivative works, for Defendants internal use, and to run in parallel. Defendants fraudulently omitted from all communications, concealed they had, were and intended to implement for production this derivative work that Lothrop, Bramante and Larkin had copied, for the ongoing profit and gain of Defendants, without compensating Plaintiff for its share if the IP royalties, and revenue share royalties that it had agreed to pay in the EULA and other Engagement Letters. (*See* Affidavit 1)

224. Larkin also continued his fraud and misrepresentations that Northland and Hedge would make renumerations for services and software and licenses under an Agreement in Principle.

225. Plaintiffs relied upon the misrepresentations, omissions and fraud and continued to disclose IP, Software and trade secrets, and execute a Settlement Agreement, and continued to provide services, software and IP after the settlement, reliant on other fraudulent statements that Defendants would reinstate compensations, license fees and royalties..

226. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1 million.  In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendants' fraud, in an amount to be determined at trial, but believed to be in excess of $1 million.

227. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants conduct, jointly and severally, was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## FOURTH CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS – DEFEND TRADE SECRETS ACT
### Against Defendants Larkin, Lothrop, Northland Energy, and Hedge Solutions

First Amended Complaint, Page 50

228. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

229. The Plaintiffs IP and Software including as well as its risk management strategies, hedging techniques, know-how, methods, models processes and techniques constitute trade secrets and confidential and proprietary information. Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. This information is a valuable asset of Plaintiffs and has independent economic value.

230. Recipients have agreed under the EULA and other agreements, the Plaintiffs IP and Software constituted trade secrets, with definitions and terms therein, and were the crux of Plaintiff's commercial value. (*See Eula ¶ 27, Timetrics NDA ¶2.b*) The trade secrets were shared with Defendants under the express obligations of confidences.

231. Plaintiffs' IP and Software are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value from not being known to other persons In particular, Plaintiffs' IP and Software derive independent economic value, actual or potential from not being generally known to other persons, who can obtain economic value from its disclosure or use. of the information.

232. Plaintiffs took and takes reasonable measures to maintain the secrecy of Plaintiffs' IP. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

233. During the period September 2016-March 2017 Kumaran disclosed trade secret and confidential information to Larkin, which he then used and implemented in Defendant Northland Hedge's business in New Hampshire for profit. Kumaran disclosed the information under the express restrictions of the Timetrics NDA which prohibited such use.  Kumaran was induced to disclose the information, reliant on promises by Larkin that compensation would be made by Defendants.

234. Defendants misappropriated Plaintiffs IP by deliberate actions which include but not limited to : (1) the acquisition of Plaintiff's IP using improper means, including by fraudulent inducement of Settlement Agreement and Agreement in Principle, and promises to pay compensation and royalties (2)  breach of their confidential relationship with Plaintiffs to maintain the secrecy and restrictive covenants of Plaintiff's IP, including but not limited to the restrictions and confidential obligations in the various agreements including but not limited to Timetrics NDA, EULA and Settlement Agreement; (3) ongoing use and profit of Plaintiffs IP for their own economic benefit without the express or implied consent of Plaintiffs;  all in violation of the Defend Trade Secrets Act  "DTSA".

235. Based on the willful and intentional misappropriation of Plaintiffs' IP: (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' IP until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's IP; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ;(3) an equitable accounting for all profits or benefits arising out of such breach (4) exemplary damages including but not limited to all special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees.

236. Since Defendants have both acquired by improper means and utilized implemented trade secrets for profit in their OBT Book, across state lines. disclosures were made and accessed from Plaintiff in New York, and used in  New Hampshire, Defendants are liable for misappropriation across interstate lines of commerce under the Defend Trade Secrets Act.

237. Defendants, jointly and severally, have wrongfully profited from its misappropriation and have caused Plaintiffs damages and irreparable harm. Defendants conduct, jointly and severally, was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**MISAPPROPRIATION OF TRADE SECRETS – NEW YORK LAW**

**Against Defendants Larkin, Lothrop, Northland Energy, and Hedge Solutions**

238. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

239. To succeed on a claim for misappropriation of a trade secret under New York law, a plaintiff "must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."

