Affidavit Fraud 1, Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN, ) | |
| THE A STAR GROUP, INC. ) | |
| d/b/a/ TIMETRICS, and ) | Case No: 1:19-CV-08345–LGS-DCF |
| ) | Judge: Hon Lorna G. Schofield |
|            Plaintiffs, ) | Magistrate Judge: Debra C. Freeman |
| ) | |
|   -against- ) | **AFFIDAVIT BY KUMARAN** |
| ) | **IN SUPPORT OF FIRST** |
| ) | **AMENDED COMPLAINT AND** |
| NORTHLAND ENERGY TRADING, LLC ) | **MOTION UNDER** |
| HEDGE SOLUTIONS, INC., ) | **FOR** |
| RICHARD M. LARKIN ) | **LOTHROP AND BRAMANTE** |
| DANIEL LOTHROP ) | |
| DOMENIC BRAMANTE ) | |
| ) | |
|            Defendants, ) | |

## AFFIDAVIT 1 - FRAUD  - SAMANTHA S. KUMARAN

Pursuant to 28 USC 1746,  FCRP 15(c)(1)(C) and Local Rule III.3.(B) Plaintiff Samantha Siva Kumaran provides this Affidavit in support of its Plaintiffs First Amended Complaint and Motion under Rule 15 (c)(1)(C) to relate back claims for Daniel Lothrop and Domenic Bramante.

1.      I am Samantha Siva Kumaran, I am a British born, United States citizen and I am the Plaintiff that is the sole owner of all rights, title and interest to the Plaintiff's IP and Timetrics Software which is the subject matter of this Complaint.

2. During the period from about March 2011 until March 2015 I disclosed IP, and provided services and software under a license agreements, non-disclosure agreements, and several engagement letters to Defendants. A primary contract between the parties was the Software License Agreement ("EULA") which attached to which Lothrop and Bramante are both directly parties, as an employee who are jointly and severally defined as Licensee.

3.   My  IP and Timetrics Software was licensed to Defendants, exclusively under the EULA which contained numerous restrictions and covenants for which Lothrop and Bramante are expressly

bound as an individual. [1]..[2]  Until Lothrop's interference with Plaintiff's services in late 2014, Defendants expressed satisfaction with Plaintiff's services and had executed four (4) contract renewals. (*See* Eng Ltr 0-4 supra).

4.   No sooner had the PILOT commenced, Larkin, Lothrop and Bramante began their fraudulent scheme to misuse the PILOT to internal duplicate, modify and create an internal clone called the OBT Book, and misuse my technologies for their internal use, all of which were fraudulently concealed.

5.   Instead, fraudulently concealed from Plaintiffs, when the PILOT went live in or around August 2014, Defendants through Lothrop, Larkin and Bramante started functional and implementing for use, a shadow-system to internally supplement their risk management monitoring, and were actively working on transferring technologies, know-how, hedging strategies and software designs on site, all fraudulently concealed from Plaintiffs, to purposefully replicate the hedging strategies onsite.

6.   Simultaneously to their plans to operate the OBT Clone, on or around September 1st 2014, Lothrop, Larkin and Bramante secretively transferred dozens of synthetic futures, specifically unauthorized under the Agreements, into the FCM Account which was dedicated for the PILOT. Lothrop, Bramante and Larkin continued their fraudulent concealments, in express breach of the agreements, Lothrop and Larkin transferred and executed dozens of unauthorized transactions into the Separate FCM Account rendering performance and margin reconciliation under the contracts impossible

---

[1] Section 1.1 of the EULA defines  **"Licensee"** shall mean collectively Northland Energy Trading LLC and Hedge Solutions, Inc both New Hampshire Corporations, with offices at 500 N. Commercial Street, Suite 302A, Manchester, NH, 03101 and its Operators, officers, directors, employees and owners all jointly and severally defined as Licensee. Further Larkin, Lothrop and Bramante were bound by the terms related to Derivative Works under Section 1.7 of the EULA which states

