# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN, ) | |
| ) | Case No:1:19-CV-08345–MKV-DCF |
| *Plaintiff,* ) | Judge: Hon Mary Kay Vyskocil |
| ) | Magistrate Judge: Debra C. Freeman |
| ) | |
| -against- ) | **AFFIDAVIT BY KUMARAN** |
| ) | **IN SUPPORT OF** |
| ) | **MOTION TO STRIKE** |
| NORTHLAND ENERG TRADING et al. ) | |
| **)** | |
| *Defendant,* ) | |

## AFFIDAVIT 1 – FALSE STATEMENTS - SAMANTHA S. KUMARAN

Pursuant to 28 USC 1746, FRCP (12(f), FRCP 56, FRCP 11(b) and Local Rule III.3.(B) Plaintiff Kumaran provides this Affidavit in support of its Plaintiffs Motion to Strike

1. I am Samantha Siva Kumaran, and I am the Plaintiff that is the sole owner of all rights, title and interest to the IP which is the subject matter of this Complaint.

2. This affidavit certifies that the letter Defendants filed with the Court on March 2nd 2020, made numerous misrepresentations to the Court, and contained multiple false accusations which can be proven after even a little factual discovery, to have no evidentiary support. Many of these false statements are related to corporate entities that are not parties to this action.

False Accusation 1 –At a subsequent meeting.. "Timetrics" would instruct Northland and Hedge on a to-be-agreed-upon volume of trades.

3. There was only one in person meeting to discuss and agree upon the terms of an Agreement in Principle on August 4th 2016 in New York City. There was no "subsequent meeting" in which I or another corporate entity agreed to "instruct" anyone on trading. Any subsequent meeting was related to Larkin's (in his individual capacity) his personal and individual proposed Two Year Capital contribution to a third-party entity Nefertiti Asset Management, LLC ("NAM")

4. Any agreement which was mostly discussed or was a proposal for trading was for me in my individual capacity or through a new entity that had been formed, specifically to be registered as a

CTA called Nefertiti Risk Capital Management, LLC ("NRCM"). There was no agreement at all for Timetrics to trade.

5. On September 28th 2016 Larkin and I discussed that he had spoken to an Futures Clearing Merchant ("FCM") about opening a Managed Account, for me (in my individual capacity) and an affiliate Nefertiti Risk Capital Management, LLC ("NRCM") to have direct trading authorization on a Northland account. This authorization was not for the corporate entity "Timetrics".

6. The person at the Futures Clearing Merchant was an executive called Tim Toohey. I also spoke to Mr. Toohey on several dates around this time. He was also aware that any trading would be either handled through either me, (individually) or through a new entity NRCM. There was never any mention in any of these dialog related to Timetrics.

7. On or around October 3rd 2016, Larkin sent me trading applications (in my individual capacity) to be signed at the FCM on behalf of Northland. I was to have direct authorization on the account, and under no circumstance would I be "instructing" anyone on trades. A true and exact copy of the forms he wanted me to sign as trading for Northland are hereto attached as Exhibit 1. The evidence of email exchange is below.

> Rich Larkin rich@hedgesolutions.com
> To:Samantha Siva astargroup@yahoo.com
> Oct 3, 2016 at 9:40 PM
> Hi Samantha: Please see attached. Please go to page 3 and fill out Section 5 for me so I can get this moving along. Also, let me know a good time to chat tomorrow. It's going to be busy and you had mentioned availability on Wednesday so if that works better let's do it then. I'm talking about times to go over the OBT data. Regarding the NAM stuff, I'm available tomorrow evening and Wednesday evening. Let me know what works on both topics above. Thanks! Rich
> **Richard M. Larkin,** / President Hedge Solutions,

8. On October 25th 2016, the following email exchange occurred
> QEP status Yahoo/Sen
> From: Samantha Siva astargroup@yahoo.com
> To:Rich Larkin
> Oct 25, 2016 at 7:58 PM
> Rich, waiting for call back from Toohey. They need to know for the MA agreement if you are QEP status. Don't want to have this cause any delays. Please confirm asap. NRCM is registered as CTA so its regulatory compliance. Please confirm today if you can. Thanks, Samantha
> Forwarded Message -----
> **From:** Rich Larkin <rich@hedgesolutions.com>
> **To:** Samantha Siva <astargroup@yahoo.com>

