## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN, ) | |
| et al ) | Case No: 1:19-CV-08345–MKV-DCF |
| *Plaintiffs,* ) | Judge: Hon Mary Kay Vyskocil |
| ) | Magistrate Judge: Debra C. Freeman |
| ) | |
| -against- ) | **PLAINTIFF'S MEMORANDUM** |
| ) | **OF LAW IN SUPPORT OF** |
| NORTHLAND ENERGY TRADING, LLC ) | **PROTECTIVE ORDER FOR** |
| et al ) | **TRADE SECRETS** |
| *Defendants,* ) | |

## PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## PROTECTIVE ORDER FOR TRADE SECRETS

Pursuant to Federal Rules of Civil Procedure 26(c)(7) and 5.2.(e)(1), and Local Rule 6.1

Plaintiff Samantha Siva Kumaran (herein called Plaintiff"), in support of its Motion for Protective

Order of Trade Secrets, states as follows.

## TABLE OF AUTHORITIES

*1–1 Milgrim on Trade Secrets § 1.01 n. 3 (Lexis 2009).*

*Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1483 (Fed. Cir. 1986)*

*Allen v. City of New York, 420 F.Supp.2d 295, 302 (S.D.N.Y.2006) (citations omitted);*

*Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1030 (Del. Ch. 2006).*

*Andrew Corp. v. Rossi, 180 F.R.D. 338, 341 (N.D.Ill.1998);*

*Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407, 624 N.E.2d 1007,1013, 604 N.Y.S.2d 912, 918 (1993);*

*AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012)*

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc. 784 F.2d 1325, 1345-46 (7th Cir. 1986).,*

*Bank of Am., N.A. v. PSW NYC LLC, 29 Misc. 3d 1216(A), 918 N.Y.S.2d 396 (Sup. Ct. 2010)* .

*Bank of New York v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 143 (S.D.N.Y.1997)*

*Beauchem v. Rockford, No. 01-C50134, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002).*

*Brittain v. Stroh Brewery Co., 136 F.R.D. 408, 415–416 (M.D.N.C.1991)*

*Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater New York, No. 07-CV-1471(RRM)(LB), 2008 WL 4541014, at *2 (E.D.N.Y. Oct. 7, 2008)*

*Closed Joint Stock Company "CTC Network," v. Actava TV, Inc., 2016 WL 1364942, at *4 (S.D.N.Y., 2016)*

*Culligan v. Yamaha Motor Corp., 110 F.R.D. 122, 126 (S.D.N.Y.1986)*

*Davis v. AT & T Corp., 1998 WL 912012, *2 (W.D.N.Y.1998)*

*Deford v. Schmid Prods. Co., 120 F.R.D. 648, 653 (D.Md.1987);*

*Doe v. Marsalis, 202 F.R.D. 233, 237 (N.D. Ill. 2001).*

*Doskocil Cos. v. C&F Packing Co., No. 89- C0600, 1989 WL 152808 (N.D. Ill. Nov. 20, 1989)*

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 219 U.S.P.Q. 37, 38 (D.Del.1982)).*

*Edward Andrews Group, 2005 WL 3215190, at *6 n. 3*

*Faiveley Transport Malmo AB v. Wabtec Corp.,559 F.3d 110,118–19 (2d Cir.2009)*

*Fieldturf Intern., Inc. v. Triexe Mgmt. Group, Inc., No. 03-C3512, 2004 WL 866494, at *3 (N.D. Ill. Apr. 16, 2004)*

*Four Star Capital Corp. v. Nynex Corp., 183 F.R.D. 91, 110 (S.D.N.Y.1997).*

*FragranceNet.com, Inc. v. FragranceX.com, Inc., No. 06CV2225JFBAKT, 2010 WL 11606632, (E.D.N.Y. Mar. 15, 2010)*

*GAF Corp. v. Eastman Kodak Co., 415 F. Supp. 129, 132 (S.D.N.Y. 1976)*

*Gill v. Arab Bank, PLC, 2012 WL 8169888, at *1 (E.D.N.Y.,2012)*

*Gryphon Dom. VI, LLC v. APP Intl. Fin. Co., B.V., 28 A.D.3d 322, 325, 814 N.Y.S.2d 110 [1st Dept. 2006].*

*Highland Park CDO I Grantor Trust, Series A, 2009 WL 1834596, at *5, 2009 U.S. Dist LEXIS 53272*

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1388 (7th Cir. 1986) (Posner,J)

*http://www.usdoj.gov/atr/ cases/f209600/209687.pdf*

*In re Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992)

*In re Parmalat Sec. Litig.*,258 F.R.D.236,244–45(S.D.N.Y. 2009)

*In re Zyprexa Injunction*, 474 F.Supp.2d 385, 415 (E.D.N.Y.2007);

*IP Innovation L.L.C. v. Thomson, Inc.*, No. 03-CV-0216-JDT-TAB, 2004 WL 771233, at *2-3 (S.D. Ind. Apr. 8, 2004)

*Ivy Mar Co. v. C.R. Seasons Ltd.*,907 F.Supp. 547,556 (E.D.N.Y.1995);

*J. Moore, 6 Moore's Federal Practice & Procedure § 26.104[1], at 510–12 (3d ed.2009)

*Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994)

*Kamyr AB*, 1992 WL 317529 at *5.,

*L & L Wings*, 756 F.Supp.2d at 364

*Maritime Cinema Service Corp. v. Movies En Route, Inc.*, 60 F.R.D. 587, 590 (S.D.N.Y.1973)).

*Monaco v. Miracle Adhesives Corp.*, Civ.A. 76–2373, 1979 WL 200011 at *1 (E.D.Pa. Aug.21, 1979);

*N.Y. v. Actavis, PLC*, 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014).

*New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014)

*Nycomed US, Inc. v. Glenmark Generics, Inc.*, 2010 WL 889799, at *1–2 (E.D.N.Y.,2010)

*Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F. Supp. 393, 404 (W.D. Va. 1987)

*Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)

*Pellaton v. Bank of New York*, 592 A.2d 473,478 (Del. 1991).

*Plair v. E.J. Brach & Sons, Inc.*, No. 94-C244, 1996 WL 67975, at *5 (N.D. Ill. Feb. 15, 1996);

*Princeton Management Corp., v. Assimakopoulos*, 1992 WL 84552 (S.D.N.Y.1992)

*Quotron Systems, Inc., v. Automatic Data Processing, Inc.*, 141 F.R.D. 37, 40 (S.D.N.Y.1992)

*Roswell Capital Partners LLC v. Alternative Constr. Tech.*, 2009 WL 222348, *17, 2009 U.S. Dist LEXIS 7690 (S.D.N.Y.2009)

*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 21 (D. Del. 1988)

*Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984);*

*SEC v. TheStreet.com, 273 F.3d 222, 231 n. 10 (2d Cir.2001)*

*Speedry Chem. Prods., Inc. v. Carter's Ink Co., 306 F.2d 328 (2d Cir.1962);*

*Sperling v. United States, 692 F.2d 223 (2d Cir.1982), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983),*

*Stillman v. Vassileff, 100 F.R.D. 467, 468 (S.D.N.Y.1984)*

*Sullivan Marketing, Inc., v. Valassis Communications, Inc., 1994 WL 177795, at \*2 (S.D.N.Y.1994)*

*Support Sys. Assocs. Inc. v. Tavolacci, 135 A.D.2d 704, 522 N.Y.S.2d 604, 605–06 (N.Y.App.Div.1987)*

*Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F.Supp.2d 360, 368 (S.D.N.Y.2007);*

*Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F.Supp.2d 586, 606 (S.D.N.Y.2001);*

*Trump's Castle Assocs. v. Tallone, 275 N.J.Super. 159, 645 A.2d 1207, 1208 (N.J.Super.Ct.App.Div.1994);*

*United States v. UPM-Kymmene Oyj, No. 03-C2528 (N.D. Ill. Apr. 21, 2003)*

*United Statesv. Int'l Bus. Machs. Corp., 67F.R.D. 40, 46 n. 9 (S.D.N.Y.1975)*

*Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004).*

*Vesta Corset Co., Inc. v. Carmen Found., Inc., 1999 WL 13257, \*3 (S.D.N.Y.1999)*

*Waelde v. Merck, Sharp & Dohme. 94 F.R.D. 27, 29 (E.D. Mich. 1981).*

*Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 123–24, 672 N.Y.S.2d 8, 15 (1st Dep't 1998), Restatement (Third) of Unfair Competition § 39 (1995);*

*Young v. United States Dep't of Justice, 882 F.2d 633 (2d Cir.1989), cert. denied, 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990),*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SAMANTHA SIVA KUMARAN,   )
    et al      )  Case No: 1:19-CV-08345–MKV-DCF
    *Plaintiffs,*   )  Judge: Hon Mary Kay Vyskocil
         )  Magistrate Judge: Debra C. Freeman
         )
  -against-    )  **PLAINTIFF'S MEMORANDUM**
         )  **OF LAW IN SUPPORT OF**
NORTHLAND ENERGY TRADING, LLC )  **PROTECTIVE ORDER FOR**
    et al      )  **TRADE SECRETS**     )
    *Defendants,*   )

## PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PROTECTIVE ORDER FOR TRADE SECRETS

### MEMORANDUM OF LAW

In accordance with FRCP 26 and FRCP 5.(2)(e((1), the following facts, applicable to the analysis herein, are established through the attached Motion, First Amended Complaint ("FAC") (*ECF 26*) and its exhibits, the Motion to Strike (*ECF 40*) and its exhibits, and concurrently filed motion for Preliminary Injunction. Incorporated by reference herein and referred to are the Settlement Agreement executed on May 9, 2016,  ("SA" or "Settlement") (**ECF 52 Exhibit 1**; the Timetrics Non-Disclosure Agreement executed in March 2011 ("NDA") which survives, was intentionally excluded from and not superseded by the Settlement, and remains unimpaired by the Settlement, (**ECF 52 Exhibit 2**); the End User License Agreement ("EULA") executed in March 2013 (**ECF 52 Exhibit 3),** which shows the clear intent and agreement of the Parties at the time Plaintiff disclosed its Trade Secrets, and other the **Exhibits 4-7** attached and incorporated herein.

### SUMMARY

Plaintiff pursuant to FRCP 26(c)(7) and 5.2.(e)(1) respectfully moves for a *narrowly tailored* proposed Protective Order ("PO") governing use and disclosure of trade secrets and highly sensitive confidential information in this action. This motion is also made under 18 USC 1835(b) which permits Plaintiff to file a motion to request the Motion to Dismiss is filed under seal. The proposed PO was largely based on the SDNY Model Order of Hon. Paul F. Gardephe (**Exhibit 4)** and also incorporates language, used in the mode orders District of ND Cal, where litigation involving patents, computer

source code, and trade secrets and IP are frequent. The Federal Rules specifically recognize the need to protect the information in the category of trade secrets and other proprietary information, given the possibility that disclosure can result in unnecessary financial detriment to the parties. *See* Fed.R.Civ.P. 26(c)(1)(G). [1]

Plaintiff's proposed order is also consistent with the law in this circuit and other circuits that address the types of issue in this litigation such as intellectual property, trade secrets, source code, and technical computer information, under the DTSA. The district of ND Cal, oversight of the software development in Silicon Valley, notably sets forward Model Orders, that specifically distinguish between general civil litigations and those that are IP cases such as patents, trade secrets, and source code (**Exhibit 6**)**.** Courts there recognize frequently the concerns of parties litigating computer technology, IP and trade secrets, and have adopted model orders that comply with the interests for public review, but protecting competitive trade secrets and specific technology concerns (**Exhibit 5**). Notably, in a Meet and Confer on June 4, 2020 Defendants *agreed to use the proposed combined PO form* which takes into consideration the intellectual property and computer technology considerations. Plaintiffs proposed form, included all the procedures from the SDNY Model Order of Hon. Paul Gardephe (**Exhibit 4**) and also included select procedures that were relevant – such as protections for experts, and heightened designations during transcripts – that allow for more efficient discovery in trade secrets and IP litigations.

Nearly all of the twenty paragraphs in the SDNY Model Orders were incorporated verbatim in the proposed Order. The order proposed by Plaintiff permits parties to designate timely *narrowly tailored* Confidential information and Trade Secrets they believe needs protection, but prevents Parties, frivolously later on filing additional motions for designations, and burdening the Court's time and resources. It also protects non-public financial information of Non-Parties, such as third parties or affiliates. Such an order will ensure that the litigation proceeds efficiently, as targets of discovery will be able to produce information without repeatedly seeking protection from this Court. Defendants have had a draft of this PO for over six months have however, left it to the last minute a few days before the conference, to provide a changes making a Stipulation not practical. Defendants failed to provide Plaintiff with a workable draft, leaving too little time to negotiate meaningful changes, in a transparent

---

[1] Gill v. Arab Bank, PLC, 2012 WL 8169888, at *1 (E.D.N.Y.,2012)

attempt to make it time prohibitive for Plaintiff to file a motion of good cause. Instead present a fatally flawed argument that under Federal law in the Federal Courts, Courts do not protect Trade Secrets.

*1. Key Issues #1  before the Court – Court's Focus on Four Substantive Areas of Disagreement for Protection of Trade Secrets*

This motion follows Plaintiffs' attempt to reach agreement with Defendants on a stipulated protective order. Defendants agreed during a Meet and Confer in June 4, 2020 to use the form of Plaintiff's Combined PO (*ECF* 50), The *only* issues identified that were of substantive dialog were the redactions of Trade Secrets under PO § 2.2 and the hiring of experts PO §12.1-§12.4.