240. Plaintiffs IP and Software including as well as its risk management strategies, hedging techniques, know-how, methods, models processes and techniques constitute trade secrets and confidential and proprietary information. Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. This information is a valuable asset of Plaintiffs and has independent economic value.

241. Plaintiffs' IP and Software are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value from not being known to other persons. In particular, therefore Plaintiffs' IP and Software derive independent economic value, actual or potential from not being generally known to other persons, who can obtain economic value from its disclosure or use. of the information.

242. Plaintiffs took and takes reasonable measures to maintain the secrecy of Plaintiffs' IP. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

243. Recipients have agreed under the Timetrics NDA, EULA and other agreements, the Plaintiffs IP and Software constituted trade secrets, with definitions and terms therein, and and were the crux of Plaintiff's commercial value. (*See Eula ¶ 27, Timetrics NDA ¶2.b)*. The trade secrets were shared under the express obligations of confidences.

244. During the period June 2014-March 2015 Kumaran disclosed and licensed trade secret and confidential information to all Defendants, under the express restrictive covenants of the Timetrics

NDA, EULA and other restrictive engagements. Defendants, willfully and intentionally, in breach of those obligations, used, duplicated, and implemented for commercial use Derivative Works and risk management tools from which Defendants have used to generate substantial profit and revenue, in what has become operational in an OBT Book, Kumaran disclosed the information under the express restrictions of the Timetrics NDA which prohibited such use.

245. All Defendants, acting together and individually for personal benefit, took over actions, made false statements and intentionally omitted to fraudulently concealed their internal duplications, Derivative Works, and misappropriations.

246. Defendants misappropriated Plaintiffs IP and Software by deliberate actions which include but not limited to: (1) the acquisition of Plaintiff's IP using improper means, including fraudulent concealments of replications during the FAT Test, (2) breach of their confidential relationship with Plaintiffs to maintain the secrecy and restrictive covenants of Plaintiff's IP, including but not limited to the restrictions and confidential obligations in the  Timetrics NDA, EULA and other Agreements; (3) ongoing use and profit of Plaintiffs IP for their own economic benefit without the express or implied consent of Plaintiffs;  all in violation of New York law;

247. Based on the willful and intentional misappropriation of Plaintiffs' IP: (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' IP until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's IP; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ; (3) an equitable accounting  for  all profits or benefits arising out of such breach (4) exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees.

248. Defendants, jointly and severally, have wrongfully profited from its misappropriation and have caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## SIXTHCAUSE OF ACTION
### MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### Against Defendants Larkin, Lothrop, Northland Energy, and Hedge Solutions

249. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, supra, as if fully set forth at length herein.

250. Defendants only had access to the Plaintiffs' IP and Software because of the relationship between the parties, which was governed expressly by confidentiality restrictions, including but not limited to those in the Settlement.

251. Defendants did not have access to the same information without this relationship because otherwise they would not have the "guidance" and reference from which to migrate their hedging strategies, and build trading strategies, methods, techniques, processes, models with similar functionality and design to the Plaintiffs IP, and improve profits.

252. Defendants Larkin, and Lothrop run competing businesses as Commodities Trading Advisors. ("CTA"s). Larkin and Lothrop generate revenue and charge clients fees, for hedging and risk management services, that they acquiring Plaintiffs confidential information. The use of the hedging strategies and programs by one CTA without giving credit to the other CTA, is direct competitive commercial harm.

253. The primary focus of a misappropriation of confidential information claim is "the relationship of the parties at the time of disclosure and the intended use of the information". ID. Thus, it is the parties' relationship and expectations that are key, whereas for a trade secret claim the focus is on the nature of the information that a party seeks to protect. Defendants did not have access to the same information without this relationship with Plaintiffs, because otherwise they could have created their product without the necessity of engaging with or requiring disclosure from Plaintiffs.