[2] **"Derivative Works"** shall mean modifications, adaptations, alterations, copies, improvements, enhancements, Updates, extensions, upgrades, revisions and other works created from or using the Timetrics Property (or any portion thereof), including without limitation: (… (ii) ***any duplications, excerpts, critiques, sub-reports, and copies (in whole or in part) made by Licensee or third party which may be incorporated into internal correspondence, documents, property, software, spreadsheets, models, systems, reports, or discussions***; and (iv) for material which is protected by trade secret, any copies (in whole or in part) ***or new material derived from such existing trade secret material***, including ***new material which may be protected by copyright, patent and/or trade secret.***  (Emphasis added)

7. Under the Engagements, there was a clear division of rules and responsibilities, which meant that Defendants were solely responsible for all broker statement reconciliations, margin and cashflow reconciliations. Notably Bramante, the Controller was responsible to sign off and certify on a daily basis on the risks, Middle Office and controls of the program – a material responsibility in the division of labor and I had no responsibilities to even look at or review any of the FCM statements, place any trades, and were simply retained to run in parallel out of software, based on its own record of positions and customer revenue.

8. In order to conceal the activities, and since I had no contractual obligations to review the FCM Statement, Larkin and Bramante was able to conceal the breaches by making fraudulent statements and sign-offs as "Ok" and "Approved" on a daily basis, by intentionally and make fictitious representations, that he had reconciled the Cashflow and Margin and no such Unauthorized Transactions were in the FCM Account in his daily emails. This was intended to mislead Plaintiffs to thinking that the account was still a separate account, and the Defendants were not profiting and misusing the cashflow and margin from Plaintiffs IP to support other extraneous activities of Northland's business for which Plaintiffs were not being compensated and instead were diverting transactions into the OBT clone for internal use in breach of the

9. Specifically, in emails from Domenic Bramante, from his office in Manchester New Hampshire, dated September 2nd, 2014, September 3rd, 2014, September 4th, 2014 and September 5th, 2014, effectuating the fraud, sent using wire communications from the to Kumaran in here offices in New York City, with cc. copy to Larkin, Bramante, made fraudulently statement knowingly and intentionally, acting in concert with Defendants  both (a) fraudulently concealed numerous unauthorized transactions from another FCM, specifically included synthetic futures and (b) fraudulently concealed and materially omitted that Lothrop and Larkin were operating a Derivative Work shadow system online for other activities in the Northland book**.** In order to deceive and mislead me, Bramante, with copy to Larkin to conceal, signed the position and cashflow and margining statements,  as reconciled to Plaintiffs  statements, as "OK" and

Affidavit Fraud 1, Page 4

"Approved" so that it was deliberately misled to believe the account only contained positions from the PILOT.

10.     On similar dates, from their offices in New Hampshire to Plaintiffs offices in New York City, Daniel Lothrop, via multiple IM communications starting August 18th, 2014, and all trading days in September 2014, materially omitted and fraudulently concealed, with knowledge and review by Larkin to omit, that all Defendants had become operational with a risk management clone and Derivative Work, expressly forbidden under the contracts, for their internal use, profit and gain, and to cut Plaintiffs/me out of their license fees and profits sharing.

11.   Reliant on the fraudulent statements, I continued to provide services and disclose IP to assist Northland's business. If Defendants had been truthful about their internal replications, Derivative Works, cloned risk management spreadsheets and other misconduct, I would have terminated the contracts, not performed further services, restricted further disclosure of any IP, and enforced my rights.

12.   Each day, continuing the fraudulent representations in email Domenic Bramante, Controller of Northland, on September 8th 2014, September 9th, 2014, September 10th, 2014, September 11th, 2014 and September 12th, 2014, signed and certified the statements as "OK" and "Approved" sending those emails from his offices in Manchester New Hampshire, to my offices in New York City, NY. Defendants, both (a) fraudulently concealing the unauthorized synthetic futures and (b) and fraudulently concealed Lothrop, Larkin's and Defendants implementation of the Derivative works OBT Book which had become operational.