Affidavit Motion to Strike, Page 3

>**Sent:** Tuesday, September 27, 2016 10:47 AM
>**Subject:** RE: working on it
>*I am working the QEP question, but I do believe we meet that threshold. I have to wait on the attorney to confirm. I've searched all your emails and cannot find a Risk Disc. Doc. Can you resend? Rich **Richard M. Larkin** / President /Hedge Solutions, Inc.*

9. The form that was sent by Larkin, if executed, gave me Power of Attorney, <u>in my individual capacity</u>, on Northland's Account, and had no requirement to "instruct" someone else (Northland or Hedge) to trade. Under this agreement, I had would have <u>direct trading authorization</u> on, and would be properly registered under the Commodities Exchange Act ("CEA ") and I agreed to trade a Managed Account, and under those rules, <u>I would be solely responsible for placing those trades</u>. (not "instructing" anyone, which is a completely different arrangement)

10. As we proceeded to finalize the terms of the account, I discussed the express regulatory disclosure that were required. In order to comply with the CFTC Rules, I needed to provide Larkin a disclosure document, and also Toohey needed they compensation schedule of how I would be paid as I was registering as a Commodities Trading Advisor ("CTA"). Since the other entity NRCM was also registering as a CTA, at the National Futures Association, Larkin and I expressly discussed the disclosure requirements for this other entity to be on the account.

11. Other evidence shows emails in October 2016, sent to Larkin that state
>"I spoke to the CTA lawyer and since <u>NRCM</u> is now registered (it was recently filed) the risk disclosure document needs to be filed with the CFTC, <u>so we are subject to regulatory oversight in terms of NRCM managing the Northland account.</u> The FCM also needs a copy of the Managed Account agreement filed, so that the performance incentives are reported. Also in the Risk Disclosure Document for the Hedge Fund, and NAM, this MA needs to be reported, as well as performance incentives…. For regulatory compliance, the terms you propose have some conflicts of interest and would cause problems in disclosure for launching the fund and therefore need to be changed."

12. Larkin then suggested he wanted the activity hidden from the regulator as well as his CFO, Controller and Lothrop. After he realized that there were regulatory compliance disclosure requirements, and the Managed Account would be fully transparent , he then told me he wanted me to hide my name from the FCM forms. This would have been a compliance violation so I declined such an arrangement. This illegal activity would have been so that Larkin and Northland did not have to disclose how I was paid.

13. I was aware the Larkin had been fined previously for regulatory compliance violations, and I was advised that Larkin's requests were to skirt the rules which I declined to do.

14. Larkin not only wanted to hide the account from the FCM, he was wanted to hide it from his his controller, to hide the account from his trader, to hide the account from his CFO, rather than fill out the disclosure account required, he then wanted to "lie" to the FCM about who was actually trading the account. It was only after Nov 2016, that he started demanding new terms that I "instruct" him behind the scenes and I declined to get involved in such dishonest activity. I never agreed to such activity.

15. Therefore I never proceeded to sign the FCM forms or undertake this Managed Account..

16. On October 26th 2016, I sent Larkin an email starting *"Since I think you mentioned you want Northland/NRCM relationship to be anonymous, I cannot breach the regulatory disclosure requirements or the audit requirements."*

17. Shortly after this email, Larkin continued to threaten me, and demanded that either myself and NRCM (a separate legal entity that is not a party to this action) violate the Commodities Exchange Act, and "hide" my involvement by not putting my name on the FCM Account, as a CTA, or he would withhold funding from the hedge fund.

18. He also demanded that I now instead "teach" Northland and Larkin to trade my CTA strategies, without registering my name of the CTA, and without disclosing the activity to the FCM or regulators. This would unlawfully allow Larkin to take credit for his competitors performance record without compensation. I declined again such activity.