In the discussion that follows Plaintiff will address the main four topics it believes most likely to be contentious, and the substantive issues of disagreement; (i) protection of Plaintiff's Trade Secrets as both parties agreed would be defined in the Settlement and NDA (PO §2.2A.(1)); (ii) protection of Plaintiffs' CTA/CPO Trade Secrets and license fees and royalties as protected under the CEA; (PO § 2.2 (B); (iii) protection of affiliates high sensitive commercial information – non-public capitalization, ownership and control stakes of privately held hedge funds  (PO § 2.2.(C)) and (iv) protections and procedures for the objections before disclosure to direct Competitors (PO §12.1- § 12.4) The proposed redactions are not a mass designation but narrow focus to those that could place competitive harm. Conversely Defendants have not made any good cause showing.

2. Key Issue #2 – Defendants proposed alternative was not workable

Defendants have refused to agree to a reasonable and workable protective order, arguing alternatively the extreme position they themselves have "*no confidential and trade secret information of their own*" at this time – failing to show good cause for any of their own items - and refusing to protect *any* of Plaintiff's trade secrets in this PO. Defendants maintained the unreasonable and reckless position their companies have absolutely no "commercially sensitive information" and themselves possess no trade secrets, despite their own registrations as businesses, and Commodities Trading Advisors ("CTA's) under the Commodities Exchange Act, and obligations to customers, clients. (See **Exhibit 7**).

Defendants conversely maintain an unsupported argument, that Plaintiffs Trade Secrets, as clearly defined and ***agreed to by Defendants*** in the Settlement and NDA (SA § 1.3, NDA § 2, 2.b) are not binding in this Court. Defendants therefore refuse to honor the express binding agreements and contractual provisions which define and protect that both clearly define trade secrets and language agreeing to Defendants acknowledgement (*See* NDA §2.a,b).

> *"**Recipient acknowledges and agrees that Timetrics Software constitutes trade secrets..**
> (See NDA §2.a,b). Recipient further acknowledges and agrees Timetrics Software is the
> **competitive intellectual property** of [Plaintiffs], and is the **crux of commercial value and
> sale price**  of [Plaintiffs] business models and services."*

Defendants instead seek to "wish away" the contracts and make argument that (i) such agreements are invalid in Federal Court (ii) Trade Secrets do not rise to the level of protection under Federal Law and (iii) SDNY Model Orders do not protect trade secrets. Defendants have in bad faith, failed to provide one identification of their own trade secrets or provide good cause for sealing any of their own sensitive confidential information,  Waiting to the last minute they maintained in meet and confer they wanted to support and frivolous argument that "everything is public" - should not. Further to claim that "nothing is confidential at this time".

They further argue that the intended interpretation under §2.1 under SDNY Model Orders (a)-(c) of the phase  "*previously non-disclosed*" does not mean "*previously non-public*". This contradicts the law of this circuit under model orders, specifically to carve out *previously non-public* financial information of privately held corporations, ownership and membership information, and other information covered under 2.1(a)-(c).  "Internal documents ... that contain **_non-public_** strategies and financial information constitute 'confidential commercial information under Federal Rule 26(c)(1)(g)."[2] The supports the FAC where it was shown Defendants willfully intend to not protect *any* information that the parties shared under confidentiality requirements of an NDA or Settlement., to intentionally cause irreparable harm According to Defendants, "nothing is protected."

Defendant unreasonable position is that they not only refuse to agree to protect only *agreed upon* Trade Secrets in this Protective Order, but also Trade Secrets and obligations under the Commodities Exchange Act, for the protection of trading data of CTA's.

Plaintiff disclosed trade secrets under the express confidentiality restrictions and rubrics of the NDA, EULA and Settlement[3], in fact executed  here before the SDNY, which contained material representations and acknowledgements. The Court is therefore respectfully requested to honor the binding agreements, made before this Court in the Southern District, in a Settlement Agreement,  by

---

[2] N.*Y. v. Actavis, PLC,* 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014).
[3] Though the EULA and other engagements were terminated (as alleged in the FAC through fraudulent representation) the NDA, by specific exclusion **was not terminated**. Further, by specific negotiation and exclusion the Settlement expressly **did not supersede** the NDA. Therefore the NDA and Settlement are both valid and binding agreements.

which Defendants NT Parties, expressly agreed to both a definition of Trade Secrets (*See SA, Appendix A,* §1.1-1.3*),* and to numerous protections thereunder, including not contradicting there position in a motion to oppose (*See SA Appendix A, § 1.2, § 1.3, § 3.3).* Any argument opposing is Judicial Estoppel.

**<u>Judicial Estoppel:</u>** Defendants position is to wholly ignore and "reverse" their contractual agreements – a pattern of conduct they have enacted in the past to try to void prior agreements, refusing to be reasonable in this narrowly tailored order, stating SDNY Model Orders don't permit redactions of trades secrets. Supporting their  conduct, Defendants have reversed their position in oral argument made to this Court on January 15, 2020 where they are now engaging in judicial estoppel, after arguing in open court to Hon. Mag Judge Freeman, the settlements need to be placed under the seal, reversing that position to Plaintiff on June 5, 2020 – in time for this PO – to support their reckless new position that everything should be made public.

Finally, Defendants intend to support their position, with an un workable and inefficient plan to burden the Court during discovery only, with ongoing "case-by-case" designations – of significant cost, time and burden also to Plaintiff, who will need to respond, when this could reasonably be addressed and foreseeable now. Plaintiff has opposed that concept.

### 3. *Key Issue #3 - Disputed Trade Secrets – OBT Book*

A ***crucial*** issue before this Court, in the protection sought for Trade Secrets, is the cloned copy of Plaintiff's property and trading strategies, which is referred to as the OBT Book. (FAC¶¶90) which wrongfully remains in Defendants' possession. As background to the Court, at the time of the Settlement, Defendants represented and warranted that they were only using previously existing property and had not retained, duplicated or otherwise created version of Plaintiffs models, trading strategies.(FAC ¶15, ¶116¶139) (*See*  SA § 1.4). Reliant on these fraudulent representations, Plaintiffs were wrongfully induced to execute a Settlement. Several months later, in September 2016, Defendant Larkin admitted these representations were false admitted that Defendants had gone on to create a derivative work, which they now called the OBT Book, and were using the OBT Book, to supplement significant profit and revenues to Defendants without agreed upon compensation to Plaintiffs. (FAC¶¶143-148). Defendants admitted to replicating a clone called the OBT Book, which went into commercial operations for use and profit in or around 2015. (FAC ¶95) The OBT Book, which is a derivative work or Related Work of

STORM, includes many of the design, features, graphical inputs, and decision support strategies, is currently in Defendant's possession, as well as the decision support methods.

   The OBT Book is defined as a Related Work under the Settlement (*See* SA§1.1- 1.4). The OBT Book, is deemed a ***Related Work*** under this Action.  Related Works is expressly defined valid *( SA, Appendix A, §1.1, Pg 2)*

> *Related Works…shall mean… (i) adaptations..copies made to Timetrics Software made by Northland, Hedge… (iii) **duplications...and copies** (in whole or in part) made ..which may be **incorporated into internal** .. **software, spreadsheets,** models, systems.,,(v) **and new material derived from the Timetrics Software.***

   Under the express definitions of the **Related Works** and derivative and updates in the NDA (NDA§3), the protections under the Settlement, extend without exception to the OBT Book. The Settlement expressly states that **Plaintiff (**and not Defendants) are exclusively owners of the Related Works, and that the Related Works fall under the protections of Trade  Secrets, and Timetrics Software. Plaintiffs has alleged in its FAC, that the intention of Defendants position, is to undermine the trade secret and intellectual property rights of Plaintiff in this action (by dissemination to a wider audience)[4] and are using and profiting from the OBT Book, which infringes the property rights of Plaintiff. This motion is ***critical,*** as allowing the Defendant's unfettered dissemination of IP in his possession, (**including by reference in pleadings, and the upcoming Motion to Dismiss**) specifically of the OBT Book, its comparison to STORM, would result in irreparable harm, wrongful use and publication.

*Plaintiff Owns the Rights to the OBT Book*

   To the extent Defendants argue that the replicated and copy-cat OBT Book, which is the subject matter of this litigation is within their right to make public, this analysis is incorrect. The Agreements, make clear that all Confidential Information and Related Works are owned by ***Plaintiff (***and not Defendants).  Settlement, Appendix A,§ 1.1- § 1.2 states that ***Plaintiffs*** (and not Defendants) ***own and retain the sole and exclusive right, (including copyright), title and interest in and to all Timetrics Software (and Related Works),*** throughout the world and in perpetuity. Further they agreed..  ***All inventions (including discoveries, ideas, or improvements, whether patentable or not), which are conceived or made and are derived or result from or in any way utilize any Timetrics Software, shall belong to***

---

[4] "A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets") *Faiveley Transport Malmo AB v. Wabtec Corp.,*559 F.3d 110,118–19 (2d Cir.2009)

***Timetrics. Timetrics shall have the sole and exclusive right to use, alter, maintain, enhance or otherwise modify the Timetrics Software.*** (SA §1.2 Ownership)

Similar language occurs in the intent in the NDA§ 3 that all confidential information, acquired or created *by Recipient shall be the exclusive property* of Timetrics.[5] Therefore under the NDA, all IP that is of subject matter disputer under this litigation, including the OBT Book is the exclusive property of Plaintiff. Therefore Defendants have no right to act in manner inconsistent with that, and make public, by not redacting, information that is proprietary. (*See* SA, Appendix A)

Therefore **Plaintiff** (and not Defendants) owns the rights to the OBT Book, and Defendants have no rights to make public any portion of its descriptions, components and technologies in its pleadings or other motions. All rights to protect and redact and ownership of the foregoing commercially sensitive confidential information belong with Plaintiff and he contracts are expressly clear that trade secret ownership lies with Plaintiff. The OBT Book is currently in Defendants' possession and location. Defendants have stated and intended they intend to make "constant reference to the OBT Book and STORM in pleadings and motions" including the Motion to Dismiss. To disenfranchise Plaintiffs property rights, Defendants have taken unreasonable, overreaching positions that the OBT Book and STORM should be made public should also be noted by the Court. As such, to prevent irreparable harm on publication, Plaintiff requires all disputed trade secrets, including those in any way relating to the OBT Book be Protected Materials.

*18 USC 1835  Protects Plaintiffs rights to keep the OBT under seal*

Plaintiff is entitled to protect trade secrets materials, that are Related Works of STORM, that is has asserted and demonstrated by a preponderance of contractual evidence belong to Plaintiff. Under the DTSA,  18 USC 1835 the court may not authorize or direct the disclosure of any information the owner asserts to be a <u>trade secret</u> unless the court allows the ***owner the opportunity to file a submission under seal that describes the interest of the owner in keeping the information confidential***. Therefore Plaintiffs' rights extend not just to STORM, Timetrics Software, but all information related to the OBT Book, which wrongfully remains in Defendants location and possession and also Defendants' pleadings.

---

[5] ***NDA, Para 3****, Recipient acknowledges and agrees that all Confidential Information whether or not acquired or created by Recipient during the Purpose, shall be the exclusive property of Timetrics, and hereby irrevocably assigns to Timetrics in perpetuity all tights of all kind and character in or arising out of any Confidential Information created or acquired during the Purpose by Recipient, to the extent where Timetrics does not already own such rights.*

*Defendants are Judicially Estopped from Acting Contrary to Plaintiff's rights*

Defendants' made representations and warranties in the Settlement that arose prior action in the Southern District. Failure to honor these contracts and reversal of their positions again constitute judicial estoppel. Defendants motions and arguments to this Court, and refusals to protect these trade secrets is also prohibited under SA § 1.2 ***[Defendants] each will not act or fail to act in any manner inconsistent with such rights, title and ownership.*** Further to the extent the Court cannot resolve the issue in this motion, it should not be permitted for Defendants to utilize and disclose or publish disputed Trade Secrets, to wider audience, at this stage in the litigation, including in pleadings and motions, as this would cause irreparable harm.

*4. Key Issue #4 – The Court should adopt for Good Cause, protections for Trade Secrets under FRCP 5.(2)(1)(e.) for Pre-Trial Pleadings and Motions as well as FRCP 26.*

Plaintiffs motion, for the reasons of irreparable harm above, covers good cause for filings under both FRCP 5.2(1)(e) and FRCP 26. For good cause, the court may by order in a case ... require redaction of information …. and other data expressly protected under Rule 5.2(a)). Ordinarily, 'good cause' is satisfied if "a 'clearly defined and serious injury' ... would result from disclosure of the document." [6] The touchstone of the court's power under Rule 26(c) is the requirement of 'good cause.[7] Plaintiff seeks redaction of specifically and narrowly defined sensitive information from pre-trial pleadings and motions, including specifically those already in Defendants possessions such as the reports from Timetrics Software, STORM, trading data and details of the OBT Book.  Plaintiff's motion under 5.2.(e)(1) meets the standard of good cause, and clearly defined injury. Memorandum for PI incorporated herein, meets the standards under Rule 5.2(a). Plaintiffs' rights to relief under FRCP 5.2.(e)(1) is also contemplated under PO 2.1.(e) of SDNY Model Orders, and explain why Plaintiff seeks inclusion of both redactions in filings. [8]

*5. Key Issues #5 – The Court should incorporate Protecting Trade Secrets for Good Cause under 2.2 of the SDNY Model Orders for designations of Trade Secrets*

The SDNY Model Orders (Exhibit 4) do not specifically designate a category for protection for trade secrets, but allows parties to provide for designations as order by the Court. (PO § 2.1.(e)). Plaintiffs

---

[6] Allen v. City of New York, 420 F.Supp.2d 295, 302 (S.D.N.Y.2006) (citations omitted); J. Moore, 6 Moore's Federal Practice & Procedure § 26.104[1], at 510–12 (3d ed.2009) Nycomed US, Inc. v. Glenmark Generics, Inc., 2010 WL 889799, at *1–2 (E.D.N.Y.,2010)

[7] *In re Zyprexa Injunction, 474 F.Supp.2d 385, 415 (E.D.N.Y.2007); See also* Fed.R.Civ.P. 5.2(e)(1)

[8] *In re Zyprexa Injunction,* 474 F.Supp.2d 385, 415 (E.D.N.Y.2007); *see also* Fed.R.Civ.P. 5.2(e)(1).

motion herein is therefore consistent with the intention of  SDNY Model Order to allow for orders from the Court to permit the designations of Trade Secrets. To streamline this procedure, Plaintiff has narrowly defined Trade Secrets and other commercially sensitive information which should be Protected in (PO§ 2.2 (A),  (B)). The primary issue before this Court, is the inadvertent publication of commercially sensitive of trade secrets and disputed trade secrets the OBT Book, the trades, and STORM.