254. Plaintiff also asserts misappropriation of other Confidential Information, for Defendants unjust enrichment and gain, 3ven if information at issue is (in part) publicly available, and so does not "rise to the level of a trade secret" it may still be protectable as confidential and proprietary information. The contracts also clearly specified that the terms and payment of licensee fees under

which the contracts were materially negotiated were under a confidential license, including the output of the software.

255. Further Defendants are in the competitive risk management business, and offer their use provides a competitive benefit, at the expense of Plaintiffs. Further they breached their independent duties of confidentiality to protect and not use the information. Finally Defendants have misappropriated Plaintiff's IP for their own personal benefit. Plaintiff also alleges that Defendants have been unjustly enriched based upon the misappropriation of the Confidential Information. [10]

256. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**Against Defendants Larkin, Lothrop, Northland Energy, and Hedge Solutions**

257. Plaintiffs repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

258. Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges "(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." [11] The essential fact necessary to prove such a claim is that "one party has received money or a benefit at the expense of another." Defendants have profited over $1 million a year, and retained other economic value and benefit, including but not limited to non-payment of Plaintiffs for services, license fees, royalties and profit sharing commissions, as well as incurred

---

\*\*

[10] SRM BEAUTY CORPORATION, Plaintiff, v. SOOK YIN LOH and Trendy Beauty Spa, Inc., Defendants. No. 20273 2010.Feb. 14, 2011.
[11] Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)accord Paramount Film Distrib. Corp. v. State of N.Y., 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 2 N.E.2d 695 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."), cert. denied, 414 U.S. 829, 94 S.Ct. 57, 38 L.Ed.2d 64 (1973).

other cost savings, other renumeration and benefits. and without fair and just compensation to the Plaintiff for its misappropriation and violations of the Settlement.

259. Further, both prior to and subsequent to the Settlement, Defendants have incorporated system design improvements, software functionality features, methods, processes and techniques, and in-house models, under express restrictions of doing so, reliant on the Defendant's promises of renumeration under an Implied Agreement. Plaintiff has not received compensation for such services, software, IP royalties, licensee fees or royalties, for the performances made after September 2016, yet Defendants have benefitted in amounts in excess of $1 million dollars.

260. The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another. [12]Under New York law, a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust.[13]

261. Plaintiff may plead this cause, in the alternative since unjust enrichment applies even where the parties have an express contract *if:* (1) the plaintiff cannot recover under the contract because the plaintiff is guilty of breach of contract, and (2) the defendant would nevertheless be unjustly enriched by keeping the plaintiff's services or money without some payment.[14]

262. Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### EIGHTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL
### Against Larkin, Northland and Hedge

---

[12] *Miller v. Schloss,* 218 N.Y. 400, 113 N.E. 337 (1916).
[13] *See Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982). Reprosystem, B.V. v. SCM Corp., (2d Cir. 1984)
[14] *Vines v. Orchard Hills, Inc.,* 181 Conn. 501, 435 A.2d 1022, 1028 (1980) Fabri v. United Technologies Int'l, Inc., 387 F.3d 109, 128 (2d Cir. 2004)

263. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein. Plaintiffs restate and copy in full Section F G ¶150-171 and Section H ¶172-178 herein.

264. To establish a promissory estoppel it must be shown that the Defendant made a clear and unambiguous promise upon which the plaintiff reasonably relied to his or her detriment".[15]

265. After the Settlement Agreement, during September 2016- March 2017 Plaintiffs provided a variety of services, software licenses,  and work product, and disclosed trade secrets and confidential information with a reasonable expectation of remuneration that never materialized. Defendants on the other hand, retained the benefit of those services, including recommendations that increased profits and improved hedging and risk management in amounts in excess of $1 million dollars.

266. Defendants made numerous promises of Payments, in or after September 2016 upon which Plaintiffs relied, prior to engaging in further business dealings with them. Injustice can be avoided only by enforcing Northland's promise of payment.