13.   Under the Engagement (Eng ltr Para 4,) Bramante was solely responsible to manage the risks and reconcile cashflow and margin. With the unauthorized synthetic futures, which he was knowingly concealing, it was contractually impossible for Bramante to reconcile the cashflow and margin or to monitor the risks in the book in the FCM Account, as well as reconcile the cashflow and margining with those Plaintiffs reported,  as the Defendants, acting together to fraudulently conceal Lothrop activities, were deliberately misrepresenting that the only activity in the FCM Account was only of those of the trades involved in the PILOT.

14. By knowingly omitting the activities, making false statements on the reconciliation, and fraudulently concealing the OBT Book and clone to transfer Bramante, Larkin, Lothrop and Defendants knew they were misappropriating the PILOT for internal use, with willful scienter and deliberate intention to reduce my profit sharing and not pay the License Fees. Defendants went out of their way to keep the unauthorized activities fraudulently concealed and omitted from communications.

15. Further, in express breach of contracts, to sabotage my performance, Lothrop and Larkin placed, the unauthorized synthetics in the dedicated FCM Account to hinder my performance share and revenue.  However, the magnitude of the negligence and lack of experience in trading, manifested itself in outright negligence and backfired on the morning of about September 15th 2014, when Northland started receiving sizable margin calls on the FCM Account due to the fraudulently concealed trading activity**.** Not only had Lothrop encumbered the account, he had made the gravamen error, citing his inexperience and lack of qualifications to handle the trading floor, and lack of supervision and internal controls, and materially  miscalculate the margin effect of short puts and long calls, and made grossly negligent miscalculations that the synthetic futures that contained two positions ( a long call and a short put) would "net out" and have no margin.

16. As such, Lothrop, in his bungled attempts to operate the clone he had negligently far exceeded the cashflow and margin limits.

17. Defendants negligence and actions had therefore significantly placed the PILOT in complete impossibility of performance, and rendering the objectives to benchmark performance of the hedging strategies a nullity, and completely violating a material consideration of maintaining a separate account for the Pilot and caused a material impediment to performance under the PILOT. This in turn in now completely damaging and hindering my ability to provide services as intended and of deliberate financial consequence to my performance.

18. After weeks of stalling on explaining the activity, Larkin made excuses that the situation was  temporary glitch due a problem with another FCM, they were in the process of opening yet another FCM Account, and made assurances that the unauthorized transactions would be removed

in their entirety. These statements were materially false when made, to further induce me to keep disclosing proprietary information and demonstrate value of its IP and hedging strategies, as Defendants continued to create mimic and derivative works onsite. Larkin instead continued to keep the loss leading deals in the account, with <u>all</u> Defendants fraudulently representing otherwise.

19. After December 1st 2014, Northland now trying to recover their own loss breached the contracts in multiple ways, rendering performance of the PILOT impossible and commercially voided the intent of the PILOT.

20. Those breaches include but not limited to (i) removing all physical hedges from the PILOT which was designed to run as a Hedging Account and requesting the program run only Speculative Trading be done most likely in breach of their own FCM agreement in order to recover Lothrop's Webinar Loss, with significantly increased risk parameters approved by Bramante and Larkin, in excess of $1 million dollars (ii) demanding out-of-scope services for the cashflow and margin allocated in the PILOT to include unauthorized transactions of synthetic futures in the book, making reconciliation of the books and margin an impossibility; (iii) failing to provide Customer Premium, estimated to be in excess of $3,000,000 leaving the FCM Account underfunded, as part of the Defendants machiavellian attempts to create a shadow program (iv) requesting the program be modified to run with Lothrop's Losses and not supplying gallons or physical deals with Customer Premium to offset the losses.