19. I was told that if I didn't go along with these demands, Larkin would withhold capital as leverage and hold up funding from the hedge fund, unless I comply with this unilaterally demands.

20. When I declined to break the law, Larkin then enacted his threats and "resigned" as he was unable to coerce unreasonable demands. All these facts show there was never any agreement that "Timetrics" would "instruct" Northland and Hedge to make trades. Neither Timetrics nor Hedge are parties to this. The only agreement that was considered, was that myself in my individual capacity, and a separate corporate entity "NRCM" would handle a Managed Account for

Affidavit Motion to Strike, Page 5

Northland, <u>with direct trading authorization</u>, that under regulatory compliance involved a CTA disclosure agreement and registration of compensation with the FCM.

21. This agreement was never consummated, because Larkin did not want to comply with the regulatory requirements.

*False Statement 2 – Kumaran never provided the promised trades"*

22. As explained in detail above I never "promised" to provide Defendants any trades. As documented above in Paragraphs 1-21, the only discussed agreement was for me (in my individual capacity) and an affiliate, not a party to this litigation, NRCM, to handle a Management Account, subject to regulatory compliance and disclosure requirements that Larkin wanted to avoid.

23. After Larkin pulled the FCM Account, all further discussions that occurred after November 2016, included written communications from Larkin acknowledging that "he was under no obligation to see the trades" and therefore the exact opposite is true.

24. The following emails exchanged and draft agreements between the parties, shows that <u>Larkin agreed in writing on December 9th 2016</u> as follows

> "There is no obligation..to disclose the trades or detailed workings of the Trading Programs to you. If the parties mutually decide <u>later</u> to disclosure of the trades, ..we agree that you will sign a Non-Compete Agreement.. and to terms to protect the intellectual property, proprietary nature and confidentiality of the Trading Programs."

25. Larkin refused to sign such a non-compete agreement. There were no "promised" trades and no such agreement otherwise. Larkin did not want to comply with the regulatory requirements for disclosure and payment.

*False Statement 3 ..."Timetrics" - instruct trading on a "to-be-agreed-upon" volume of trades.*

26. When I agreed to manage an account, there was not only no agreement for Timetrics to undertake this activity, and there was no agreement for there to be an "*to-be-agreed*" upon volume of trades.

27. After September 2016, Larkin provided me approximately seven or more delivery months of Heating Oil transactions. The agreement was that performance compensation was calculated from and due on all seven months of them. After I provided services and disclosed strategies and ran software and improvements on all of the seven months, Larkin then acquired those benefits,

incorporated the benefits and profited for himself and Northland. Then, after-the-fact, and after receiving the benefit for seven months, Larkin then tried to reduce the number of books to one or two) for which I would be compensated for to claim all the profits on most of the books and not pay the agreed upon rates. Thereby Larkin would keep the financial benefit from most of the books without fairly paying for what the services were done.

28. Those terms became inherently unfair, not what we agreed to. This was also part of the commercially unreasonable conduct that Larkin wanted to acquiesce or he would withhold funding and are conclusory allegations.

29. I never agreed to an "after-the-fact" agreed upon volume – which means afterwards Larkin could unilaterally decide to compensate his workers "less" than bargained for and dictatorially reduce profit sharing on services already performed. This statement is also contradicted by the plain English language terms in the Agreements. (*See* Supra 1-19)

*False Accusation 4 –When they met, Kumaran proposed that "Timetrics" resume trading for Northland and Hedge – initially gratis- so she could demonstrate that Timetrics' program worked.*

30. For the same reasons above this is not true. The evidence shows clearly that the agreement was that only myself in <u>my individual capacity</u> and a separate legal entity Nefertiti Risk Capital Management, LLC ("NRCM") that is not a party to this proceeding were involved in any trading accounts for Northland (<u>and not Hedge</u>). Therefore these statements are false and assign the wrong corporate entity to the activity and have no evidentiary support.

31. NRCM is not a party to this proceeding and NRCM has not brought any claims in this action. Since NRCM and Larkin are NFA Members they are obligated to binding arbitration to resolve their NFA Membership. Further any agreements with regards to the distinct corporate entity, Nefertiti Asset Management, "NAM" fell under the agreement to Arbitrate under AAA.