Conversely, Defendant's transparent attempt to use the SDNY Model Order "***Confidentiality provisions as is"*** - (See *ECF 50*, Footnote 1) –  so as to interfere in Plaintiff's timely filed right to seek protection of its trade secrets which are not automatically protected in SDNY Model Orders. In a case where the ownership, rights, title and interest of the trade secrets are the heart of the issue before the Court, Plaintiff is cognizant that Defendants, want the benefit of unambiguous terms, lack of protections of trade secrets, as the *crux* of resolution of this action, is wrongful use, acquisition, and profit under the Defend Trade Secrets Act of the OBT Book, which Defendants have in their possession, which is the cloned property Failure to restrict publication and wider audience dissemination use now would make this action moot and cause irreparable harm (*See* Memorandum PI).

*6.  Key Issue #6 - The Court should adopt Plaintiff's proposed PO to include language that clarifies that "Previously Non-Disclosed" means "Previously Non-Public"*

Plaintiffs PO includes language in PO§ 2.1.2 that clarified SDNY Model Orders, that "*previously non-disclosed*" means "*previously non-public*". Defendants argue that the model SDNY Order (Exhibit 4) is subject to interpretation in 2.1(a)-(c) that the terms "*previously non-disclosed*", and does not mean "non-public" only applies to information not previously shared with Defendants. This position and interpretation is not supported by the rulings in this district, which specifically determines "non-disclosed" and "non-public".  "Internal documents ... **that contain non-public strategies** *and* financial information constitute 'confidential commercial information' under Federal Rule 26(c)(1)(g), particularly where the disclosing company is engaged in a highly competitive industry and deliberately has shielded such information from its competitors." *N.Y. v. Actavis, PLC,* 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014). A number of judges in the Southern District of New York have incorporated this principle into their model protective orders, which authorize the parties to designate as confidential any previously

non-disclosed financial information. [9] [10] (*Emphasis added*) Therefore the Second Circuit has interpreted the words "non-disclosed" to mean "non-public" and it would be non-sensical for privately held companies, with sensitive ownership, equity and control information to be made public as defeating the intent of the protective order.

Defendants also seek this mis-interpretation as they wish to make such information public. They incorrectly argue the term "*previously non-disclosed*" does not apply to information that was only under the express requirements of NDA's and confidentiality obligations,  as is upheld, under the SDNY Model Order. The FAC (¶¶199-202) that has raised Defendants intentionally intend to circumvent the requirements to hold sensitive financial data of privately held companies and trade secrets that they were disclosed under NDA's. Therefore, for the avoidance of ambiguity, Plaintiff has included language to specifically clarify this term. Given Defendant's sole purpose is to use the Courts – as revenge for Plaintiffs' filing of this action -  to recklessly and for improperly purpose find loopholes to publish Plaintiff's trade secrets and cause irreparable harm and economic injury.

Plaintiff proposed PO, removes the room for interpretation and any ambiguities in what was intended that "non-disclosed" means "non-public". (see PO 2.1.2.(i) § (B)).  The wrongful inclusion of disputed trade secrets, their attributes and trading strategies, in pleadings and motions, (including the pending motion to dismiss) This would cause irreparable harm  and then constitute loss of trade secrets. (*See* Memorandum PI, Irreparable Harm)

## 7. Key Issue #7– Time of Essence in Ruling

Given the extreme position of Defendants, and the irreparable harm that would be caused under DTSA - 18 USC 1831 el seq.  if trade secrets are not protected now, at this early stage, Plaintiff seeks protection from the Court, on what material constitutes trade secrets (and disputed) prior to filing of the Motion to Dismiss. Plaintiff's motion of redacting trade secrets, is narrowly focused, shows good cause, and provides clear transparency to the Court on what narrowly focused items will be redacted and protected in the Pre-Trial Pleadings and Motions. For the reasons below Plaintiff respectfully move this Court to enter its proposed Protective Order, submitted with this motion.

---

[9] *See, e.g.,* Model Protective Order (Gardephe, J.) ¶ 2(a), *available at http://nysd.uscourts.gov/judge/Gardephe* ; Form of Protective Order (Woods, J.) ¶ 2(a), *available at http://nysd.uscourts.gov/judge/Woods* ; Model Protective Order (Rakoff, J.) ¶ 2(a), *available at http://nysd.uscourts.gov/judge/Rakoff* ; Model Protective Order 1 (Forrest, J.), ¶ 2(a), *available at http://nysd.uscourts.gov/judge/Forrest.*
[10] Closed Joint Stock Company "CTC Network," v. Actava TV, Inc., 2016 WL 1364942, at *4 (S.D.N.Y., 2016)

## FACTS SUPPORTING THIS MOTION

Defendants, under deception and fraud, improperly acquired Plaintiff's Trade Secrets, under binding agreements of confidentiality including an  NDA§ 2-2b,3, EULA §7, §31 and later a Settlement - Appendix A. Plaintiff is an experienced Top 10 award winning advanced analytics and hedging strategies and shared its methodologies and approach after Northland and Hedge, certified and warranted they had no such competing technologies in which admitted they themselves could not build.(FAC¶¶ 77-91). In exchange for confidential access, Defendants promised substantial royalties and license fees, and signed binding agreements protecting trade secrets (*See* SA §1.3 NDA §2.1). Kumaran exercises sole control and ownership on her strategies, IP and technologies under 18 USC 1831..

The relationship broke down *only after*, an inexperienced, recent college-graduate trader Defendant Lothrop, who was the sole trader on the Northland account, fraudulently concealed and placed dozens of unauthorized trades into a brokerage account, miscalculated margin, and left the trading floor unmanned during market hours – causing sizable losses – sabotaging the PILOT with Plaintiff.  The conduct left the trading floor vacant, riddled with unauthorized transactions and materially breached Plaintiffs' contracts under impossibility of performance. Larkin and Northland have concurrently been fined by regulators for failure to supervise of the trading floor, and other inequitable principles of unfair trade practices. (ECF40, Exh1). Despite the clear contractual provisions between sophisticated parties that assigned Northland sole responsibility for all risks, Larkin wrongfully assigned blame and instead tried to withhold payments to Plaintiffs on past due invoices. Plaintiff brought prior action in SDNY, NT parties settled the past due invoices of $75,000 for above market at $90,000 (Exhibit 1). The parties executed a Settlement in this Court based on representations and warranties that Defendants had not replicated Plaintiffs IP. (*See* SA, Appendix A)

Those representations turned out to be false. Unknown to Plaintiff, simultaneously, Defendants were fraudulently concealing from Plaintiff a clone copy of the STORM program  - the OBT Book - which they were using as a shadow system in express breach of NDA and EULA to divert profits and cut Kumaran out of the royalties. (FAC ¶¶90-100, 117-120). The OBT Book is a Related Work, and a trade secret of Plaintiff. Larkin knew Plaintiffs technologies and CTA programs were valuable, and was willing to personally, in his individual capacity, even after the purported Settlement - to invest Two Years Capital, to become a personal business partner of Kumaran - to launch the hedge funds. After re-

engaging in business around September 2016, Larkin admitted to the OBT Book clone and was using it to cashflow profits in excess of $1 million a year, in breach of the Settlement. In order to acquiesce Plaintiff not bringing action, after the Settlement, Larkin promised Plaintiff Kumaran Two Years Operating Capital, in order to form, operate and launch a hedge fund now operating under the name Nefertiti which are affiliates of Kumaran and  non-party to this litigation. To acquiesce a new deal, not only did Larkin, promise sizable budgets and capital and salary to Kumaran, Larkin promised to revert to the original license fees and profit sharing effective April 2017, for ongoing use of the OBT Book, a Related Work of STORM. Under false promises of payment, Larkin induced hundreds of hours of free services from Kumaran (for which he has never made compensation) and as requested Kumaran disclosed more of its CTA programs and strategies they are also incorporate into the OBT clone generating further profit for Defendants, for which he promised Kumaran would receive compensation.

Larkin however, was never interested in truly becoming a partner in the hedge fund. Instead wanting access and control, over Kumaran's proprietary technologies, strategies and trading programs Larkin induced Kumaran to disclose further trade secrets, which he incorporated into the OBT and retained benefit.  Reliant on Larkin's promises of non-termination Two Year Capital, Larkin used financial "leverage" to pay late or withhold capital from Kumaran, while he unilaterally tried to acquiesce new commercially unreasonable terms. Unsupervised, Larkin starting withholding the Two Year Capital as leverage, demanding terms outside of the contract, to try to force Kumaran to turn over trades, and proprietary information and disclose further information about its trading strategies to Larking, ***without a contract certifying how Larkin would pay for them***. (FAC ¶¶183-185).

As he has done at Northland, he started withholding payments, dictating unreasonable terms, modifying contracts on-the-fly, conducting his operations recklessly without controls, supervision or compliance with regulatory laws, using money as leverage, withholding capital, unless Kumaran gave him unfettered use of the hedge funds proprietary CTA and CPO strategies, that Kumaran, in its individual capacity owns. Larkin also knew the Kumaran was registering as a *direct competitor*. That was never part of the agreement. Larkin also insisted Kumaran operate in violations of the CEA which it refused to do. (ECF 40, Attachments 1-4). Further Larkin started engaging in fraud to his own employees, concealing the arrangements from his controller and employees, and demanding Kumaran commit regulatory compliance fraud to brokers (FAC ¶¶186-189).

When Kumaran refused to participate in illegal activity, or acquiesce new commercially unreasonable terms, Larkin threatened revenge, and publication and dissemination of trade secrets and confidential information. (FAC ¶199). In or around December 20116, Larkin's divorce from the hedge fund was acrimonious. Larkin on or around January 2017 and for a period of two years threatened Kumaran irreparable harm, to use Kumaran's and its affiliates confidential information as "leverage" (FAC¶¶199-202). Larkin has in his possession operating budgets, commercially sensitive information, to equity valuations, Nefertiti financial information and trading programs. STORM is registered now as Hedge Funds. Larkin has threatened irreparable harm and direct economic injury to these affiliates who are direct competitors.

To threaten and intimidate Kumaran not to enforce its rights in Court, Larkin threatened to public trade secrets, the OBT Book and STORM and other commercially sensitive information in this Court as "revenge" for filing a court proceeding. Kumaran is the sole owner of the trade secrets, the OBT Book, and STORM Since then Larkin has obstructed and threatened irreparable harm to use Plaintiff's confidential and trade secret information as "leverage".  In fact before this Court in the pending Motion to Dismiss, and Defendants arguments to this Court to not consider anything trade secrets, or commercially sensitive, is precisely the reason this PO and PI are precipitous and permitted under 18 USC 1835 (b).

## ARGUMENT

## A. THERE IS GOOD CAUSE FOR A PROTECTIVE ORDER

### 1. Federal Rules Protect Trade Secrets

The Court may issue an order protecting trade secrets and other confidential research, development or commercial information ("business confidential information") upon showing of "good cause" Fed.R. Civ.P. 26(c(7). This protection can prevent disclosure or allow for it only in a designated way. A Court may enter "any order which justice requires". Id. Good cause "generally signifies a sound basis or legitimate need to take judicial action". [11] Good cause may be established by showing that the disclosure will cause a seriously defined and serious injury.[12] In determining whether there is good cause for a protective order, the court must balances the interests involved.[13] A court should weigh fairly the

---

[11] *Gryphon Dom. VI, LLC v. APP Intl. Fin. Co., B.V.,* 28 A.D.3d 322, 325, 814 N.Y.S.2d 110 [1st Dept. 2006].
[12] *Doe v. Marsalis*, 202 F.R.D. 233, 237 (N.D. Ill. 2001).
[13] *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984);

competing needs of parties affected by discovery comparing the parties hardship and 'giving more weight to interests that have a distinctively social value than to purely private interests".[14] Plaintiff's trade secrets do not have social value of justice, and this focused redaction represents purely private interests commercial of Plaintiff's livelihood as a CTA and CPO, which Defendants have and continue to harm. Publication or dissemination would cause irreparable harm.

Good cause also exists while discovery is ongoing to confirm the confidentiality designations on the documents designated as Plaintiff's confidential business information as defined in 2.2(B) of the Protective Order. Indeed, FRCP 26(c)(1)(G) explicitly permits a court to "so order" a protective order to, *inter alia,* protect trade secrets, confidential research, development, or other commercial information, and 2.2(A), (B) and (C) of the Protective Order pertaining to Plaintiff's confidential business information falls within the scope of Rule 26(c)(1)(G). Moreover, in an action where the plaintiffs' allegations necessarily involve an in-depth investigation of the defendants' trade secrets, computers, technologies, as is the case here, good cause clearly exists during the discovery stage to protect such business information if the public dissemination of such information would prove harmful to Plaintiffs' business.[15]

The facts here establish the existence of competitively sensitive information, and the "good cause" necessary for a protective order together with the attached Preliminary Injunction ("PI"), and associated Memorandum ("Mem_PI") filed concurrently with this motion

### 2.   *Federal Rules Permit Trade Secret Redaction*

Defendants argument that trade secrets, agreed to in the agreements, do not rise to the level of protection in Federal law claims is false, and are not protected in Federal Courts is also unreasonable and unsupported in law. FRCP 26(c)(7) provides that a district court, "for good cause shown," may order "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way."  To demonstrate good cause under this provision, the party seeking the protective order must show that the information sought is a trade secret or other confidential information, and that the harm caused by its disclosure outweighs the need of the party seeking the disclosure. [16]

---

[14] *See also Beauchem v. Rockford,* No. 01-C50134, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002).
[15] *See Kamyr AB,* 1992 WL 317529 at *5., Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater New York, No. 07-CV-1471(RRM)(LB), 2008 WL 4541014, at *2 (E.D.N.Y. Oct. 7, 2008)
[16] *Bank of New York v. Meridien BIAO Bank Tanz., Ltd.,* 171 F.R.D. 135, 143 (S.D.N.Y.1997)

In determining whether information warrants protection as a FRCP 26(c)(7) trade secret, courts have considered the following *six factors* .[17] In a federal action based solely on federal law claims both state and federal courts have routinely applied the six factors set forth in the Restatement (First) of Torts § 757, comment b, when determining the existence of a trade secret: (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[18]  The six factors assist the courts in determining whether information is "sufficiently valuable and secret to afford an actual or potential economic advantage over others." [19] *see* Restatement (First) of Torts § 757, cmt. b ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."). Plaintiff has addressed those *six factors* in its MemPI and are incorporated reference herein.