267. Plaintiffs relied on repeated promises made by Larkin of payments by Northland and Hedge, including but not limited to after the Settlement, foregoing other work so that they could devote a substantial number of man hours, time and resources towards work for Defendants, including disclosing valuable system designs, model improvements, and hedging strategies Defendants promises of compensation, were relied upon, in order for them to have performed such services, software, IP, and other contributions of value to Defendant's business.

268. Defendants benefitted materially from Plaintiff's services, and that, as a result of multiple emails, phone calls and verbal assurances between Plaintiffs invested significant resources in Northland, relying on the promise and prospect of compensation. These allegations give a factfinder a basis to find Northland liable under one or more of the quasi-contract theories alleged, including but not limited to promised compensation and return of license fees.

---

[15] (*Roufaiel v. Ithaca Coll.,* 241 A.D.2d 865, 869, 660 N.Y.S.2d 595 [1997] [citations omitted]; *see Bunkoff Gen. Contrs. v. Dunham Elec.,* 300 A.D.2d 976, 978, 753 N.Y.S.2d 156 [2002] ). )

269. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harmDefendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### NINTHCAUSE OF ACTION
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### Against Defendants Larkin, Northland and Hedge

270. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein.

271. New York law implies a covenant of good faith and fair dealing in all contracts.[16] This provision "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." [17]The duty is violated when one party acts to deprive the other of the right to receive the benefits under the agreement.[18]

272. Defendants Larkin, Northland and Hedge have failed to act in good faith in its execution and misrepresentations regarding the Agreement in Principle, and failure to enact the bonuses, license fees, and profit sharing that was agreed to [..] insert.

273. . Defendants were fully aware of the conduct which they were undertaking to replicate and create shadow systems and trading programs, creating Derivative Works from  Plaintiff's IP, and intended to materially conceal and obfuscate that activity from Plaintiff, to deny them the fruits of their labor, and their correct royalties, profits sharing and compensation. Larkin has also failed to act in good faith, to execute the non-disclosure forms, and operating agreements to intentional delay and obstruct Kumaran's businesses.

274. Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included[19] Even if a party is not in breach of its express contractual obligations, it "may be in breach of the implied duty of good faith

---

[16] *Russo v. Banc of America Securities, LLC,* 2007 WL 1946541 *6 (S.D.N.Y.2007).
[17] *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989).
[18] *E*TRADE Financial Corp. v. Deutsche Bank AG,* 631 F.Supp.2d 313, 388 (S.D.N.Y.2009);)
[19] *NewYorkUniv. v. Continental Ins. Co.,*87 N.Y.2d 308,318,639N.Y.S.2d 283, 662 N.E.2d 763;.

First Amended Complaint, Page 59

and fair dealing when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit or benefit)of its bargain" [20]

275. Defendants Larkin, Northland and Hedge acted with bad faith and with deliberate intent to circumvent his obligations under the agreements to deprive and or significantly reduce Plaintiffs' of their share of the incentive compensations and bonuses and other deprivation of commercial benefits that were relied upon as consideration of the bargain. A new arrangement to deprives it of the fruit, or benefit, of its labor is considered bad faith. [21]

276. Further Defendants violated an obligation that is not inconsistent with the other terms of the previous Engagement Contracts between the Defendants and the Plaintiffs.[22]

277. Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## TENTH CAUSE OF ACTION
## BREACH OF AGREEMENT IN PRINCIPLE - IMPLIED-IN-FACT CONTRACT

278. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein. Plaintiffs restate and copy in full Section F ¶141-149,  Section G ¶150-171 and Section I ¶179-198 supra herein.