21. As Defendants schemed and continued to fraudulent conceal and operate the Derivative OBT Clone Further, fraudulently concealing the OBT Clone from me Larkin, Lothrop and Bramante continued to scheme to now "use" my services to accelerated deployment of their own version, transferring about 89% of the contracted volume into the replications, and enacting their plan to lower revenues to Plaintiffs.

22. On December 1tst, 2014 Larkin made fraudulent statements via Instant Messenger on Yahoo Communications to me that stated that unauthorized transactions of futures had been removed, and that the only remaining position were "net long" and that their margin contribution was "zero". These statements were false when spoken, intended to deceive, as Defendants continued to be

fraudulently concealing numerous synthetic futures, with margin contributions of several hundred thousand of dollars and certainly not zero.

23. On specific dates December 1st, 2014, December 4th 2014, December 8th, 2014, December 10th, 2014 and also on December 12th, 2014, Daniel Lothrop in his IM communications from their offices in Manchester NH, sent via Yahoo Messenger to Kumaran in their offices in New York City (a) fraudulently concealed and materially omitted to disclosed in communications that he was in parallel running with Larkin a on the Derivative OBT Works for risk management processes so as to avoid paying the onsite Licensee Fees omitted in his communications the OBT clone had become operational and (b) fraudulently concealed and materially omitted to disclose in communications Defendants were using the PILOT of benefit outside the terms of the scope, to monitor numerous unauthorized transactions of synthetic futures which were expressly out of scope of the agreements, and that in fact those transactions had not been removed.

24. On specific dates, December 1st, December 2nd December 3rd, December 4th, December 5th, and December 8th, December 9th, December 10th, December 11th, and December 12th, Domenic Bramante in email communications from his offices in Manchester NH, sent via email to Plaintiffs to their offices in New York City, and with email CC copy to Larkin, signed and certified as "OK" and "Approved" that fraudulently misrepresented that the cashflow and margin and other statements matched those of the FCM Statements, and also fraudulently concealed that the Defendants had numerous unauthorized transactions concealed in the FCM Account and fraudulently concealed that Defendants were using a Derivative OBT book onsite for other aspects of their business and to supplement risk management tools.

25. On the morning of January 28th 2015, Bramante and Lothrop again in email and IM communications from their offices in New Hampshire to Plaintiffs offices in New York, fraudulently mispresented the deals and positions in the book, misstated FCM positions and certified in writing the positions and margin as "Ok" and "Approved" when they knowingly were fraudulently concealing dozens of unauthorized transactions, Again these statements were false,

intended to deceive as Defendants Larkin, Lothrop and Bramante also knowingly implementing their own version of the duplicate OBT Book.

26. The depth of Lothrop's inexperience and confusion with options trading began to manifest itself, all of which resulted in Northland being long dozens of futures contracts. The failure to have proper controls, and mismanagement on Larkin's part extended well into the early hours of trading and ultimately resulted in a significant loss of $90,000.

27. Further on the morning of January 28th 2015, both Bramante and Lothrop provided fraudulent misstatement of the positions. in email communications and in instant messenger, that materially misrepresented the actual positions in the FCM Account, further obscuring that various options assignments had occurred. Since Plaintiffs were not obligated to review the FCM statements, Plaintiffs were solely reliant on accurate communications from Lothrop and Bramante.

28. Waiting for more than twenty four hours, to understand the seriousness of the mistake, Lothrop again in inexperience and negligence had miscommunicated and misunderstood calls with the brokers and therefore made further gravaman errors causing losses in the account.