32. Second the proposal to do a bilateral deal came from Larkin, as he expressed dissatisfaction with Lothrop's performance. At first, on August 4th 2016 Larkin concealed from me the OBT Book and at first dishonestly told me that Lothrop was using Avi's Spreadsheets and reverted to their old baseline. Only after we enacted the deal and he started funding the company, did he admit the

misappropriations of the OBT Book and start exposing the activities asking me to fill in the missing pieces, promising that License Fee and Royalties would revert in April 2017. (See FAC)

33. Third, the documentary evidence also proves that I never agreed to work "gratis" and that this allegation is false. The Agreement in Principle dated September 2016, shows that Larkin committed to funding a significant amount of Capital, that would cover <u>Two Years of Operating Capital</u> including my salary to launch a hedge fund. While under that salary, as is customary in hedge funds, I offered Larkin preferential rates, for incentive accounts and managed accounts, so that Larkin could recover his proposed investment of Capital. The basic terms of Larkin's commitment to a Two Year Capital, and various "salary bonuses', and reverting to License Fees and Trading Royalties, upon which I relied, as documented in the Agreement in Principle show clearly that I did not agree to work "gratis". These statements are therefore materially false.

*False Accusation 5  - Defendants never saw or had access to the "Timetrics Software" or its components, including underlying programs or algorithms.*

34. This statement is also directly contradicted by terms of the EULA, and other Agreements, and which has clear definitions of the components provided to Defendants.

35. In June and July 2014, I gave Larkin, Northland and Hedge line-by-line access to coding and formulae during a Factory Acceptance Test ("FAT") Test. Defendants then mis-used that information as the basis to create their replications in the OBT Book.

36. From this they were able to set up a clone and copycat spreadsheet which went on to be used, without my knowledge and as a I later found out an OBT Book.

37. Also I had several meetings directly with Larkin and other Northland employees, including Aviral Chopra. During those detailed meetings, I presented in great details the components, programs and algorithms including the basis of the decision support.

38. Based on those numerous meetings between 2011-2015, including those at  various hotels where Larkin frequently stayed, he and other Northland employees met with me and received detailed demonstrations and inner workings of the Software (as defined in the EULA). These dates included on or around February 2012 at the Ritz Carlton in New York City, September 2012 at the

Ritz Carlton in New York City, March 2013 at the Marriot Gramercy in New York City, June 2013 at the Tribeca Grand in NYC.

39. Based on these detailed "demos" Northland and Hedge agreed to over five extensions and renewals. It would be illogical that after 4 years, Larkin would go-live with a program he claims he had no clue about. Because of the requirement that Northland had accepted the algorithms and inner workings, in June 2014, the parties conducted a Factory Acceptance Test.

40. Also I provided all Defendants, detailed copies of the inner coding, this became the basis from which Larkin started to create a duplicate clone, without consent or license, which later they calld the OBT Book. Also, Larkin provided his signature on various acceptances of the FAT and acceptance of liability thereunder

41. Also during the period Sep 2016 – Nov 2016 I gave Larkin detailed access to reports, strategies and methods and functional design, and "output of software" as well as features of its design, which he then included, replicated and copied into their OBT Book.

42. Also it was fully contemplated and documented in the agreements, that the EULA defines Timetrics software wth definitions included therein. Larkin, Lothrop, Bramante and all Defendants have retained copies of all such output of software, on a daily basis had to certify and accept them, and from this replicated those reports and functionality therein.

*False Accusation 6 - At a subsequent meeting, Kumaran solicited Larkin to invest.[]. in a hedge fund*

43. Both Larkin and I agreed that all non-public financial information about affiliates is defined as Confidential Information. The information contained in this statement, contains non-public confidential information related to third parties that are not parties to this proceeding. In the Agreement in Principle, Larkin and I agreed that the Capital Contributions are non-public financial information of third party affiliates which are not parties to this Agreement, would be considered confidential. The confidentiality of this information is protected under the Timetrics NDA.