### 3.  *Defendants conversely fail to meet their own burden of good cause for disclosure*

If the good cause showing is met, the burden shifts to the party seeking discovery to establish that disclosure of the confidential information is relevant and necessary. *Four Star Capital Corp.,* 183 F.R.D. at 110.  Defendants conversely have not provided any good cause showing for why Plaintiff's trade secrets or commercially sensitive information should be made public - and the FAC in fact directly alleges a more Machiavellian intention – to deliberately cause economic injury harm in retaliation. (See FAC ¶¶ 199-202 ECF40)

---

[17] *See Four Star Capital Corp. v. Nynex Corp.,* 183 F.R.D. 91, 110 (S.D.N.Y.1997).

[18] United Statesv. Int'l Bus. Machs. Corp., 67F.R.D. 40, 46 n. 9 (S.D.N.Y.1975), citing inter alia Speedry Chem. Prods., Inc. v. Carter's Ink Co., 306 F.2d 328 (2d Cir.1962); see also Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F.Supp.2d 586, 606 (S.D.N.Y.2001); Andrew Corp. v. Rossi, 180 F.R.D. 338, 341 (N.D.Ill.1998); Ivy Mar Co. v. C.R. Seasons Ltd., 907 F.Supp. 547,556 (E.D.N.Y.1995); Deford v. Schmid Prods. Co., 120 F.R.D. 648, 653 (D.Md.1987); Waelde v. Merck, Sharp & Dohme, 94 F.R.D. 27, 28–29 (E.D.Mich.1981); Monaco v. Miracle Adhesives Corp., Civ.A. 76–2373, 1979 WL 200011 at *1 (E.D.Pa. Aug.21, 1979); Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407, 624 N.E.2d 1007,1013, 604 N.Y.S.2d 912, 918 (1993); 1–1 Milgrim on Trade Secrets § 1.01 n. 3 (Lexis 2009) (collecting cases for nearly every state).In re Parmalat Sec. Litig.,258 F.R.D.236,244–45(S.D.N.Y. 2009)

[19] *Wiener v. Lazard Freres & Co.,* 241 A.D.2d 114, 123–24, 672 N.Y.S.2d 8, 15 (1st Dep't 1998), *quoting* Restatement (Third) of Unfair Competition § 39 (1995); *accord Trump's Castle Assocs. v. Tallone,* 275 N.J.Super. 159, 645 A.2d 1207, 1208 (N.J.Super.Ct.App.Div.1994);

## B. THRESHOLD MATTER - IRREPARABLE HARM

### i. *Threshold Matter – Parties are Direct Competitors*

As a threshold matter, this motion addresses material consideration and very real concern the Plaintiff and Defendants are *direct competitors*, in a highly competitive trading industry.  Plaintiff is a Commodities Trading Advisor ("CTA") and is a direct competitor of Defendants Larkin and Northland who are also registered as CTA's. By the very definition of "Commodities Trading Advisor" or "CTA", Northland, Larkin and Kumaran have competitive economic concerns, in trading strategies, and programs. The trade secrets include competitive information used to generate profits from trading, and hedging.  Northland and Larkin are now using his competitors, Plaintiff's trading strategies in direct unfair competition. The STORM program derives a unique competitive advantage and independent economic commercial value for Plaintiff's livelihood in the commodities futures trading business.

Plaintiff shared its competitive trading and  risk management strategies and software under express restrictions and confidentiality NDA's, EULA, Settlement and express structure of renumerations and promises of compensation – as well as Defendants' agreement they were trade secrets. Plaintiff would never have disclosed such competitive information, without the agreement to treat select information, notably the software and risk management strategies as trade secret.

Defendant Larkin after recognizing the commercial and competitive value of the strategies, decision support  trading programs, going further, to agree in his individual capacity to contribute Two Years Capital to help launch the STORM fund. (*See* FAC ¶¶ 141) Defendant Larkin, in his individual capacity, breached his commitment to provide Two Years Capital and voluntarily resigned from the fund. (*See* FAC ¶¶ 179-197). After an acrimonious business divorce, Larkin then threatened Plaintiff with retribution by causing competitive harm to its business, by publication of its trade secrets and trading strategies. Kumaran and Defendants' Larkin and Northland are both registered CTA's and CPO's with directly competing business interests.

After the Settlement, Defendants wrongfully acquired Plaintiff's trade secrets and confidential information, and have incorporated, adopted and utilized Plaintiffs' commercially competitive trading strategies for their own profits – and now in ***direct competitive*** use. (FAC¶¶46,179,197,308 ) Defendants failed to make the said renumeration, operating in direct competition without paying the agreed upon license and royalties. Since Defendants have those trading strategies, description of the software and

programs that designed and built,  as well as highly sensitive information about the non-public financial information about its hedge funds, and being used now in a competitive hedge fund, which requires raising capital and Assets Under Management ("AUM") from investors.

On or around June 3, 2020 Plaintiff registered the Nefertiti STORM Commodities Options Funds, LP ("STORM Fund") as a commodity pool and hedge fund. The fund will raise capital from investors for the trading program, and also offer hedging services *in direct competition* with Defendants. Plaintiff has treated and designated all the foregoing information as confidential, commercially sensitive The parties signed agreements protecting the trade secret and confidential sensitivity of such information that are highly sensitive, trade secret and confidential computer STORM, software, Related Works OBT Book, the trading strategies, algorithms, including the trades, positions, are in the position of the Defendants. (See PO §2.2(A), 2.2§ (B), 2.2 §  (C))

Defendants' have in their possession trade secret and confidential information related to STORM, and Related Works OBT Book (*See* SA Appendix A§1.1-1.3) which Plaintiff is the sole owner of. Defendants dissemination to a wider audience in pleadings to the public, or to Competitors which would cause irreparable harm and depletion of Plaintiff's competitive advantage if any information to STORM and OBT was made public. Plaintiff's income as a CTA and grow its CPO business relies on the ***secrecy*** and competitive advantage of the strategies. Kumaran *in her individual capacity* is the sole owner of the STORM trading program, STORM Software and all Related Works. IP, software and trade secrets. (18 USC 1831). The issue of irreparable harm is also itemized in the PI filed concurrently.  A CTA and CPO not only relies on the secrecy of the trading strategies but also the methodologies, visual displays and reports that provide descriptions  therein.

*ii. Competitors should not have access to Plaintiffs' Trade Secrets and Highly Sensitive  Confidential lnformation*

Absent a protective order, confidential information, *already in Defendant's possession* or obtained by Defendants in discovery could be made public or shared with Competitors of Plaintiff.  To narrowly focus the definition of competitors, Plaintiff has defined competitors that are CTA's, CPO's or financial interests in trading firms such as hedge funds, or risk management software and services vendors. (See PO §23.(h). Plaintiff also had made its livelihood as a consultant offering also unique competitive advantage in both the risk management software and services. *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994) ("Absent a protective order, parties . . .may disseminate

materials . . . as they see fit.").This disclosure could irreparably injure Plaintiff, who depends on the secrecy of its trades and trading strategies, as the trading and hedging strategies, from which it derives independent commercial competitive value as a CTA are now irreversibly and without protection in the hands of Competitors CTA's and CPO's, as Northland and Larkin wantonly and recklessly see fit.  This disclosure could injure both the competitor whose information is disclosed and the competitive process, which depends on allowing and encouraging firms to try to "steal a march" on their competitors.[20]

### iii.  Foreseeable: The potential for competitive harm is foreseeable

Courts have routinely recognized  that when Parties are direct competitors, and the release could without protections disclosure to Competitors, and/or disclosures without restrictions or public disclosures will cause irreversible competitive harm. See Fieldturf Intern., Inc. v. Triexe Mgmt. Group, Inc., No. 03-C3512, 2004 WL 866494, at *3 (N.D. Ill. Apr. 16, 2004) (recognizing that "disclosure of confidential financial information to competitor[s] may cause a party great harm" and limiting disclosure to outside counsel). Allowing competitors, including the general public, access to confidential competitive business information including, CTA trading strategies, software programs and their design and description, costs, license fees and business plans, may serious damaged the competitive position of the producing company  See, e.g., Doskocil Cos. v. C&F Packing Co., No. 89- C0600, 1989 WL 152808 (N.D. Ill. Nov. 20, 1989) (denying defendant's motion to modify protective order to disclose confidential documents to in-house personnel because of potential competitive harm); see also Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc., 682 F. Supp. 20, 21 (D. Del. 1988) (precluding party's president from accessing confidential documents as he "might (whether consciously or subconsciously) abuse the confidential . . . information revealed to [the producing entity's] competitive disadvantage. The potential for abuse [and] competitive loss is real").

### iv. Likelihood of economic injury is particularly high with start-up CTA/CPO and hedge fund

The likelihood of economic injury is particularly high for Plaintiff who is a new CTA and CPO, starting out in capital raise for AUM. Start-ups who have innovative trading strategies and trading programs and algorithms, including decision support methods, if released to their competitors would immediately and irreparably destroy their competitive advantage and thus – perhaps permanently – undermine their ability to raise AUM and capital from investors seeking to subscribe to the hedge fund

---

[20] See Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1388 (7th Cir. 1986) (Posner,J)

or commodities pool. This would cause substantial economic injury to Plaintiff. Further Larkin's ongoing unauthorized use of OBT Book and STORM is also direct competitive which is also a deterrent to investors, and unfair competition. Kumaran is the sole owner and inventor of the IP and trade secrets. (18 USC 1831 el seq)

Protective orders that limit access to certain documents to counsel and experts are commonly entered in litigation involving trade secrets and other confidential research, development, or commercial information. *See Quotron Systems, Inc., v. Automatic Data Processing, Inc.,* 141 F.R.D. 37, 40 (S.D.N.Y.1992) (limiting disclosure to counsel and experts); *Culligan v. Yamaha Motor Corp.,* 110 F.R.D. 122, 126 (S.D.N.Y.1986) (limiting disclosure to plaintiff's counsel); *Stillman v. Vassileff,* 100 F.R.D. 467, 468 (S.D.N.Y.1984) (limiting disclosure to plaintiff's counsel); *Sullivan Marketing, Inc., v. Valassis Communications, Inc.,* 1994 WL 177795, at *2 (S.D.N.Y.1994) (limiting disclosure of documents relating to pricing and market strategies to outside counsel, their employees, and consultants retained for litigation because in-house counsel was sufficiently involved in competitive decision-making). *But see Princeton Management Corp., v. Assimakopoulos,* 1992 WL 84552 (S.D.N.Y.1992) (limiting access to documents regarding trade secrets to two specifically designated representatives of the plaintiff solely for the purposes of litigation).

Applying the standard set forth above, courts grant confidential treatment under circumstances where trade secrets and material that would place a party at a competitive disadvantage are being used in public filings.[21] Pursuant to Fed.R.Civ.P. 26(c)(7). a court may enter a protective order requiring "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way."

Because innovative start-ups are new in the market place, such as Kumaran, CTA's and CPO's are direct targets of competitors in the industry, they are more vulnerable to commercial harm, as they are not yet fully capitalized, and do not have large capital reserves. Further, innovative start-ups, that produce new algorithms, technologies, software and trading programs,  - which could be disruptive to the market place - are more likely to be attacked or victims by larger competitors, who seek to steal and leverage their non-public trading strategies. Further economic injury is substantial for start-up CTA's

---

[21] New York v. Actavis, PLC, No. 14 CIV. 7473, 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014)

and CPO's whose livelihood depends on raising capital from Investors.  Publication of their trade secrets is devastating, and would cause permanent destruction, at an early stage would cause irreparable harm to the CTA and CPO. The economic injury to Plaintiff is it may even shutter their businesses – the wanton intent of Larkin. (FAC  ¶199-202).

*v. Courts should adopt a definition of Competitors under PO § 23.(h), and protect as being restricted*

Plaintiff has a legitimate concern about disclosure of its most sensitive trade secrets, such as reports and output from Timetrics Software, STORM and the OBT Book, details of its trading strategies, and risk strategies, and actual trades, including those already in Larkin's possession. Plaintiff has narrowly carved out a definition being disclosed to Competitors, who may be experts or other consultants. The narrow definition is of those who are also registered as CTA's and CPO's or have financial interests in hedge funds. Provides a competitive advantage and innovation in the market place is that of a trader, and is vulnerable to theft. Once Plaintiff's competitors and other CTA's or risk management vendors acquire the knowledge and inner workings of Plaintiffs hedging and risk strategies, Plaintiff loses its market place value and its livelihood will be irreparably harmed. Kumaran had also carved out and narrowly named risk management software vendors and consultants as direct competitors. The FAC alleges Larking reviewed over dozens of other competitors risk management software products and could not find any with the risk strategies and features of Plaintiff. (FAC ¶75) The FAC further alleges that Kumaran's software and risk product have derived award-winning status as a Top 10 ETRM product. (FAC ¶45) This supports the reason to carve out risk vendors, software and consultants. Provides a competitive advantage and innovation in the market place is that of a trader, and is vulnerable to theft. Once Plaintiff's competitors and other CTA's or risk management vendors acquire the knowledge and inner workings of Plaintiffs hedging and risk strategies, Plaintiff loses its market place value and its livelihood will be irreparably harmed.