279. Subject to the disclosures under the Timetrics NDA, and subsequent to the Settlement Agreement that the parties would consummate a purpose and business relation of mutual benefit, the parties initiated an  Agreement in Principle in or around September 2016. But for the express restrictions and disclosures under the Timetrics NDA, Plaintiffs would not have entered into the Agreement or performed services or disclosed IP and Software thereunder. This contract was

---

[20] *Marion Scott Real Estate, Inc. v. Rochdale Vil., Inc.,* 23 Misc.3d 1129[A], 2009 WL 1425252,

[21] *See Moran v. Erk,* 11 N.Y.3d at 456, 872 N.Y.S.2d 696, 901 N.E.2d 187)

[22]  s*See Dalton v. Educational Testing *785 Serv.,* 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289; *Phoenix Capital Invs. LLC v. Ellington Mgt. Group, L.L.C.,* 51 A.D.3d 549, 550, 859 N.Y.S.2d 46), and it is not duplicative of the cause of action alleging breach of contract. Elmhurst Dairy v Bartlett Dairy, No. 12116/11, 0 (N.Y.A.D. 2 Dept., July 25, 2012)

enacted upon by the parties in action, and memorialized in various email exchanges, and payments made by Larkin personally.

280. For a contract to exist, it need not be memorialized in a written form. Even if an express written contract does not exist, a contract may be "implied in fact" as a result of "an inference from the facts and circumstances of the case." [23] "[A]lthough not formally stated in words," an implied-in-fact contract "is derived from the presumed intention of the parties as indicated by their conduct." *Id.* at 506–07.

281. S1. During the period September 2016-March 2017, the parties operated under an implied-in-fact contract—an Agreement in Principle, which served as a Quasi Agreement—pursuant to which Defendants committed to contribute various capital contributions and other renumeration to Kumaran. Kumaran also provided services, work product, software licenses, disclosed confidential information and IP, in exchange for promises of renumeration, The terms of this services, relied on substantial incentive compensations, for salary bonuses to and trading royalties when performance milestones were met, and that  in exchange for Defendant's compensation schedules, which were also made personally and individually by Larkin, on behalf of Defendants. The parties operated under the Agreement in Principle - subsequent to the Settlement Agreement, where Plaintiffs provided services, software license fees, and disclosed other Plaintiff's IP and were Defendant's had started making payments to Plaintiffs. This alleged course of conduct, accepted as true, suffices to establish the existence of an implied-in-fact contract. [24]

282. Even though the parties had not signed a finished agreement, under the Timetrics NDA, the parties had an "Agreement in Principle" upon which (i) Larkin would personally make capital

---

[23] *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 36 N.Y.2d 496, 369 N.Y.S.2d 400, 330 N.E.2d 414, 420 (1975)). However, "[a] contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Saeed v. Kreutz*, 606 F. App'x 595, 597 (2d Cir. 2015) (summary order) (quoting *Julien J. Studley, Inc. v. N.Y. News, Inc.*, 70 N.Y.2d 628, 518 N.Y.S.2d 779, 512 N.E.2d 300, 301 (1987)). "The terms of an implied-in-fact contract turn on the conduct of the parties." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (citing *Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (3d Dep't 1992)).

[24] *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977) (holding that courts should look to "objective manifestations of the intent of the parties as gathered by their expressed words and deeds" to determine the existence of a binding contract).

contributions towards Kumaran's launch of a hedge fund in exchange for Membership Interests once formed – and subject to a minimum capital contribution - and bilaterally (ii) Kumaran would provide services, software and IP to Defendants in exchange for trading royalties, a profit share of all salary bonuses and materially a full reinstatement in April 2017 of the license fees under the EULA, and compensations included Software License Fees, and Trading Royalties at previously negotiated profits sharing.

283. Plaintiffs complied with their end of the Agreement in Principle, and provided hundreds of hours of services, disclosed IP, and made contributions of value and also complied with offering Larkin the Membership Interests he required in the hedge funds.

284. There was no express contract regarding the services, software licensee being provided by Plaintiffs during the period of September 2016 – March 2017, and services were provided relied on the Implied Contract.[25]

285. Kumaran worked no less than several hundred hours, in anticipation of these compensations, took time away from its business, and relied upon terms that were in the "Agreement in Principle", notable the promises of salary bonuses from Northland Hedge, and a reversion in full of the April 2017 original agreements that would be reinstated. After receiving the benefits of the labor, skills and services, Defendants breached the terms of the Agreements.