29. In email from New Hampshire on January 28th 2015, to Plaintiffs' offices in New York, Larkin then finally admitted that the error was a mistake made by Lothrop, and due to his own misunderstanding of calls with the FCM where he had left the book dozens of futures long. His email of this date, admitted to Lothrop's lack of understanding and Larkin stated in his email…
*"Hi Samantha : spoke w Dan. ..... He admits he misunderstood the call from [FCM] to us this morning so it's appears to be our issue. I would like to get a call from you ASAP if possible..I'll deal w the aftermath later. .....This is not critical to the timetrics P&L...But it is to us. A quick call would be greatly appreciated. You can reach me on my cell,Thanks, Rich"*

30. The fraudulent activity manifested itself in a final debacle on or around February 18th 2015,when Defendants were caught once again concealing numerous unauthorized synthetics and despite Bramante's fraudulent statements on February 15th, 2015, February 16th 2015 that the positions were certified "ok" and "Approved", Lothrop and Larkin's effort to conceal the unauthorized activities resulted in margin calls that did not reconcile.

31. On February 18th, 2015, Plaintiffs demanded to finally review the FCM statements, again performing out of scope services, to reconcile statements, where the fraudulently concealed activities were once again exposed.

32. However the malfeasance was uncovered too late. Negligently miscalculating the impacts of the dozens of unauthorized synthetic futures, which Defendants, Larkin, Lothrop and Bramante had fraudulently represented had been removed and had "zero" margin (See Supra) and expressly and falsely stated had been removed, instead the account was replete with unauthorized transactions causing further margin calls in excess of hundreds of thousands dollars.

33. In IM and email Plaintiffs confronted Larkin with the breaches, and Defendants documented loss leading transactions that were still encumbering the account, that Bramante, Lothrop and Northland had willfully concealed.–

34. My contracts expressly did not allow for me to provide services, software or systems to include (a) Lothrop's unauthorized transactions including synthetic futures, and (b) provide strategies on a system that was no longer hedging, where Defendants had not supplied Customers volume, withholding of premium, customer revenue and customer gallons, (c) increased risk limits to recover negligence and losses caused by absences from the trading floor by Lothrop, including the Lothrop Webinar Loss (d) operating the programs without hedging heating oil gallons thereby turning the software system into a speculative trading system and not a hedging trading system outside of the regulatory compliance parameters Northland was supposed to conduct its business; (e) to recover losses caused solely by Northland; ((f) operate without Customer Gallons, which were ceased to be provided on or around December and/or (g) be with an absentee trader.

35. All the foregoing were material "out-of-scope" services, that were not contracted for, but were being demanded to remedy the problems caused by Lothrops' trading floor absences and the Webinar Loss, he incurred over Thanksgiving.

36. Defendants through the negligence and unauthorized trading of Lothrop failed to meet an intraday margin call, and upon belief incurred significant losses as they were unable to post margin on the combined book. ("Lothrop Premium Loss")

37. Unknown to me at the time, Lothrop, Bramante and Larkin had in fact diverted substantial customer gallons, volume and premium away from the PILOT I was running, to in fact, run a shadow system, from which they would not have to pay me the royalties and profit splits. These attempts backfired, when they place loss leading deals in the FCM account and Lothrop, who was a recent college graduate with no experience in trading, miscalculated margin, causing significant debacles and placing the company at significant risk.

38. Lothrop, instead, was scalping the value of the PILOT to build and modify and adapt the programs and models, abetted by Bramante and Lothrop, for his own personal use and gain, and advancement at Northland, in order to stop paying the license fees to me, for use in New York and transfer the technologies onsite, in express breach of the agreements.

39. In lieu of an affidavit sworn under oath, federal law allows an "unsworn declaration, certificate, verification, or statement, in writing, of [a] person which is subscribed by him, as true under penalty of perjury, and dated" to have the same force and effect as an affidavit or other sworn statement. [3]

---

[3] *See* 28 U.S.C. § 1746; *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (while an affidavit is required to be sworn to by the affiant in front of an officer authorized to administer oaths, 28 U.S.C. § 1746 allows for "unsworn declarations under penalty of perjury" to support any matter that legally requires an affidavit to support it). If this unsworn declaration under penalty of perjury is executed outside of the United States, section 17 46 requires that it be substantially in the following form:"'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).