44. Not only did this statement, willfully publish non-public financial information, her statements contain financially inaccurate information. In the Agreement in Principle on September 15th 2016 and also the Revised Agreement in Principle, voluntarily suggested by Larkin on Nov 29th, 2016

show that the dollar amount of capital that Larkin volunteered to commit <u>is multiple times this amount</u> and covered *Two Years Capital.*

45. Therefore this pleading makes direct financial misrepresentations to the Court on the <u>financial capital that Larkin committed</u>, which can readily be demonstrated by reading the Agreement in Principle. Further, these erroneous new facts, are a blatant attempt to mislead the Court.

46. Further garbling the facts, there was "no subsequent meeting" in which I "solicited" Larkin to contributed in a fund. Prior to agreeing on terms, we met <u>once</u> prior to moving forward on August 4th 2016, at The View in which we began discussions on a bi-lateral deal. Any terms finalized as a result of that were memorialized in the draft Sep 15th 2016, Agreement in Principle. At a second meeting on December 16th 2016, Larkin had proposed and voluntarily offered Two Years Capital to help launch a venture (not the amounts stated in ECF 32). The facts in this statement are not true and readily disprovable.

*False Accusation 7 - Larkin invested [] in the fledgling hedge fund.*

47. Larkin did <u>*not*</u> make a Capital Contribution this amount in the hedge amount. The amount of Capital Contribution is contradicted by the facts and supported documents both in checks written, and written dialog with Larkin's former counsel.

48. Statements made about the hedge fund in 2016, cannot be based upon fact, as the fund was not formed until May 2018. At the time of Larkin's Capital Contributions, he was aware the business was a "start-up" and did not exist yet. Documentary evidence shows the parties fully agreeing it would take approximately two year for the business to become operational and generate returns.

49. Further information contained in this statement, is disputed confidential and financial information related to the financial statements of a non-public entity. I had already contacted Westerman specifically to go over the Stipulated Protective Order, and identified that these amounts needed to be redacted. Instead Westerman misled me to postpone a Meet and Confer and not waiting to discuss proposed categories. They then went ahead and published <u>disputed</u> confidential information, without abiding by a Meet and Confer. This is further consistent with the

threats by Larkin he intends to not abide by any confidentiality agreements and will publish confidential information in revenge.

50. Nonetheless the financial amounts contained are knowingly false.

*False Accusation 8 – Northland terminated Timetrics which it was entitled to do.*

51. This statement is also not true. The agreements clearly had a 30 day termination provision.

52. On several occasions, notably when Northland were confronted with either leaving the trading floor unsupervised in breach of contract, or placing unauthorized transactions in hedging accounts, and other conduct that violated our agreements, Larkin would attempt to breach the termination provisions, as retaliation or as a way to coerce additional out of scope services to go along with illicit activity.

53. On numerous occasions during my engagements, Larkin demanded I provide out of scope services, or work hours that I was not required to work. If I declined to do so, he would enact threats to either make payments late, withhold moneys or threaten to terminate the agreements without notice, showing very little regard for the contracts at all times.

54. Therefore contrary to Westerman's pleadings there was no termination "in accordance" with the contracts that he was entitled to undertake. Larkin's failure to abide by these provisions also contributed to losses of several hundred thousand dollars caused by his breaches in contract to try to terminate the agreement, and his own failure to leave the trading floor operational. Therefore Northland was never entitled to terminate the agreements in the manner that unfolded.

55. In lieu of an affidavit sworn under oath, federal law allows an "unsworn declaration, certificate, verification, or statement, in writing, of [a] person which is subscribed by him, as true under penalty of perjury, and dated" to have the same force and effect as an affidavit or other sworn statement. [1]

---

[1] *See* 28 U.S.C. § 1746; *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (while an affidavit is required to be sworn to by the affiant in front of an officer authorized to administer oaths, 28 U.S.C. § 1746 allows for "unsworn declarations under penalty of perjury" to support any matter that legally requires an affidavit to support it). If this unsworn declaration under penalty of perjury is executed outside of the United States, section 17 46 requires that it be substantially in the following form:"'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).