Conversely, Defendants have refused to acknowledge the definition of Competitors. Defendants have also refused to identify any categories of competitors, of their own business, intentionally seeking to leave the terms "ambiguous". For the reasons above, the Courts should adopt the clearly defined category of Competitors outlined in PO § 23.(h)) and avoid any ambiguities.

*vi- Disclosure would undermine economic and capital plans*

The disclosure of Plaintiff's and its affiliates sensitive strategic business plans, capitalization, membership, raise, financial information about its trading programs, performance, developments, and its affiliates capitalization, ownership structure, royalties and compensation, would seriously undermine Plaintiff's ability to carry out those plans. The public and/or Competitors to whom this sensitive information would be disclosed would have an opportunity to usurp creative ideas, to forestall new competition, or otherwise to use Plaintiff's innovative and commercially competitive trading and risk management strategies, software and other information to their advantage.

*vii -  Courts should adopt PO § 6.7 under 18 USC 1835 permits the filing under seal*

To avoid this wrongful publication and irreparable harm, Plaintiff has filed this PO and proposed language in its proposed PO of a reasonable thirty (30) day inspection period to identify Trade Secrets and disputed Trade Secrets so that the necessary protections and redactions can be sought, and if needed, as correctly included in the PO, in the event of disagreement, resolution sought by the Court. (PO § 6.7) These restrictions would rightfully prohibit carte-blanche reckless decision making and flawed discretion of Defendants, who have already threatened irreparable injury and retribution against Plaintiff to refer to and include Plaintiff's owned Trade Secrets, and disputed Trade Secrets in their pleadings, causing irreparable harm in this litigation. Under 18 USC 1835 Plaintiff is entitled to interlocutory appeal for such pre-trial publications in pleadings. Plaintiffs requests to entertain the issues by filing under seal, are also consistent with the rights invoked under 18 USC 1835 which allows Plaintiff to discuss the issue under seal. *The court must allow the owner the opportunity to file a submission under seal that describes the interest of the owner in keeping the information confidential.*

## C. DEFENDANTS HAVE INTENT AND MOTIVATION TO HARM

### (i) Defendants Intend to cause Irreparable Harm in Pleadings in Motion to Dismiss

Before this Court is the upcoming Motion to Dismiss in which, Defendants already threatened they intend to include descriptions and proprietary technical information of the disputed OBT Book and STORM  – which by virtue of their actions would cause irreparable harm. The complaint has alleged, wanton disregard, and a willful intention to harm (FAC ¶199-202). Defendants in meet and confer and discussions have implied or stated they intend to "constantly refer to Trade Secrets, by description,

exhibits, affidavits or otherwise" in pleadings and motions which by being made public, would also be accessed by Competitors. The FAC has specifically alleged, Larkin intend to wants to damage Kumaran's competitive advantage in the Motion to Dismiss and other pleadings and cannot be trusted to exercise prudence and jurisprudence in its treatments of its adversaries property. This competitive information is already in his possession. The need for this Protective Order is concurrent with the need for a Preliminary Injunction.

*(ii) Deep-Rooted Malice and Resentment*

The FAC shows a long-standing deeply rooted malice and resentment by Larkin against Kumaran.–In December 2016 the parties had an acrimonious business divorce. Since then, Larkin has made prior threats as retribution to destroy and deplete Plaintiff's confidential information, trade secrets and other commercially sensitive should Plaintiff, a competitor and CTA/CPO for bringing this action. (FAC ¶199-202). Any inadvertent publication of Kumaran's trade secrets, and commercially sensitive information, would cause irreparable harm. (*See* Memorandum PI).

Defendants have also implied they intend to use Plaintiff's election to file this action, and bring this issue to the Court, to "void" agreed upon protection in the Settlement as to what trade secrets are. They further intend to use this upcoming Motion to Dismiss to improperly refer to confidential and sensitive information they have in their possession and are owned by Plaintiff  including operating budgets, non-public ownership and control information about hedge funds Nefertiti. The facts alleged in the FAC show a motivation to harm and revenge, not protect and freely disseminate Trade Secrets, which is why this Motion is relevant in advance of Defendant's Motion to Dismiss.

For over two years, as revenge, Larkin has enacted his threats and plans to not honor confidentiality, to obstruct Plaintiff's hedge fund, obstruct bargained-for execution of non-disclosure agreements, operating in directly competition with the CTA and CPO, despite his promises and fraudulent representation. To support their reckless position in this PO,  Defendants have refused to identify their own highly sensitive and confidential and Trade Secret information. His motivation to harm is supported by his hapless and careless approach to his own compliance, failure to designate protection of his own confidential information. (FAC ¶199-202).

The Court is also respectfully requested to note Larkin as a CTA, is also a direct competitive of Kumaran, a CTA, and would gain economic advantage by taking such adverse action, if not enjoined by

the Court. Unless enjoined Larkin and Northland continue to use the Court's proceeding to improperly exert dominion on Plaintiff's trade secrets and competitive advantage

### *(iii) Defendants Past Conduct and Threats of Irreparable Harm*

Defendants have demonstrated prior recklessness and disregard for protections. This action initiated from a state court filing in June 2015.  In that proceeding, Defendant's showed a lack of restraint in wantonly publishing confidential information and commercially sensitive information. Those pleadings had to be removed. (ECF 1) In this proceeding on March 2, 2020 the docket shows additional confidential information related to non-parties, and Delaware LLC's as well as factual misstatements of fact, in financial amounts. Plaintiff has to file a Motion to Strike (pending) to remove these misstatements of fact. (ECF 40). They were also improperly filed as in the relevant proceeding. Defendants have therefore shown a consistent patterns of disregard for Plaintiff's confidential and commercially sensitive information and Plaintiff seeks relief from the Court that this conduct is ceased. Given his pattern of conduct, Larkin has full intention to seize this opportunity, if not enjoined by the court, or protected under the Protective Order, as revenge, throw caution to the wind, publish sensitive information and cause as much competitive harm as possible. His ill-willed and untruthful publications are also intended to cause irreparable harm to Kumaran's goodwill.  *See Muze, Inc. v. Digital On–Demand, Inc.*, 123 F.Supp.2d 118, 130 (S.D.N.Y. 2000) (finding that a "breach of contract ... in a manner that is directly competitive with [plaintiff's] core ... business ... threatens imminent injury to the economic value of the goodwill and reputation associated with [plaintiff's] product," justifying injunctive relief); *Norcom Elecs. Corp. v. CIM USA Inc. et al.*, 104 F.Supp.2d 198, 209 (S.D.N.Y. 2000) (finding evidence of irreparable harm and granting preliminary injunction on breach of contract claim

### D.  -  NARROWLY TAILORED TRADE SECRETS

Plaintiff's focus in this motion is and its proposed protective order is designed to prevent irreparable harm, is ***narrowly tailored*** to trade secrets, of either (a) Timetrics Software as defined under the SA, NDA under 2.2 § (A) and (b) Trade Secrets of CTA's/CPO's under 2.2 § (B)) CTA trading data and strategies which is also protected under Federal law and the Commodities Exchange Act. 2.2. § (C), it also seeks to clarify the non-public ownership and control financial information of a privately held affiliates. Larkin, in his individual dealings with Kumaran, has in his possession, competitive

information about ownership and control, equity stakes, operating budgets and financial data of a privately held all of which are sensitive business information. These affiliates are now direct competitors.

1. Court Should Protect Trade Secrets of Software Protected Under Category 2.2(A)
   (i)    *Plaintiff's Timetrics Software and risk management strategies and descriptions thereof are trade secret under Category 2.2(A)*

Plaintiff seeks *narrowly focused* redactions related of Timetrics Software and items already defined and agreed to in a Settlement before this Court, would be treated and protected as *trade secrets*. The items were already agreed to by the parties and defined *as trade secrets*. PO § 2.2(A) has shown the requisite good cause for required protection for *trade secrets*, of competitive information include those of Timetrics Software, and descriptions of the software functions, features, design, graphs and Related Works including the OBT Book. Defendants had the opportunity to review and agree to what were Trade Secrets in the Settlement.

Defendants already agreed to the definition of trade secrets, after careful consideration of the contracts and consultation with counsel. (*See* SA §9 )[22]  and are therefore judicially estopped from now contradicting an argument, in which they agreed in prior proceeding in SDNY, that the material defined under SA, Exhibit A, §  1.1 -  § 1.3 are trade secrets, and are exclusively owned by Plaintiff. New York courts "also give due consideration to 'whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and ... that [the provision] was freely contracted to.'" [23]

The Court is requested to uphold the contractual provisions agreed to by  Defendants, which were pre-requisite to Plaintiffs executing a Settlement before this court. When the parties "set down their agreement in a clear, complete document," and, therefore, "their writing should ... be enforced according to its terms." [24] There is no ambiguity in the Settlement, § 1 -  § 4, and also Exhibit A, that **Plaintiff,** (and not Defendants) own and have right, title and interest to the Timetrics Software (as defined in that Agreement) and they are not using and will not utilize any strategies learned from the trading

---

[22] "*The Parties represent that they have carefully read this Agreement, and understand its terms and conditions without reservation. The Parties acknowledge that they have had ample opportunity to consult with legal counsel of their choice regarding this Agreement.*"
[23] *L & L Wings,* 756 F.Supp.2d at 364 (quoting *Edward Andrews Group,* 2005 WL 3215190, at *6 n. 3).  AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012)
[24] *Vermont Teddy Bear Co. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004). Bank of Am., N.A. v. PSW NYC LLC, 29 Misc. 3d 1216(A), 918 N.Y.S.2d 396 (Sup. Ct. 2010) .

recommendations from the Timetrics Software to improve NT Parties trading or hedging revenues. Therefore these provisions are expressly clearly on the ownership of the IP and trade secrets.

Recognizing the sensitive nature of proprietary *technical information*, courts generally afford more protection to it than to ordinary business information.[25]  Indeed, in cases involving the disclosure of **trade secrets**, courts often issue protective orders limiting access to the most sensitive information to counsel and their experts.[26] Those orders represent judicial efforts to strike a proper balance between "the philosophy of full disclosure of relevant information and the need for reasonable protection against harmful side effects," such as the risk that disclosure will result in competitive harm. [27]

Defendants already agreed to the definition of Timetrics Software, and its associated descriptions, components and technical information being ***Trade Secrets***. (SA §1.3, NDA §2.1) The definition of Timetrics Software, Related Works and its treatment as a trade secret, was fully agreed to as an integral and binding part of the Settlement, executed before this District Court in 2015. Defendants agreed under SA § 4 "*The Parties agree, however, to the intellectual property and related provisions set forth on Exhibit A attached hereto and made a part hereof, which provisions shall survive*." Further the OBT Book, and Related Works, which are derived from Timetrics works, as well as created in violation of the Agreement, are, in accordance with the proprietary rights of the Settlement the exclusive property of Timetrics, and are also trade secret. Further NT Parties have irrevocably assigned  all right, title and interest to the foregoing. Defendants cannot be permitted to argue in judicial estoppel, and now argue or dispute the technical information related to software and computer programs, are standard definitions.

(iv),*Court should uphold the agreement of Trade Secrets, and definition in the NDA*

The parties agreed in binding agreements under the NDA to protected trade secrets of Timetrics Software and risk management strategies. The NDA, which survives, and is not superseded and Defendants acknowledged in binding agreement that Timetrics Software[28] and its components would be

---

[25] *See Davis v. AT & T Corp.,* 1998 WL 912012, *2 (W.D.N.Y.1998) (citing *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.,* 682 F.Supp. 20, 22 (D.Del.1988)); *Maritime Cinema Service Corp. v. Movies En Route, Inc.,* 60 F.R.D. 587, 590 (S.D.N.Y.1973)).

[26] *See, e.g., Vesta Corset Co., Inc. v. Carmen Found., Inc.,* 1999 WL 13257, *3 (S.D.N.Y.1999) (collecting cases); *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,* 682 F. Supp. at 21–22 (collecting cases)).

[27] *Davis v. AT & T Corp.,* 1998 WL 912012 at *2 (quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 219 U.S.P.Q. 37, 38 (D.Del.1982)).

[28] *NDA, Para 2b.Timetrics Software shall mean all models, analytical tools, methods, software, methodologies,  reports and documentation, marketed, developed or in-development by Timetrics Software,  including but not limited to the software's functional attributes, capabilities, visual expressions, features, design, user interfaces, reporting outputs, descriptions,*

the considered trade secret.  Under NDA §2 and 2.b Defendants agreed, that *Timetrics Software shall be considered without exception Confidential and Proprietary Information of Timetrics.* ***Recipient acknowledges and agrees that Timetrics Software constitutes trade secrets*** *.... and Confidential and/or Proprietary Information of Timetrics and its suppliers, licensors or subcontractors"* In additional Defendants gave further acknowledgements, *NDA, § 2.b* that  *Recipient further acknowledges and agrees Timetrics Software is the competitive intellectual property of Timetrics, and is the **crux of commercial value** and sale price, of Timetrics business models and services. ("Software Proprietary Items").* **(Emphasis added)**

The NDA from March 2011 §2.1 which survives, and also echoed in the EULA, the parties carved out what the "***crux***" of commercial value in Plaintiff's business is – its software, and risk management strategies. Irreparable harm would be caused if Defendants divulge Software Proprietary Items, and trading strategies in their Pleadings. The contracts define and list out in some detail the *technical information*, such as source code, spreadsheets, reports, graphs, etc.. those details are germane to the proprietary nature of the software, and precisely what software developers protect as descriptions of the computer program. Specifically, Defendants had access to the reports and graphical outputs of STORM, as well as detailed presentations of design, functions, algorithms, and its decisions support system.