286. Plaintiffs performed their obligations under the Agreement in Principle but Defendants breached the Agreement in multiple ways including but not limited to making payments to Plaintiffs under the Agreements. Plaintiffs have suffered injury in lost revenue, failure to receive compensation for its services, software and incentive compensations, and salary bonuses, and losses in the capital contributions.

---

[25] See _Nwachukwu v. Chem. Bank_, No. 96-CV-5118 (KMW), 1997 WL 441941, at *8 (S.D.N.Y. Aug. 6, 1997) (observing that, under New York law, a "plaintiff's assertion of a claim based upon an implied contract" may only be dismissed if "[t]he existence of an express contract" has been definitively established). Under New York law, the "manifestation or expression of assent necessary to form a contract may be by word, act, or _conduct_ which evinces the intention of the parties to contract." _Leibowitz v. Cornell Univ._, 584 F.3d 487, 507 (2d Cir. 2009) (citing _Maffea v. Ippolito_, 247 A.D.2d 366, 367 (N.Y. 2d Dep't 1998)). Thus, "[a] party's conduct indicates assent when he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." _Id._ (citation omitted).

287.  Defendant's conduct was also a breach of the duty of commercial reasonableness is a breach of contract claim.[26] Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, dishonest, fraudulent, willful and intentional to harm Plaintiffs, malicious, and/or grossly negligent, which justifies an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT OF AGREEMENT IN PRINCIPLE**
**Against all Defendants**

288. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth at length herein; Plaintiffs restate and copy in full Section E ¶128-140,  Section F ¶141-149 and Section H supra herein.

289. Under New York law, a plaintiff must allege four elements to state a claim for fraudulent inducement: (1) a material misrepresentation of a presently existing or past fact; (2) an intent to deceive; (3) reasonable reliance on the misrepresentation by the plaintiff; and (4) resulting damages. *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012).

290. Larkin, acting in his capacity as CEO of Northland and President of Hedge, falsely made material representations to Plaintiffs in or around September 2016, at specific dates, times and places as alleged herein, and thereafter, that Defendants would honor numerous compensations agreements, salary bonus structures and reinstatement of software license fees, in exchange for services, and substantial profit sharing in hedging improvements. In making these statements, Larkin was acting as President of Hedge Solutions and CEO of Northland Energy and was representing Northland as a whole.

291. Given the short deadlines that Defendants represented were for the trading live during the months of September 2016-March 2017, Plaintiffs accelerated its timeline to provide services, software, risk management and hedging techniques and improvements of financial value to

---

[26] See Beninati v. F.D.I.C., 55 F. Supp. 2d 141, 147 (E.D.N.Y. 1999)

First Amended Complaint, Page 63

Defendants reliant on the compensations schedules, and took time away for its other operations and opportunities to earn revenue.

292. Further, reliant on the representations, Plaintiff's continued to provide services, software and other upgrades, design and recommendation in hedging strategies, and disclose IP, Confidential Information and Trade Secrets, to Defendants. Further, Plaintiffs reasonably relied on Larkin's representations in deciding to enter into the Implied Agreement, and proceeding to provide services, software, risk management and hedging upgrades and techniques, disclose further IP, and dilute its time management from the other activities to assist Defendant's business, reliant on the cashflow and revenue incentive compensations that were promised by Defendants.

293. Defendants however knew their representations were false and they had no intention of compensating Plaintiffs for their services, in particular because Defendants were not willing to comply with the FCM and commodities exchange regulations for Kumaran to provide such services. Plaintiffs reinsert Section G ¶ 166-171 supra herein in full.

294. Therefore Larkin, Northland and Hedge knew at the onset that their representations were false, and that compensations through Northland and Hedge could not have been made, and intended to deceive Plaintiffs to induce free services, wrongfully acquire by fraudulent inducement to disclose more trade secrets and their valuable IP, Confidential Information, provide services and proceed with the Agreement in Principle while all the time increasing profits and revenue to Defendants.

295. Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Agreement in Principle, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder in amount in excess of $1 million dollars.