The narrowly focused definitions in PO 2.2  § (A) protect and make clear to the Court, what the parties agreed would be considered trade secrets, and would be protected as such. These narrowly focused items, are ,leave no room for ambiguity, and inadvertent disclosure that Defendants have in their possession Plaintiff's trade secrets,  pose specify the exact items, that need to be redacted from Pleadings and Motions, and is the competitive intellectual property and the "crux" of commercial value and sale price, and competitive intellectual property.

Further to the extent the NDA and SA, are nearly identical provisions for Timetrics Software, and trade secrets, New York courts have routinely enforced nearly identical contractual provisions. *See e.g. Highland Park CDO I Grantor Trust, Series A,* 2009 WL 1834596, at *5, 2009 U.S. Dist LEXIS 53272 (granting injunctive relief "as provided for under Section 33 of the Intercreditor Agreement," the

---

*formulae, mathematics, techniques, analytical processes and methods, intellectual property, knowledge, application of software, GUI, reports, formats, and output of software collectively called ("Timetrics Software").*

terms of which are nearly identical to contractual provision in the instant action); *Roswell Capital Partners LLC v. Alternative Constr. Tech.,* 2009 WL 222348, *17, 2009 U.S. Dist LEXIS 7690 (S.D.N.Y.2009)* ("terms throughout the contracts at issue specify that a default constitutes irreparable harm entitling Plaintiffs to injunctive relief to cure breaches," which, "[w]hile not dispositive, [may be viewed by] courts ... as evidence of an admission that irreparable harm has occurred" [29]

*(v) Courts should uphold Highly Sensitive Information for those that are not Trade Secrets*

In the alternative, if the Court adopt Defendants argument that *nothing* rises to the level of trade secret, Courts should grant Timetrics Software, and OBT Book, and Related Works  protection on commercially highly sensitive information under Rule 26.(c). Even if the Court were to adopt Defendants argument courts in this circuit agree, in the alternative that .. " even if a business's information need not be a "true" trade secret in order to warrant protection from disclosure under Rule 26(c), *e.g., Gelb v. Am. Tel. & Tel. Co., supra,* 813 F.Supp. at 1035, trade secret law is instructive in gauging whether information constitutes sensitive business information that courts should shield from public scrutiny. *See SEC v. TheStreet.com,* 273 F.3d 222, 231 n. 10 (2d Cir.2001) (identifying trade secrets as example of type of information entitled to protection).[30]

2.  Court Should uphold protection under Commodities Exchange Act to protect CTA trade data

*(i) The Court should uphold protections under Section 2.2(B)(i) to protect CTA data*

The Court should adopt protection of trade secrets under the Commodities Exchange Act. The information intended to be protected under 2.2  § (B)(i) as trades and transaction records of CTA's  are protected under the rules of CEA and the NFA. Defendants Larkin and Northland are registered CTA's. Kumaran is also a registered CTA. Both are subject to compliance under the CEA, and associated regulatory rules to not disclose CTA trading data (including details of transactions, trades).  These laws make it a compliance violation to disclose another CTA's trades without their consent. Defendants' hapless conduct to not protect highly sensitive trades and trading strategies is symptomatic of the Defendants' conduct to violate regulatory laws including specifically NFA 2-4 Interpretive Notice 9061. NFA 2-4 also invokes the obligations of market participants to invoke fair and just principles of trade. NFA 2-4 9061 specifically prohibits the disclosure of a CTA and CPO's trading data to a wider audience.

---

[29] <u>Bank of Am., N.A. v. PSW NYC LLC</u>, 29 Misc. 3d 1216(A), 918 N.Y.S.2d 396 (Sup. Ct. 2010)
[30] <u>In re Parmalat Sec. Litig.</u>, 258 F.R.D. 236, 244–45 (S.D.N.Y. 2009)

This regulatory law protects CTA trading data as trade secrets and proprietary information.[31] In 2016 similar to this action Defendants Larkin and Northland were cited with compliance violations for not engaging in conduct or proceedings inconsistent with just and equitable principles of trade. Larkin and Northland paid regulatory fines of over $300,000.[32] Plaintiff alerts the Court to a pattern of bad faith conduct that violates their obligations in regulatory compliance laws including in this PO.

Proprietary transaction data of CTA's  trades are protected by the Commodities Exchange Act. The information incorporated would allow competitors to glean real-time trading activity and cause irreparable harm to Kumaran– and then unfairly compete against CTA, front-run their trades, or incorporate these strategies into their business. Defendants' reckless and vengeful stance, that despite the express protections of "trading data" under NFA Compliance Rules, is that protecting trades should not be covered under SDNY Model orders, supports the lack of commercial integrity that Northland have operated. Defendants' refusal to protect Category B and the trade secrets of CTA's directly violates their obligations under the Commodities Exchange Act and NFA Rules.

Defendant's failure to respect its competitors and CPO'S and CTA's trade data is expressly a violation under the Commodities Exchange Act. Larkin's actions are being done with malice and wanton disregard with intention to harm Plaintiff Kumaran, a direct competitor in the Commodities Trading business. Their objections are also bad faith. As members, Defendants are under regulatory compliance laws not to disclose CTA's and CPO's trading data. NFA- 2-4 Int 9061 specifically prohibits Defendants from reckless misusing another CTA's trade secrets. Therefore Defendants objections and failure to abide by the NFA rules, to protect trade secrets of CTA's and CPO's and protect transaction  data under PO Section 2.2.(b(i) is impermissible in this Court.

*(ii) The Court should uphold protections under Section 2.2(B)(ii) to protect cost, profits and license fees*

Plaintiff seeks to protect costs, profits and licenses fees of its CTA and trading programs. This also includes the commercial terms of its suppliers. Further the license fees and costs, that Kumaran charges for license and use of its software is competitive. Plaintiff are in a competitive licensing business, where license fees are charged for the use and access of its hedging, trading and risk management technologies. Many of the competitive awards are secured through RFP and competitive bidding. If

---

[31] https://www.nfa.futures.org/rulebook/rules.aspx?Section=9&RuleID=9061
[32] https://www.cmegroup.com/notices/disciplinary/2016/06/NYMEX-15-0069-BC-RICHARD-LARKIN.html

Plaintiffs competitors were to access the pricing, costs and License Fees, of Plaintiffs products, it would be at a disadvantage Plaintiffs. Cost data is sensitive and potentially damaging if shared with competitors. *See Vesta Corset Co. v. Carmen Founds., Inc.,* 97 Civ. 5139, 1999 WL 13257, at *2 (S.D.N.Y. Jan. 13, 1999) (noting protocol to treat parties' cost information as confidential and holding, "Pricing and marketing information are widely held to be 'confidential business information' that may be subject to a protective order"); *Support Sys. Assocs. Inc. v. Tavolacci,* 135 A.D.2d 704, 522 N.Y.S.2d 604, 605–06 (N.Y.App.Div.1987) ("pricing and cost information provided to [defendant] was ... confidential because if it were known to competitors, they would be in a position to underbid the plaintiff").  Marketing and promotional expenses are sensitive and can be damaging if shared with competitors and customers, depending "upon: 1) the extent to which information is known outside the business; 2) the extent to which information is known to those inside the business; 3) the measures taken to guard the secrecy of the information; and 4) the value of the information to the business and its competitors."  Id. *Vesta* at *2.

The disclosure  of the terms of CTA"s and CPO's commercial terms and pricing and costs with third-party brokers' terms, investors, members, as well as specifically the pricing, costs of the license fees it charges, and the revenue shares, would provide Competitors with an unfair advantage in subsequent competition for renewal or renegotiation of those deals. Because of similar concerns, the Court of Appeals in *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* affirmed the entry of a protective order restricting the access to the confidential price data of their customer. 784 F.2d 1325, 1345-46 (7th Cir. 1986). The court recognized that the plaintiff could "use [the price data] to advantage in the next round of negotiations." *Id*. at 1346; *see also Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986) ("Obviously, where confidential material is disclosed to .. a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased.").

### 3. Court Should Protect Sensitive Information of Affiliates

*(i) Court should uphold Plaintiff's definition of financial information of its affiliates - hedge fund (PO 2.2(C)*

SDNY Model Order 2.1(a)-(c) protects non-public information of privately held information of companies. The parties agreed that affiliates confidential information would be protected under the Settlement and NDA. Plaintiff seeks to protect the *non-public* strategies and financial information including the valuation of its affiliates, specifically narrowly tailored to (a) the equity valuation of membership interests and (b) the percentages offered to Members and other routinely protected non-public information. The protection of affiliates is inherent in the Party's signed agreements. Since

Plaintiffs' affiliates are newly operational and seek to raise capital and other capital contributions, in a highly competitive industry that relies on capital contributions, disclosure of the non-public valuations would cause significant and direct competitive harm to Plaintiff.  These affiliates are not-public the exact equity valuations, units and membership interests are highly confidential and competitive.

    *(ii)    Non-Public Strategies and Financial Information Is Confidential*

Internal documents and unpublished drafts that contain non-public strategies and financial information constitute "confidential commercial information" under Federal Rule 26(c)(1)(g), particularly where the disclosing company is engaged in a highly competitive industry and deliberately has shielded such information from its competitors. *See, e.g., Fox News Network v. U.S. Dep't of Treas.,* 739 F.Supp.2d 515, 571 (S.D.N.Y.2010) (withholding draft containing proposed financial and risk reporting strategy); *Brittain v. Stroh Brewery Co.,* 136 F.R.D. 408, 415–416 (M.D.N.C.1991) ("Such commercial information, which encompasses strategies, techniques, goals and plans, can be the lifeblood of a business [and] may also be particularly deserving of protection if the disclosing corporation is vulnerable to competitors."). [33]

Plaintiff shared trade secrets, and non-public sensitive financial information, of competitive trading companies that are its affiliates formed after the Settlement. Larkin and Kumaran re-entered business negotiations directly related to his interest to contribute capital, in exchange for membership interests in those affiliates, operating under the name Nefertiti that were intended beneficiaries. These affiliates are direct competitors of Larkin and Northland, and its employees. Larkin now also wishes to directly cause harm to the affiliates Nefertiti, that he resigned from and is a disgruntled former partner.

At the time that Kumaran shared its competitive information, the parties agreed and fully contemplated and intended that Nefertiti entities were affiliates and beneficiaries and their information would be protected as confidential information. The parties expressly agreed and intended in the NDA § 2 and Settlement Appendix A, 3.1[34]  that the confidentiality requirements would protect information about affiliates and that confidential information of affiliates as beneficiaries would be protected. And at the time Plaintiff disclosed information about hedge fund affiliates, that parties intended for those affiliates to be protected under confidentiality requirements

---

[33] <u>New York v. Actavis, PLC</u>, No. 14 CIV. 7473, 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014)

[34] SA, Appendix A, 3.1 .. "Confidential Information" means all information and my idea in whatever form, …. , whether disclosed to or learned by Recipient pertaining in any manner to the business of Discloser or to Discloser's clients, ***affiliates..***"

Plaintiff is likely to suffer irreparable harm from Larkin's threats to publish confidential information that was shared related to  affiliates, as third party beneficiaries under the NDA and Settlement. That information includes commercially sensitive budgets, capitalization, costs, business plans, marketing plans, and proprietary information about its trading strategies and product offerings   Kumaran legitimately fears that Larkin will enact its threats given his refusal to comply thus far with his confidentiality requirements stating that "*he will only protect the financial information of the affiliate  is forced to by the Court*" (FAC ¶¶ 199-202, ECF 40, Exhibits 1-4). The Court is also asked to note that the affiliate are a hedge fund/CTA which *are direct competitors* of Defendants so they wish to incur economic injury on their competitors.

Second Circuit has agreed as such. Detailed financial information concerning a privately held business, not previously disclosed to the public, will in most cases warrant confidential treatment. "Internal documents ... that contain non-public strategies and financial information constitute 'confidential commercial information' under Federal Rule 26(c)(1)(g), particularly where the disclosing company is engaged in a highly competitive industry and deliberately has shielded such information from its competitors." *N.Y. v. Actavis, PLC,* 2014 WL 5353774, at *3 (S.D.N.Y. Oct. 21, 2014). [35]

It is directly foreseeable due to Defendant's letters and pleadings in this action, that Larkin intends to divulge confidential and protected sensitive information, about capital contributions of these affiliates – who are Non-Parties (ECF 40).  The FAC ¶¶199-202 states Larkin has for two years, refused to sign an NDA, and repeatedly threatened to publish confidential information as revenge for Kumaran's. rights to protect its IP. If Larkin enacts its threats to publish non-public and other financial information about third party beneficiaries and affiliates, this dissemination to a wider audience would cause irreparable harm Larkin and Plaintiff were in negotiation for two years to attain his good faith cooperation to sign an NDA Larkin has intended to harm the reputation and good will of Plaintiff's businesses, unless it waives its rights to its IP.  Courts take serious the threats of public dissemination of confidential and commercially sensitive information in assessing preliminary injunctions. ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise

---

[35] Closed Joint Stock Company "CTC Network," v. Actava TV, Inc., 2016 WL 1364942, at *4 (S.D.N.Y., 2016)

irreparably impair the value of those secrets") *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110,118–19 (2d Cir.2009)

*(iii) Parties Intended to Benefit Kumaran's affiliates including Nefertiti entities*

The parties agreed that the Settlement would inure to the benefit of beneficiaries (SA  § 11) – "*This Agreement shall be binding upon and shall insure to the benefit of the Parties, their respective heirs, beneficiaries, personal representatives, successors and assigns.*" It is directly foreseeable, and given Defendant's prior conduct in extraneous letters and pleadings to the Court,  frequently imputing affiliates confidential data, as Non-Parties (*ECF 40*). Larkin intends to divulge confidential and protected sensitive information, about capital contributions of these affiliates – who are non-parties. Nefertiti affiliates were not only named as protected under the nondisclosure and confidentiality agreements, but also intended beneficiaries of the protections of confidential data. New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract."[200] *Synovus Bank of Tampa Bay v. Valley Nat'l Bank,* 487 F.Supp.2d 360, 368 (S.D.N.Y.2007).  Consistent with ND Cal orders (Exhibit 4), to affiliates who are Non-Parties confidential information are also included as information, who's sensitive data is Protected Materials. For the same reason as included in the 2.1(a) the non-public sensitive and financial data related to ownership of control this extends to Plaintiff's affiliates.