296. Defendants jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

First Amended Complaint, Page 64

**TWELFTH CAUSE OF ACTION**
**BREACH OF CONTRACT (TIMETRICS NDA)**

**AGAINST ALL DEFENDANTS**

297. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein.

298. The Timetrics NDA dated March 22nd, 2011 is a valid and binding contract upon all parties, including Defendants, supported by adequate consideration. Plaintiffs fully performed all duties and obligations under the contract.

299. Defendants agreed that they would only use Plaintiffs IP for mutual benefit, would not retain, or use, or modify, reverse engineer, or otherwise misappropriate Plaintiffs' IP, including but not limited to obtaining guidance from to develop an internal spreadsheet with similar features and functions as previously and further described by the full language of the contract contained in Section 2, Section 3 and otherwise therein.

300. Defendants have breached and continue to materially breach the contract by violating the several provisions concerning the Plaintiffs' IP and specifically by retaining, using, modifying, reverse engineering, duplicating and in other ways misappropriating Plaintiffs' IP, in derogation of their express restrictions contained within the contract, including but not limited to those under Section 2, Section 3.a and 3.b.

301. Defendants, through their retention, modification, and use of misappropriated Plaintiffs' IP, and Software have and continue to profit as a direct and proximate result of the improper use of the Plaintiffs' IP, and Plaintiffs improper development and modification thereto, those profits were in an amount not yet fully ascertained, but believed to be not less than $1 million to be determined at trial. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1million dollars.

302. In the alternative, by reason of the foregoing, Plaintiff is entitled to disgorgement of any and all profits, improperly derived from Defendant's breach of contract, in an amount to be determined at trial, but believed to be in excess of $1 million.

303.  Defendants, jointly and severally,  have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm.Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION

### RECISSION OR INVALIDITY OF PROVISION 4 OF SETTLEMENT, REINSTATEMENT OF THE EULA

#### Against Defendants Larkin, Northland Energy, and Hedge Solutions

304. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein.

305. The Settlement Agreement, notably the provisions of Section 4 to terminate all prior Engagement Letters and EULA was procured by fraud. Plaintiffs repeat (Section 21 hereunder_) Defendants knew that had retained Derivative Works, had implemented them for production as an OBT Book,, and were cash-flowing profits to Defendants, and willfully and maliciously intended to cut Plaintiffs cut of their fair share of royalties, license fees and other compensations. Larkin, Northland and Hedge induced Section 4 of the Settlement based on fraudulent omissions and statements, fraudulent representations and warranties, and thus provision Section 4 is void under law. Recission of Section 4 is permissable at the Plaintiffs' option as the terms were induced by fraud, and are therefore null and void.

306. Defendants, jointly and severally,  have wrongfully profited from its fraud, misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## FOURTEENTH CAUSE OF ACTION

### MISAPPROPRIATION OF SKILLS AND LABOR

**AGAINST DEFENDANTS LARKIN, NORTHLAND ENERGY, HEDGE SOLUTIONS**

307. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein. Plaintiffs reinsert and incorporate Sections G 150-171 and Section I 179-198 supra herein.

308. Larkin and Northland Energy and Kumaran are direct competitors, registered as commodities trading advisors. ("CTA'S). During the period September 2016 -March 2017, under the fraudulent promises of compensating Kumaran as a CTA, Kumaran provided IP, services labor to Northland and Larkin's CTA reliant on the sharing of profits and other renumerations, Larkin has misappropriated hundreds of hours of unpaid labor, skills, services, and expenditures during the period, for  continue excessive hours of work, without compensation and signed agreements and as a competitor and CTA used these skills to further his own CTA business Further Defendants, in bad faith,  have threatened to breach numerous confidentiality provisions, and publish and disseminate trade secrets and confidential information, and Larkin has impeded registrations of the hedge funds, and failed to comply with management, to attempt to destroy the reputation and good will of Plaintiff's businesses as retribution should Plaintiffs pursue action against them.