## E. PLAINTIFFS' PROTECTIVE ORDER WILL ENSURE THAT LITIGATION PROCEEDS EFFICIENTLY

Plaintiff's proposed order ensures the efficient functioning of the pretrial processes. Rule 1 of the Federal Rules of Civil Procedure requires the Rules to be construed "to secure the just, speedy, and inexpensive determination of every action." *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002) (noting that "secrecy agreement" to protect commercially sensitive information and expedite the process is appropriate at the discovery stage). Plaintiff's approach means that only narrowly tailored trade secrets, Competitors, and serious confidentiality issues need be faced only when there are serious interests in conflict (*i.e.*, matters that one party wants to put before the Court) or challenges to specific designations, and requires that all foreseeable issues are resolved before this Court now.

*(i)     The proposed Plaintiff protective order will ensure an efficient discovery process.*

Providing inadequate protection for Party's and Non-Party's confidential information at the discovery stage would discourage parties from cooperating with discovery in this litigation. Ensuring

"[c]onfidentiality while information is being gathered not only protects trade secrets but also promotes disclosure: parties having arguable grounds to resist discovery are more likely to turn over their information if they know that the audience is limited and the court will entertain arguments focused on vital knowledge that a party wants to use later."  [36] This will also reduce burden on the Court in subsequent  Motions to Compel, and ongoing motions of designations.

The Plaintiff's proposed order following Model Orders enough to meet the needs of most genuine concerns of the Parties and Non-Parties confidential information (that are foreseeable at this time), but specific enough to assist the Court and the parties by "winnow[ing] out properly confidential information" and establishing procedures to minimize the burden on the Court, the parties, and non-parties. *Plair v. E.J. Brach & Sons, Inc.*, No. 94-C244, 1996 WL 67975, at *5 (N.D. Ill. Feb. 15, 1996). The Plaintiffs proposed order permits Parties and Non-Parites, such as witnesses, experts, including Aviral Chopra, other traders, with competitive information and those being deposed, those in the best position to do so to designate confidential information in a way appropriate for pretrial discovery. These designations must be made in "good faith." PO §  6.1. Yet the order explicitly allows either party to challenge the designation of particular documents "at any time" and requires Parties and Non-Parties to defend their designations when challenged. ( PO § 7)

(ii)   *The Court should adopt Plaintiff's proposed Order to Protect Confidential Information from Disclosure to Competitors*

The Court should  adopt Plaintiff's proposed order to restrict disclosure to  Competitors under 23 § (h) and 12 § (1) unless such a party obtains' with Court's approval. Competitors are narrowly tailored and specifically defined) In order to streamline this procedure, Plaintiff in Paragraph 12 § 1 has carved out a specific type of experts that are restricted from access of Protected Materials and trade secrets – however, permitting a Party to argue to the Court should it feel it necessary. Permitting Defendants carte-blanche access to distribute Plaintiff's CTA trade secrets to competitors and consultants without a restrictive order, would cause direct commercial competitive harm. *See, e.g., IP Innovation L.L.C. v. Thomson, Inc.*, No. 03-CV-0216-JDT-TAB, 2004 WL 771233, at *2-3 (S.D. Ind. Apr. 8, 2004) (Baker, J.) (denying party's motion to allow its competitor-expert access to "Highly

---

[36] *In re Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992) (discussing justifications for protective orders in civil cases).

Confidential" documents under a protective order); [37], [38]. Further, Plaintiff's proposed Order does not burden the Court, with detailed "two-level" restrictions for instance in California, and consistent with SDNY Model Orders, allows for later "attorney's eyes only" designations at this stage in the litigation.

Defendants object to this proposal suggesting that its ability to retain experts or consultants to assist it in this litigation would be unduly restricted if it could not disclose Plaintiff's trade secrets to Competitors *during* discovery only agreeing to restrictions *after* discovery. This argument is illogical. There would be irreparable harm and loss if "during" discovery, such directly competitive access were permitted. Defendants further argue the terms are too broad and vague and it is impracticable to agree to these restrictions "*at this point in the case*". Plaintiff disagrees. There is no "point in the case" where disclosure to Competitors should be permitted. The narrowly tailored definition of Competitors, identifies very unambiguously terms of "CTA,", "CPO", "hedge fund", and risk consultant or software vendor. They identify the clear commercial and economic interest of direct competitive harm. Notably Defendants' fail to identify any "Competitors" of their own –  telling of their own illogical conduct – or perhaps admission that significant portion of their revenue originates from Plaintiff's IP (not their own). (PO §  22.(h))

(iii)     *The Court should adopt Plaintiff's proposed Order for Experts under Section 12.2-12.4*

To maximize efficiencies for this Court, Plaintiff has tailored the form to only apply restrictions to Experts that seek to have access to Protected Materials (*See* § 12.1). Therefore both Parties are unrestricted (other than their signature on the NDA in Exhibit A) to retain experts and consultants who are not reviewing trade secrets, without notification or disclosure. However, in the case, that trade secrets or sensitive  information, is desired to be disclosed to a Competitor the requires leave from the Court, or otherwise PO restricts access to direct Competitor Plaintiff has closely modelled ND. Cal Orders for resolution of Experts where IP, source code, technologies and trade secrets are at the heart of the litigation.  Plaintiffs proposed wording in § 12-2 - § 12-4, closely mirrors the language in ND Cal, where routinely considers sensitivities of competitors, being hired as Experts, in intellectual property, computing technology, and source code cases. (*See* Exhibit 5, §7.3 -§7.4 ). While greatly simplifying this and tailoring it, under the Plaintiff's proposal, if either party wished to disclose Protected Materials

---

[37] *United States v. UPM-Kymmene Oyj*, No. 03-C2528 (N.D. Ill. Apr. 21, 2003) (permitting disclosure to consultants or experts "provided they are not employed by or affiliated with a Defendant")
[38] http://www.usdoj.gov/atr/ cases/f209600/209687.pdf.

to an expert or consultant who competes with the producing entity, notice must be given to that producing entity. The producing entity could then seek relief from this Court to limit the disclosure of its Protected Materials discovery materials to the expert or consultant. (PO § 12.2-12.4.)

   *(iv)*   *The Court should include rights of Non-Parties and Third Parties and affiliates*

Plaintiff's proposal should uphold the rights of Non-Parties and affiliates, who were intended beneficiaries under the agreements. To streamline this litigation, and to prevent unnecessary motions of third parties who are Non-Parties, Plaintiff's proposed order mirrors the precise language of ND Cal to protect Non-Parties and Third Parties who may be witnesses, or consultants, or affiliates who's proprietary information may be impacted. Plaintiff's proposal protects the rights of third parties, both by giving them notice of the impending disclosure and the opportunity to resolve any dispute before the Court, and would not unduly prejudice or limit the ability of either party to litigate its case. This in turn reduces the need for the Court to revisit this issue as the case proceeds, and also permits Non-Parties who may have concerns, such as Northlands' former employees and traders like Aviral Chopra, (FAC ¶73 ) and others traders and witness (ECF 44), who work for other competing entities to provide their own trade secret and competitive information to have the opportunity to designate their own information.

As discussed in Section D.3 above, including Non-Parties such as affiliates, is also reasonably foreseeable, and has already occurred in this action. Defendants have already published information about affiliates. Both the NDA § 2 and Settlement, Appendix A § 3.1 and SA § 11  extends confidentiality requirements to affiliates. Plaintiff has included clarification on its affiliates being included in SDNY Model Order language in this proceeding. (See PO § 2.1.2,(ii)). ]]

   (v) *The Court should adopt thirty day inspection period for transcripts*

The Parties during Meet and Confer, Defendants already agreed in substance to language in PO § 6.1 – § 6.8. At the Defendants' request they requested additional language in PO § 6.6 that Plaintiff agreed to a compromise to insert language that modified the existing language to allow for thirty (30) days for transcripts. The Court should adopt Plaintiffs' thirty(30) day period to inspect transcripts under PO § 6.6. Plaintiff insert language in Section PO § 6.7, which appeared to address a reasonable window, a 30 day Inspection Period for both parties, to review under seal pleading and exhibits which could also contain Protected Materials.( PO § 6.6 / PO § 6.7)

(vi) *The Court should adopt thirty day inspection period for Pleadings and Motions*

Under 18 U.S.C. 1835, Plaintiff has requested Pre-Trial Pleadings and Motions be filed under seal for thirty (30) days, to allow for an inspection period, under which sensitive information, which includes disputed material of the OBT Book and other trade secrets can be redacted.  This provisions also is in reciprocity, given that Defendant's agree to a thirty (30) day inspection period for transcripts (PO § 6.6) the same inspection period is reasonable for inspection of pleadings. (PO § 6.7) This reciprocity is measured and allows this proceeding to proceed efficiently, without ongoing challenges, and Motions to Strike.

Further it eliminates the disastrous irreparable harm, economic injury and loss of competitive value, that would ensue if Defendants' continue their practice of haphazardly (even in violation of Rule 11) including inappropriate materials in pleadings as they have already shown they will do. (ECF 40). Raising a red flag, Defendants have alerted they intend to do in this upcoming Motion to Dismiss, "constantly referring to in detail", to descriptions and exhibits Plaintiff's trade secrets, STORM including the OBT Book .  Further, once Trade Secrets are already in the public domain, even if temporarily, the window of access to the public is there, and Courts may take several weeks to remove the erroneous filings. This is in itself irreparable harm, and compounds the purpose of Plaintiff seeking relief from this Court – to remedy and to seek equity in Defendant's wrongful use, acquisition and prof and to enjoin them from further use. The thirty (30) days inspection period, is also consistent with the period requested by Defendants for the marking of transcripts. Further this does not encumber the Court in efficiently moving the proceeding forward, as it permits filing under seal for thirty (30) days, where this Court can simultaneously adjudicate motions an discuss of law it is presented, without subjected Plaintiff to irreparable harm and injustice, in having its competitive trading strategies and risk management and hedging strategies, divulged in exhibits and pleadings, or to its Competitors.

## F. COUNTERARGUMENTS BY DEFENDANTS FAIL

(i) *Defendant's apparent alternative would be ineffective and unworkable.*

In Plaintiffs' attempt to reach agreement with Defendant on the terms of a proposed order to present to the Court, Defendant has opposed the Plaintiff's proposal as not wanting to define the term "Competitors". (*See* PO§23(h)). By leaving the term undefined and ambiguous, Defendants intentionally

leave open the door that will most certainly find loopholes to specifically target the commercially competitive value and harm the CTA and CPO hedge funds. The FAC alleges Larkin has motivation to undermine the interests of Kumaran's competition CTA and CPO as its competitor, and resigned in an acrimonious divorce. Now not only profiting himself from his competitors trade secrets, and failing to make payments, Larkin has demonstrated bad faith and scorching the earth of destruction on his competitors' CTA's business.

Defendants argue the term Competitors should not be defined and is unworkable.  By addressing the issue now, Defendants are leaving open the possibility that can give access to confidential information to Competitors. Broadening disclosure of confidential business materials to direct Competitors, however, raises serious competitive concerns "because of the certainty that the information would in fact be obtained by the competitor and the obvious likelihood of competitive injury." *Waelde v. Merck, Sharp & Dohme*. 94 F.R.D. 27, 29 (E.D. Mich. 1981).

Defendants futile arguments raised in emails discussions were that they "*did not even know if either side will retain an expert and, if so, for what purposes*". Further illogical arguments, were for Defendants to only identify Competitors,  "*on a date **after the end** of fact discovery and before the deadline for expert disclosures*" – meaning – unrestricted disclosures **during** fact discovery – which is completely inappropriate and will result in irreparable harm to Plaintiff. Further Defendants have implied that the Parties should only evaluate a Competitors' after discovery is completed and attempt to tie Plaintiffs hands not to hire experts **before or during discovery.** Plaintiff fully intends to hire forensic experts, notably on the OBT Book, during discovery.

The Court should also note Plaintiff's proposed language on Competitors is bilateral. Plaintiff also made good faith attempts for Defendants to identify their own competitors, however Defendants would not in good faith carve out any of their own competitors.

### (ii)     *Defendants proposal is unworkably complex in case-by-case designations*

Defendant's proposed system would be unworkably complex. Because Defendant's proposal encompasses *case-by-case* designations (ECF 50)  through discovery, outside of what is covered under a PO, this approach is unworkable and impractical. There are hundreds of possible communications revealing detailed commodities futures trades and transactions and software reports. A process of case-by-case designation and delaying and belaboring identifying competitive information, is cost prohibitive

for Plaintiff, and unworkable. There is no good faith reason Defendants choose not to identify their own commercially sensitive information at this time, or provide a motion for good cause. The reason is to transparently only opposed Plaintiff's trade secrets - they **could have foreseeably been addressed in this motion -** and then later run back into Court, on a separate motion, trying to protect their own designations on case-by-case. The Court should not permit such disingenuous conduct or inefficient procedures. Further Defendants are also required to show "good cause". It would also cause significant delays and inefficiencies to resolving this matter, and drive up cost and burden to Plaintiff.