309. Plaintiffs have been harmed by non-payment of the various compensations contemplated in the Agreement in Principle, while Defendants have retained the benefits from and profited from the services, discounts, software license and disclosure of IP provided to them thereunder in amount in excess of $1 million dollars.

310.  Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

### FIFTEENTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

### Against Defendant LARKIN

311. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein. Plaintiffs restate and copy in full Section J ¶199-202, supra herein.

312. Larkin under the Agreement in Principle and other oral and implied agreements undertook roles as a principle (owning 10% of more) and as a member of Timetrics' affiliate LLC, for which Kumaran is majority member. The LLC cases have generally, in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC members as owing each other the traditional fiduciary duties that directors owe a corporation. Larkin therefore owes Kumaran a fiduciary duty and a duty to act in good faith[27].

313. Larkin in his protections of confidentiality, and agreements to protect the interests of owes Kumaran a fiduciary duty in the protections of confidentiality of her businesees Larkin's obstructions to hold up signing an NDA, and excuting operating agreements are a breach of his fiduciary duty to Kumaran, to act in the company's best interest.

314. His actions, demonstrate a breach of his duty of loyalty, and a willful and intentional attempt to make public confidential information, obstrcut and harm Kumaran's as a partner in its other businesses, under Delaware Act, as well as breach of Timetrics NFA.

315. Larkin also has acted in bad faith since 2016 until present date, to not comply with the regulatory requirements and his duties to Kumaran to register the funds. His actions have caused Kumaran significant financial harm. Larkin also has a fiduciary to act in good faith to Kumaran.

316. Larkin is therefore also liable for breach of fiduciary duty under the Delaware Act, for his failure to act in good faith and execute the necessary LLC documents, respond to operating agreements, and NDA's and instead threats to make public Confidential Information.

Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

---

[27] *See Douzinas v. Am. Bureau of Shipping, Inc.,* 888 A.2d 1146, 1149-50 (Del.Ch.2006);

First Amended Complaint, Page 68

## SIXTEENTH CAUSE OF ACTION
## AIDING AND ABETTING FRAUD

### Against Lothrop and Bramante

317. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, *supra*, as if fully set forth at length herein, and Affidavits 1- 3.

*318.* In the alternative, Plaintiff pleads against Lothrop and Bramante, that Lothrop and Bramante aided and abetted Larkin, Northland and Hedge in committing fraud, by taking affirmative actions, and providing substantial assistance in enacting the scheme, and participation of the fraud, including but not limited to making material misrepresentations, concealing the OBT Book, Derivative Works, and the other fraudulent conduct stated in Affidavit 1 – Fraud, Affidavit 2 and 3 and otherwise herein, and also pled in Cause of Action 2 and 3

*319.* A defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed'; and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.' *Rosner v. Bank of China,* No. 06–CV–13562, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008)

320. Defendants, jointly and severally,  have wrongfully profited from its fraud, misappropriation and have caused Plaintiffs damages and irreparable harm. Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs Samantha Siva Kumaran and The A Star Group, Inc prays for relief that this Court render a judgment against Defendants, jointly and severally, for a ruling;

Enjoining Defendants, their offices, employees, agents, successors, and all other persons in active concert or participation with them, from:

a. Continuing to use or engaging in any and all trading activities of commodities or futures products, which are in any way derivatives of the possession, use or derivative modification, development, or reverse-engineering of Plaintiffs' IP, as described in the Settlement Agreement.

First Amended Complaint, Page 69

b. Recission of Section 4 of the Settlement Agreement; Reinstatement of the EULA and other engagements;

and Awarding:

c. Compensatory damages in an amount to be determined at trial, but believed to be in excess of $1 million;

d. Costs and disbursements;

e. Attorneys fees, in an amount to be determined, as provided for in the Settlement should Plaintiffs be the prevailing party;

f. Exemplary damages including but not limited to all special, indirect, punitive, consequential or other damages;

g. Pre-judgment and post-judgment interest; and

h. Such other relief as is just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY

Dated: New York, New York

December 26th 2019.