    (ii)      Defendants case-by-case designations would add cost and burden to Plaintiff,

Defendants indicated in ECF 50 and to Plaintiff in Meet and Confer intend to modify the order later on with case-by-case designations. This conduct should not be allowed. A Party should not be permitted to c ("[W]here a protective order is agreed to by the parties before its presentation to the court, there is a higher burden on the movant to justify the modification of the order."); *Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F. Supp. 393, 404 (W.D. Va. 1987) (stating that when "the proposed modification affects a protective order stipulated to by the parties, as opposed to one imposed by the court, it is clear that the shared and explicit assumption that discovery was for the purposes of one case alone goes a long way toward denying the movant's request without more." (citing *GAF Corp. v. Eastman Kodak Co.*, 415 F. Supp. 129, 132 (S.D.N.Y. 1976) ). <u>FragranceNet.com, Inc. v. FragranceX.com, Inc.,</u> No. 06CV2225JFBAKT, 2010 WL 11606632, (E.D.N.Y. Mar. 15, 2010) This would most certainly cause a frivolous set of time consuming motions to the Court and create a nightmare. It is in fact Defendants who are creating a potential nightmare to the Court, by their intention to identify their confidential information in the future, and where it could have foreseeably resolve in this motion, drive up cost and burdens to Plaintiff to protecting their secrets later on.

    *(iii)     Defendant's system would also be ineffective*

Defendants' system would also likely be ineffective. The complexity increases the likelihood of mistaken disclosures to Competitors – or constant referrals of Plaintiffs' IP and descriptions of the OBT Book, which is owned by Plaintiff as a Related Work -  as indicated a motive of Defendants to harm. Unless Defendants are enjoined by this Court to stop the irreparable harm, and do the damages they stated to intend to, by including explicit details of OBT Book and STORM in their pleadings. Defendants inability to identify or disclose their own trade secrets, further suggests they either lack the technical

sophistication or knowledge to know what information constitutes as such and what does not. Therefore, by haphazard and reckless inclusion could combined with ill-will wand acrimonious intentions towards Plaintiffs.  Further Defendants in their last minute 33 page redlines, without prior discussion, have deleted key terms from the SDNY Model Order.  Plaintiff never agreed to that, and also would limit Plaintiffs rights under the Contracts.

### (iv)   *Defendants argument that the PO is premature before discovery is futile*

Defendant's argument raised in *ECF50* rests on an incorrect premise and flawed logic that a PO is premature *before* discovery. This argument fails, as it obscures and does not address the highly sensitive trade secrets, such as STORM reports and OBT Book ***already in Defendant's possession***, or the that they have stated or implied they intend to *routinely refer to* by reference of otherwise in their upcoming pleadings and Motion to Dismiss, or in disclosure to experts or consultant in discovery. Not only do Courts routinely issue Protective Orders prior to and to facilitate discovery. By mis-categorizing issue before the Court isn't related solely to new material that will be obtained in discovery, but to existing material, already in Defendant's possession. As stated supra Larkin has in his already possession, that he intends to constantly refer to in pleadings and motions which is why this PO is filed prior to their upcoming Motion to Dismiss. *ECF40* Further this argument, contradicts guidance from Mag. Judge Freeman in open court on January 15, 2020 where it was specifically discussed and recommended the need to implement a Protective Order during and before discovery.

### (v)   *Defendants' Fail to Address the Motion under Rule 5.2(e.)(1)*

Defendants proposed version is unworkable as it fails to address the motion permitted under Rule 5.2.(e)(1). Defendants proposals also fail to consider that SDNY Model Order under 2.(e) specifically allow for separate motions for protections of trade secrets under FRCP 26(c.(7).  The reason Plaintiff has made this motion under ***both*** FRCP 5.2(e)(1) and FRCP 26, is to protect trade secrets *already in Defendant's possession*, that if disclosed in pleadings, motions affidavits, exhibits, such as the upcoming Motion to Dismiss (ECF). Therefore this motion is not premature or related to discovery. It is related to irreparable harm Defendants will cause, and also the need for preliminary injunction.

In conversation, Defendants have even implied they intend to make constant reference for example to the trading positions, descriptions of the features of the STORM software as compared to the clone version OBT Book. Notably Defendant's constantly changing proposed revisions exclude protections of STORM - which would, by the inclusion in the Motion to Dismiss, and other pleadings, divulge Plaintiff's competitive trade secrets, and harm its competitive advantage as a CTA, trader and risk consultant. (See supra Good Cause, Irreparable Harm).

    (i)   *Defendants ignore the difference Producing Party and Designating Party to ignore materials already in their possession*

In Meet and Confer Defendant's agreed to include Designating Party. Defendant already has in its possessions numerous reports from the STORM, Timetrics Software, software reports, technical information, descriptions including direct trading reports and transaction data (all protected as trade secrets) -  as in fact duplicated large portions of the program called OBT Book. As such the party designating redactions is not just Producing Party. Further, this Proposed Order, considers the facts that Defendants already have in their possession trade secrets that belong to Plaintiff. If any proprietary features, description and output of the foregoing were including in the Pleadings, Exhibits, Affidavits including the Motion to Dismiss, irreparable harm would be cased to Plaintiff. Consistent with Model Orders such as those in NDCal, as discussed above, Plaintiffs motion and proposed Protective Order which has PO's specially tailored towards litigations that include patents, trade secrets, source code and other IP such as those in ND Cal (**Exhibit 5**),

## G - DEFENDANTS ARE JUDICIALLY ESTOPPED FROM OPPOSING THIS MOTION
    (i)   *Defendants are judicially estopped to not agree to protect trade secrets as defined in the Settlement*

Defendants have already appeared once in this District and made several representations and warranties to this Court to agree to a Settlement. Defendants. (SA §4, Appendix A, ). In that Settlement, signed here in the Southern District ,Defendants among other things, agreed to consider Timetrics Software and its Related Works as trade secrets and owned by Plaintiff (SA, Appendix 1). They also agreed they would not oppose any protective order to protect the redaction or sealing of such trade secrets. Therefore they are judicially estopped from arguing an alternate position in this case. In *Sperling*

*v. United States,* 692 F.2d 223 (2d Cir.1982), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), in a concurring opinion, it was observed that "litigants should not be permitted to play 'fast and loose with the courts' by taking inconsistent positions in related proceedings." 692 F.2d at 227. Defendants have repeatedly demonstrated, that they sign agreements, and then completely disregard the terms and provisions that they agreed to therein. The Court is requested to uphold the intent and agreement of the parties on signing the agreement. When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."[39] In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning."[40].

    (ii)   *Defendants are Judicially Estopped from opposing this motion or interfering in Plaintiff seeking this PO*

Defendants are judicially estopped and prohibited from interfering with this Protective Order, or filing in motions in oppositions.  Upholding the agreed upon executed provisions of the Settlement, made before SDNY in prior action, Defendants agreed to SA Para 3.3 (iv) ***Defendants shall not interfere or prohibit Plaintiff's from seeking a protective order (and/or temporary restraining order) regarding the disclosure of Confidential Information*** and other relief in any disclosure of its Confidential Information as outlined in the confidentiality provisions included herein or as permitted by law. Further Defendants agreed, without limitation,  SA Para 3.3 (iii) a *Recipient shall join or agree **(or at a minimum shall not oppose)** any further motions or similar request by Discloser for an order protecting the confidentiality of the Confidential Information*; and SA Para 3.3 (iv) ***Defendants shall pursue all available means of maintaining the Confidentiality of this material as governed by law, including but not limited to securing a protective order around the materials***;"

Defendants who were sophisticated parties to binding contract, represented by counsel, cannot sign agreement, and then completely disregard the terms and provisions they agreed to a counterpart – in unfairness to their counterpart Plaintiff. Three Second Circuit cases the court identified as having discussed the doctrine in detail defined it in these terms: In *Young v. United States Dep't of Justice,* 882 F.2d 633 (2d Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990), the court wrote: The judicial estoppel doctrine ... may prevent a party who benefits from the assertion of a certain

---

[39] Pellaton v. Bank of New York, 592 A.2d 473,478 (Del. 1991).
[40] Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1030 (Del. Ch. 2006). See also Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 145 (Del. 2009)"

position, from subsequently adopting a contrary position.... It is supposed to protect judicial integrity by preventing litigants from playing "fast and loose" with courts, thereby avoiding unfair results and "unseemliness."

Defendants signature on the Settlement before this Court in prior action 651629/2015 - 15 CV 0446 is considered judicial estoppel in continuing to oppose Plaintiff's rights to its trade secrets.

(iii)    *Defendant's vascillatory conduct is adding cost and time to this proceeding*

Rather than work in good faith to arrive at a workable order, Defendants' have engaged in erratic conduct, repeatedly contradicting themselves and flip-flopping positions – even to this Court. The issues in the Protective Order have been in the hands of Defendants and their former counsel Bracewell since November 2019. Bracewell after a Meet and Confer adopted a vastly different legal position argued that large areas of Defendants business information, were subject to protection and wanting "<u>broader confidentiality</u>" to facilitate discovery.

In complete contradiction, facilitating this Motion, Defendant's new counsel adopted the diametrically opposite position on June 3, 2020, the day before a Meet and Confer, now arguing Defendants' have "*no information they consider confidential*". On June 4, 2020 Defendants argued that nothing of Plaintiff's was protected. They then adopted a brash position, in judicial estoppel, that everything including the Settlement should be made public. The vacillations continued on June 13, 2020 stating they wanted to use the model orders as is confidentiality, and then changed their minds again.

When Plaintiff sought clarification Defendants represented not only in email but again to this Court in filing on June 13, 2020 that they wanted to use the SDNY Model Order as is for confidentiality (ECF 50, Footnote 1) and sought case-by-case designations. Only the eve before filing this Motion, Defendants sent a 33 page redline, with a completely different set of comments and concerns. It appears Defendants have now deleted substantial and material chunks of the SDNY Model Order,  that they agreed to . This is indirect judicial estoppel from what they stated was their position in ECF 50 – about using Paul Gardephe's model – now deleting material paragraphs both parties previously agreed.

These erratic and vacillatory conduct, has left little chance of success on the parties reaching a stipulated order, and also has set forward unreasonable demands for Plaintiff (Pro-Se) – to review *33 pages of redlines* - less than 2 days before a conference. Majority of the comments and changes had never been previously discussed. This bad faith conduct has made it critical that Plaintiff protects its

interests, does not waive its rights to file good cause, as it cannot rely on the fluctuating and completely inconsistent positions of the Defendants, changing on an almost daily basis.

### (iv.) *Defendants are judicially estopped from reversing their position in open court*

On January 15, 2020, Defendant's argued orally to Hon. Magistrate Judge Debra Freeman, that Defendants considered the Settlement Agreement confidential and wanted it under seal.  In direct contradiction, and again reversing arguments made to this Honorable Court, they now authorized Plaintiff that they no longer consider the Settlement confidential To support their new argument that "nothing is confidential". The Court is respectfully requested to note that Defendants' vacillations also are not permitted under law, and their reversals of treatment of confidentiality demonstrate Judicial Estoppel. These erratic conduct is also increasing time, cost and burden to Plaintiff – making it impossible to reach a stipulated agreement. It is also unreasonable, after six months of having a proposed Protective Order, since December 2019, to wait until yesterday June 16, 2020 to send a redline with dozens of new considerations. Plaintiff is aware of upcoming Court deadlines, and files this motion to protect its rights. It has not agreed to anything in the blind-sighted last minute versions.

### (v.) *– Defendants have made no showing of good cause for their own information*

Defendants have made no showing of good cause, for their own information to be redacted. Therefore this motion, only applies to the redaction of Plaintiff's  trade secret and commercially sensitive and competitive information as defined herein. In a last minute redline Defendants tried to include new items such as the names of their FCM's without any showing of good cause. Plaintiff argues there is no good cause for such information to be sensitive. Finally, Defendants have attempted to delete provisions that they previously agreed to – included the language related to designations and many other provisions in the form that was agreed to.  The resulting proposal was substantially deficient to address the concerns herein.

### H. CONCLUSION

Plaintiff has proposed a Protective Order that largely follows the form of SDNY Model Orders and includes from ND Cal, where technology are frequent under Defend Trade Secrets Act, and select protective language and restrictions in disclosure are routine in computer, trade secrets, source code and IP cases where competitively sensitive information is obtained. Defendants agreed to use Plaintiffs

proposed form and identified only two substantive issues. Those related to PO § 2.2 (B) and the disclosures to Experts in Section 12. Other than those discussed issues, Defendants did not provide any notification of any substantive changes for close to six months waiting till 2 days before a conference to blindsight Plaintiff with a set of wholly different versions which were deficient and would cause irreparable harm as outlined herein for good cause.

The Protective Order, which is proposed, narrowly tailors redaction to the trade secrets and commercially sensitive information at issue and ensure that this litigation proceeds efficiently and establishes workable procedure with notice for the treatment of designated matter that is to become part of the public record. This would eliminate the concern of irreparable harm, and allows the parties to proceed through the next phases without encumbering the Court with further motion practice or motions to strike. Defendants proposal on the other hand, seek to drag out this issue, filing frequent case-by-case designations and motions, encumbering the Court's time and resources, and simultaneously driving up costs in frivolous fashion to Plaintiff. There is no good faith reason, that Defendants chose to not identify their own trade secrets and negotiate in a timely and equitable manner, and have failed to show good cause for their last-minute changes. They continue to deny trade secrets, or the commercially sensitive information of their competitors CTA's, and hedge funds, and as such could inadvertently disclose the same in following motions before the courts and cause irreversible and irreparable harm. Such conduct must be enjoined. the proposed order appropriately balances the interest of the litigants, affiliates non-parties, and the Court's discretion. Therefore, to ensure smooth progression, Plaintiff's Protective Order should be granted.


Respectfully submitted


//SSK///


Samantha S. Kumaran