UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:___2/26/2021__            │
└─────────────────────────────────────┘
```

SAMANTHA SIVA KUMARAN, and
THE A STAR GROUP, INC. *d/b/a*
TIMETRICS,

                    Plaintiffs,

              -against-

NORTHLAND ENERGY TRADING, LLC, et
al.,

                    Defendants.

1:19-cv-8345 (MKV-DCF)

OPINION & ORDER GRANTING
MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

        Before the Court is Defendants' motion to dismiss the First Amended Complaint.  For the

reasons set forth below, the motion to dismiss is GRANTED.  Plaintiffs' motion for a preliminary

injunction is DENIED as moot.

## I.        BACKGROUND[1]

        Plaintiff Samantha Siva Kumaran is the "Chief Executive Officer" of Plaintiff the A Star

Group, doing business as Timetrics [ECF #29].  Plaintiffs "develop[] computer software used by

commodities traders to increase profits and reduce hedging risks."  FAC ¶ 2.  Defendant

Northland Energy Trading, LLC ("Northland") is "an over the counter options trading company,"

and Defendant Hedge Solutions, Inc. ("Hedge") is "a software company that also licenses risk

management software products" and "prices options for hedging price risk to customers."  *Id.* ¶

54.  Defendant Richard M. Larkin is the CEO of Northland and President of Hedge.  *Id.* ¶ 34.

---

[1] The facts are taken from the First Amended Complaint [ECF #26], hereinafter "FAC."  *See Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the
complaint as true.").

Defendants Daniel Lothrop and Domenic Bramante are "employees" who work for Larkin at Northland and Hedge.  *Id*. ¶ 7, 19, 22; *accord id.* ¶¶ 35, 37.

A.  Plaintiffs Enter into the Pre-Release Agreements with Northland and Hedge.

Starting in 2011, Plaintiffs entered into agreements with Northland and Hedge to license Plaintiffs' "proprietary hedging strategies, software and techniques."  FAC ¶ 4. Plaintiffs describe the "Timetrics Software" they licensed as:

> a proprietary suite of various enterprise risk management and analytic technologies, the underlying quantitative processes and analytical engines, methods, techniques, for hedging and managing risk, and mathematical algorithms developed by Kumaran for use in creating new hedging strategies for exchange traded commodity derivatives, primarily in markets for oil and gas futures, electricity transmission contracts, and other energy futures.

*Id*. ¶ 48.  The relationship at that time was governed by: (1) the AStar/Timetrics Nondisclosure Agreement, dated March 21, 2011, between Timetrics, Kumaran, Northland, and Hedge [ECF #29 ("Timetrics NDA")], FAC ¶¶ 4, 68; (2) the Timetrics End User License Agreement, dated February 28, 2013, between Timetrics and Northland [ECF #33-3 ("EULA")], FAC ¶¶ 4, 69; (3) Terms and Conditions for Timetrics Consulting Services, dated November 1, 2011, between Timetrics and Northland [ECF #33-2], FAC ¶ 69; and (4) "various other engagement letters," including letters dated October 28, 2011 and March 1, 2014, FAC ¶¶ 4, 69, 72.

As the Court explains below, in 2016, Kumaran, Timetrics, Northland, and Hedge entered into a settlement agreement in which the parties released all claims under their prior agreements [ECF #52-2 ("Settlement Agreement")].  Thus, the Court refers to the agreements listed above as the "Pre-Release Agreements."  The Pre-Release Agreements prohibited Northland and Hedge from creating "Derivative Works" from Plaintiffs' hedging software and strategies.  *Id*. ¶ 71.  The Pre-Release Agreements also "promised that large profits sharing, and lucrative incentives and

2

license fees would be made in exchanged for the use and disclosure of Plaintiffs' [intellectual property], software and strategies."  *Id.* ¶ 5; *accord id.* ¶ 72.

B.  Defendants Allegedly Copy Plaintiffs' Software and Strategies in 2014.

In 2014, Defendants allegedly breached the Pre-Release Agreements by using "Plaintiffs' IP and Software" to "create a copycat product . . . called the 'OBT Book.'"  *Id.* ¶¶ 8, 9. However, Plaintiffs allege, Defendants "fraudulently concealed [it] from Plaintiffs" until after the Settlement Agreement.  *Id.* ¶¶ 8, 9, 14, 25, 120.  Plaintiffs allege that Defendants created the OBT Book with the "intention" of "depriving Plaintiffs of their license fees, royalties and share of trading profits."  *Id.* ¶¶ 95, 96.  The alleged OBT Book was "operational" in August 2014, and Defendants initially used it "as a 'shadow system' alongside Plaintiffs' IP," but it became "a full production system in 2015."  *Id.* ¶ 95.  Meanwhile, Plaintiffs allege, "during the period August 2014 to March 2015," Lothrop and Bramante intentionally "sabotage[d] the results" of Plaintiffs' software and strategies, in an "effort[] to derail Plaintiff[s'] share of profits," which "caused significant losses and damages to Defendant[s'] business."  *Id.* ¶¶ 96, 107.  Plaintiffs allege that, even though Defendants were "sabotaging [its] performance," Plaintiffs' program was still better than Defendants' "clone program."  *Id.* ¶¶ 96, 107, 129.

C.  Plaintiffs File the 2015 Suit and Execute the 2016 Settlement Agreement and Release.

In May 2015, Timetrics filed a lawsuit against Northland and Hedge "for non-payment of invoices."  FAC ¶¶ 12, 106, 111; *see also The A Star Group, Inc. v. Northland Energy Trading, LLC et al.*, 15-cv-4660 (JFK) [ECF #1, 17].  Plaintiffs allege that Defendants failed timely to pay February 2015 invoices—as the culmination of their scheme to deprive Plaintiffs of the fruits of their hedging strategies—because Defendants "believ[ed] the clone was," by then, "adequate" to replace Plaintiffs' software.  FAC ¶ 108.  But Plaintiffs also repeatedly allege that the failure of

Northland and Hedge timely to pay the February 2015 invoices followed "a long pattern of chronic late payments." *Id*. ¶ 106; *accord id.* ¶ 12, 111.

On May 9, 2016, Kumaran, Timetrics, Northland, and Hedge executed a "Mutual Release and Settlement Agreement.  FAC ¶ 14 [ECF #52-2 ("Settlement Agreement")].  The Settlement Agreement specifies that "the 'Parties'" to the contract are Kumaran, Timetrics, Northland and Hedge.  Settlement Agreement at 1.  Larkin signed the agreement on behalf of Northland and Hedge.  *Id.* at 7.  Northland and Hedge agreed to pay Timetrics $90,000 in five installments, with last payment to be made on June 15, 2017.  *Id* at 2.

The fourth numbered paragraph of the Settlement Agreement contains a broad mutual release of claims, "whether known or unknown" at the time, that Kumaran and Timetrics "asserted or could have asserted" in the 2015 suit against not only Northland, Hedge, but also "their employees, directors, officers [and] agents."  *Id*. at 3.   Paragraph four also specifies that the Terms and Conditions, EULA, and other engagement letters were "terminated and of no further force and effect."  *Id*.  However, it did not terminate the Timetrics NDA.  *See id.* at 1, 3.  Paragraph four further provides:

> Despite such termination, Northland and Hedge represent and warrant that neither of them has in their possession any Timetrics software that was involved in the Lawsuit . . . and they each agree not to use, duplicate, reverse engineer or otherwise misappropriate any Timetrics Software and that they are not using and will not utilize in the future any strategies learned from the trading recommendations from the Timetrics Software to improve . . . trading or hedging revenues.

*Id.*; *see also* FAC ¶ 124.

Plaintiffs allege that, during the settlement negotiations, "Larkin, acting as President of Hedge and CEO of Northland," concealed that they were already in breach of the Pre-Release Agreements because Defendants had created and were using the alleged OBT Book.  FAC ¶ 113.  Plaintiffs allege that, in "phone calls" with Kumaran, Larkin specifically "denied that Defendants

had migrat[ed] their hedging strategies to a Derivative Work, now called OBT Book, to mimic Plaintiffs['] strategies."  *Id*. ¶ 112.  Plaintiffs allege that Larkin falsely represented that Northland and Hedge had "reverted back to the[] old methodologies" they used before licensing Plaintiffs' software years earlier.  *Id*. ¶ 115.  Plaintiffs further allege that these misrepresentations were made "in order to induce Plaintiffs to agree to execute the Settlement, notably [paragraph] 4," which released Plaintiffs' claims and terminated the Pre-Release Agreements, and that Plaintiffs "did in fact" rely on the misrepresentations.  *Id*. ¶¶ 119, 124.

D.  The Alleged Breach of the Settlement Agreement and the Alleged Agreement in Principle.

Plaintiffs allege that "on September 8th, 2016," four months after they entered into the Settlement Agreement and three years before they filed this case, "Plaintiffs first uncovered or learned" that Defendants were using the OBT Book in violation of the Settlement Agreement. FAC ¶ 25; *accord id*. ¶¶ 120, 143, 144; *see also id.* ¶ 148.  Specifically, Plaintiffs allege that, "as a result of" phone calls and emails "[o]n or around September 8th 2016," including "an email dated September 8th 2016, Plaintiffs learned that Defendant [sic] had continued to utilize, and was presently using protected Plaintiffs' IP, as countenanced by the prior Settlement" and Pre-Release Agreements.  *Id.* ¶ 143; *see id.* ¶ 144 ("on this date Larkin admitted that Defendants[] had gone on to utilize the cloned OBT Book").  Plaintiffs do not allege that, upon learning this information, Plaintiffs notified Defendants that they were in breach of the Settlement Agreement, although Plaintiffs do allege that Defendants had "full knowledge" of their obligations under the Settlement Agreement.  *Id.* ¶ 148.

Meanwhile, Plaintiffs allege, "Kumaran and Larkin etched out an Agreement in Principle during the months of August 2016 – September 2016" to govern a new business relationship.  *Id.* ¶ 141; *see also id.* ¶ 130 ("Larkin in his individual capacity . . . re-established business relations

with Kumaran.").  Plaintiffs allege that the Agreement in Principle was "effective immediately

from" some unspecified date in "September 2016" and that it "had several material components."

*Id*. ¶¶ 141, 142.  Plaintiffs allege that "Larkin, Northland and Hedge recognized that their

Derivative Work OBT Book was still inferior to the Plaintiffs['] IP and original Software" and,

therefore, wanted "further proprietary information . . . [in order] to obtain Plaintiff's unique

updates and strategies ('Missing Pieces')."  *Id*. ¶ 129.  Kumaran agreed "to provide [Larkin] the

Missing Pieces," *id*. ¶ 130, even though Plaintiffs allegedly had just discovered that Defendants

were using copycat software, and even though Plaintiffs allege that they did not "re-license" the

Timetrics Software, *id*. ¶ 132.

Plaintiffs allege that, "in exchange for . . . the Missing Pieces," Larkin promised he would

make "substantial financial contributions in his personal capacity" for Kumaran "to launch [a]

hedge fund[,]" and Northland and Hedge would make certain "ongoing" payments to Plaintiffs.

*Id*. ¶ 130.  Specifically, the "material components" of the Agreement in Principle "included" that

"Larkin would contribute . . . significant financial capital contribution[s]" for Kumaran "to start a

hedge fund," named Nefertiti Asset Management, LLC, with "no ability to terminate his capital

contribution[s] for two years."  *Id*. ¶ 141; *see also id*. ¶¶ 142, 282.  Larkin would also "become a

principle and fiduciary" and "own more than 10% of the Delaware LLC."  *Id*. ¶ 141.  And

"Larkin would sign NDA's [sic] directly with the new entity."  *Id.*  Moreover, "as part of the

[same] deal," Larkin allegedly promised that Northland and Hedge would pay Plaintiffs "salary

bonuses," license fees, royalties, and "profits sharing" on the same terms provided by certain

Pre-Release Agreements, starting in April 2017.  *Id.* ¶ 142; *see also id.* ¶¶ 152, 155, 281.  "[I]n

consideration of Larkin's substantial full non-terminable capital contribution[s] for two years to

launch the hedge fund," Plaintiffs would "disclose further IP and trade secrets" to Larkin, as well as provide unspecified "services." *Id*. ¶ 142; *see id.* ¶¶ 150–52.

Plaintiffs allege that "the parties had not signed a finished [written] agreement" reflecting the alleged Agreement in Principle. *Id*. ¶ 282; *accord id.* ¶ 284 ("There was no express contract"); *see also id.* ¶¶ 197, 280 ("it need not be memorialized in a written form"). Indeed, Plaintiffs allege that, on multiple "separate occasion[s]," Kumaran asked Larkin to sign documents in connection with material aspects of the alleged Agreement in Principle, but Larkin "blanket refused to sign and agree to any terms." *Id*. ¶ 201; *see id.* ¶¶ 189, 192 (describing Larkin "withholding signature on various agreements and regulatory registrations"), 197 (alleging that Plaintiffs performed "hundreds of hours" of services "without compensation and signed agreements"), 200. Plaintiffs also repeatedly allege that Larkin kept the Agreement in Principle a secret "from his own employees . . . at Northland and Hedge," including Lothrop and Bramante. *Id*. ¶ 19; *see id.* ¶ 22, 156, 158, 169. However, Plaintiffs allege, Kumaran and Larkin exchanged emails about the alleged Agreement in Principle, and Larkin personally made at least some payments. *Id.* ¶ 279; *see id.* ¶ 165, 195.

Plaintiffs allege that, from September 2016 to March 2017, Plaintiffs provided "services" and disclosed unspecified "IP, Confidential Information and Trade Secrets" to Larkin. *Id.* ¶¶ 21, 150, 162–63, 172–74. Larkin, however, "never fulfilled his [personal] commitments of providing the capital" for Kumaran's hedge fund and committed other alleged breaches of the Agreement in Principle. *Id.* ¶ 22; *see id.* ¶¶ 163, 186, 189, 194. Northland and Hedge apparently never paid the "compensations" Larkin promised. *See id.* ¶¶ 22, 163, 197, 198.

E.  <u>The Case Before the Court</u>

On September 6, 2019, Plaintiffs initiated this action by filing a complaint, which was superseded by the First Amended Complaint [ECF #26 ("FAC")].  Defendants later filed a motion to dismiss the First Amended Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [ECF #63] and their supporting brief [ECF #65 ("Def. Mem.")].  Plaintiffs requested leave to "exceed the [25] page limit" imposed by the Court's Individual Rules for its brief in opposition to the motion, which the Court granted [ECF #71, 72].  Plaintiffs then filed three separate briefs, each of which exceeded 25 pages [ECF #73 ("Pl. Opp. to Northland and Hedge"), 74 ("Pl. Opp. to Larkin"), 75 ("Pl. Opp. to Lothrop and Bramante")].  Defendants filed a reply brief [ECF #77].  Plaintiffs have also moved for a preliminary injunction to prohibit Defendants from using their alleged trade secrets [ECF #52, 121], which Defendants oppose [ECF #122].

## II.      LEGAL STANDARD

To survive a motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff generally must allege facts sufficient "to state a claim to relief that is plausible on its face."  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Claims of fraud are subject to a heightened pleading standard.  *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2004); Fed. R. Civ. P. 9(b).  "In addition to alleging the particular details of a fraud, 'the plaintiffs must allege facts that give rise to a

strong inference of fraudulent intent.'"  *Id.* (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999).

The Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor.  *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006).  The Court also relies on documents that, while not attached to the First Amended Complaint, were incorporated by reference and relied upon by Plaintiffs in bringing the suit.  *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); Fed. R. Evid. 201(b)(2).  The Court, however, is "not required to credit conclusory allegations or legal conclusions."  *Edwards v. Sequoia Fund, Inc*., 938 F.3d 8, 12 (2d Cir. 2019).  "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim on which relief may be granted.  *Id*. (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

### III.    DISCUSSION

In a rambling, 320-paragraph pleading, Plaintiffs assert a laundry list of sixteen different claims against the various defendants.  First, Plaintiffs assert claims against Defendants Larkin, Northland, and Hedge for breach of the Settlement Agreement based on the use of the alleged OBT Book.  FAC ¶¶ 203–210.  Second, Plaintiffs assert claims against all Defendants for fraudulent inducement to enter into the Settlement Agreement based on the alleged concealment of the OBT Book.  FAC ¶¶ 211–217.  Third, Plaintiffs assert claims against all Defendants for common law fraud based on the creation and concealment of the OBT Book.  FAC ¶¶ 218–227. Fourth, Plaintiffs assert federal claims against Larkin, Lothrop, Northland, and Hedge, under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, for misappropriation of trade secrets.  FAC ¶¶ 228–237.  Fifth, Plaintiffs assert New York law claims against Larkin, Lothrop, Northland,

and Hedge for misappropriation of trade secrets.  FAC ¶¶ 238–248.  Sixth, Plaintiffs allege that

Larkin, Lothrop, Northland, and Hedge misappropriated confidential information.  FAC ¶¶ 249–

256.  Seventh, Plaintiffs assert claims against Larkin, Lothrop, Northland, and Hedge for unjust

enrichment.  FAC ¶¶ 257–262.  Eighth, Plaintiffs assert claims against Larkin, Northland, and

Hedge for promissory estoppel.  FAC ¶¶ 263–269.  Ninth, Plaintiffs assert claims against Larkin,

Northland, and Hedge for breach of the covenant of good faith and fair dealing.  FAC ¶¶ 270–

277.  Tenth, Plaintiffs assert a claim for breach of the Agreement in Principle, although they do

not list the defendants against whom the claim is asserted.  FAC ¶¶ 278–287.  Eleventh, Plaintiffs

assert claims against all Defendants for fraudulent inducement to enter into the Agreement in

Principle.  FAC ¶¶ 288–296.  Twelfth, Plaintiffs asserts claims against all Defendants for breach

of the Timetrics NDA.  FAC ¶¶ 297–303.  Thirteenth, Plaintiffs allege that, because the

Settlement Agreement was allegedly "procured by fraud," the paragraph of the Settlement

Agreement terminating prior contracts between the parties and releasing all claims is "null and

void."  FAC ¶ 305.  Fourteenth, Plaintiffs allege that Larkin, Northland, and Hedge

"misappropriated" Kumaran's skills and labor, during the period September 2016 to March 2017,

because of the "non-payment of the various compensations contemplated in the Agreement in

Principle."  FAC ¶¶ 308–309.  Fifteenth, Plaintiffs assert a claim against Larkin for breach of

fiduciary duty based on his actions in connection with the Agreement in Principle.  FAC ¶¶ 311–

316.  Sixteenth, Plaintiffs assert claims against Lothrop and Bramante for aiding and abetting

fraud based on the alleged creation and concealment of the OBT book.  FAC ¶¶ 317–320.

Plaintiffs seek money damages, an injunction prohibiting Defendants from using "derivatives" of

"Plaintiffs' IP, as described in the Settlement Agreement," "[r]e[s]cission" of their obligations

under the Settlement Agreement, attorney's fees, and disgorgement of profits earned using the alleged OBT Book.

A.  Plaintiffs Waived any Claims for Breach of the Settlement Agreement.

Plaintiffs argue that Defendants Larkin, Northland, and Hedge breached the Settlement Agreement by using the alleged OBT Book (Claim One).  Defendants principally argue that Plaintiffs waived any claim for breach of the Settlement Agreement because Plaintiffs continued to accept the benefits of the Settlement Agreement after Plaintiffs discovered the alleged breach. Based on Plaintiffs' own allegations and admissions, the Court concludes that, as a matter of law, Plaintiffs waived any claims for breach of the Settlement Agreement.

"It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir. 1992); *accord New York Telephone Co. v. Jamestown Telephone Corp.*, 282 N.Y. 365, 372, 26 N.E.2d 295 (1940) ("Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver").  A party may "continue to perform the agreement rather than terminate it, and later sue for breach . . . only where notice of the breach has been given to the other side." *Ross*, 130 B.R. at 675; *accord VCG Special Opportunities Master Fund, Ltd. v. Citibank, N.A.*, 2009 WL 311362 at *1–*2 (S.D.N.Y. Jan. 29, 2009).  In other words, "[i]f a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party." *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004); *accord Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 667–68 (S.D.N.Y.1996), *aff'd* 122 F.3d 1055 (2d Cir. 1997).

Plaintiffs' own allegations and admissions establish that Plaintiffs waived any claim for breach of the Settlement Agreement as a matter of law. Plaintiffs repeatedly allege that they had "actual knowledge" of the alleged breach of the Settlement Agreement four months after they executed it and three years before they initiated this action. *Ross*, 130 B.R. at 675. Specifically, Plaintiffs affirmatively allege that "on September 8th, 2016" they "first uncovered or learned" of "the existence of the OBT Book." FAC ¶¶ 25, 120, 143, 144, 148. Plaintiffs admit that they continued to accept the "benefits" of the Settlement Agreement, *Ross*, 130 B.R. at 675, for nine months after they had actual knowledge of the alleged breach, Pl. Opp. to Northland and Hedge at 5 (acknowledging that Defendants "continued to make payments . . . including up to the last payment" required by the Settlement Agreement); Settlement Agreement ¶ 2 (providing for the final installment to be paid on June 15, 2017). Moreover, Plaintiffs never allege anywhere in the First Amended Complaint that they took any action to "give notice of the breach" to any of the defendants. *Ross*, 130 B.R. at 675.

Plaintiffs assert for the first time in their briefs in opposition to the motion to dismiss that Plaintiffs "gave explicit notice to Defendants of the breach." Pl. Opp. to Northland and Hedge at 2. But the brief cites only paragraphs of the First Amended Complaint that say nothing about Plaintiffs notifying Defendants of the alleged breach. *See id.* at 3–4 (citing FAC ¶¶ 146 (alleging that "Plaintiffs learned" that Defendants used "Plaintiffs' IP" in violation of the Settlement Agreement and Pre-Release Agreements), 152–55 (alleging that Larkin promised to pay for use of Plaintiffs' "software" and "IP" and other services "[a]s part of [their] new business arrangements")). A "complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001). The Court has carefully reviewed all of the allegations in the First Amended

Complaint.  It alleges only that, because the Settlement Agreement itself "acknowledges . . . that Defendants 'have carefully read this Agreement, and understand its terms,'" Defendants had "full knowledge" of their obligations under the Settlement Agreement.  FAC ¶¶ 127, 148.  Obviously, this does not come close to an allegation that Plaintiffs "gave explicit notice to Defendants of the breach."  Pl. Opp. to Northland and Hedge at 2.

Plaintiffs argue that the Court cannot dismiss its claims for breach of the Settlement Agreement at this stage of the litigation, but the Court disagrees.  To be sure, waiver defenses often involve disputed facts, and, therefore, are inappropriate for resolution on a motion to dismiss.  *See Schonberger v. Serchuk*, 742 F. Supp. 108, 114 (S.D.N.Y. 1990).  However, as explained above, Defendants' waiver defense does not involve any disputed facts.  Thus, accepting the well-pleaded factual allegations in the First Amended Complaint as true, the Court concludes that Plaintiffs waived any claim for breach of the Settlement Agreement "as a matter of law."  *Ross* 130 B.R. at 675; *see VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 342 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 507 (2d Cir. 2009), *and aff'd*, 355 F. App'x 507 (2d Cir. 2009).

B. <u>Because the Alleged Agreement in Principle Violates the Statute of Frauds, Plaintiffs Fail To State a Claim for Breach of the Agreement in Principle.</u>

Plaintiffs assert a claim for breach of the Agreement in Principle that Kumaran allegedly reached with Larkin (Claim Ten).  Defendants argue that the Court should dismiss this claim because it is "an impermissible oral agreement in violation of the Statute of Frauds."  Def. Mem. at 11.  Plaintiffs respond that the Agreement in Principle was not an oral agreement and that the statute of frauds does not apply.  Plaintiffs' arguments are unpersuasive.

New York's Statute of Frauds provides that an agreement that "[b]y its terms is not to be performed within one year from the making thereof" is "void, unless" the agreement is reduced

to "writing" and "subscribed by the party to be charged" with breach.  N.Y. Gen. Oblig. Law §

5–701(a)(1) (2002).  "Thus, 'full performance by all parties must be possible within a year to

satisfy the Statute of Frauds.'"  *Guilbert v. Garner*, 480 F.3d 140, 151 (2d. Cir. 2007) (quoting

*Cron v. Hargro Fabrics*, Inc., 91 N.Y.2d 362, 368, 694 N.E.2d 56, 59 (1998)).  Material terms

"may not be severed to save an otherwise enforceable agreement."  *Thiam v. Am. Talent Agency,*

*Inc.*, 2012 WL 1034901, at *4 (S.D.N.Y. Mar. 27, 2012).

Accepting the well-pleaded factual allegations in the First Amended Complaint as true,

the Agreement in Principle violates the Statute of Frauds.  Plaintiffs allege that the "material

components" of the Agreement in Principle "included" that "Larkin would contribute . . .

financial capital" for Kumaran "to start a hedge fund" with "no ability to terminate his capital

contribution[s] for two years."  FAC ¶ 141; *see id.* ¶¶ 142, 282.  Larkin also allegedly promised

that he would "become a principle and fiduciary," "own more than 10% of the Delaware LLC,"

and sign certain agreements with the fund, and Larkin promised that Northland and Hedge would

pay various "compensations."  *Id.* 142; *see also id.* ¶¶ 152, 155, 281.  "[I]n consideration of

Larkin's . . . non-terminable capital contribution[s] for two years to launch the hedge fund,"

Plaintiffs would provide "services" and "disclose further IP and trade secrets" to Larkin.  *Id.* ¶

142; *see id.* ¶¶ 150–52.  There is no question that Larkin could not perform his promise to pay

contributions for two years within one year.

Plaintiffs argue in their briefs that the Agreement in Principle "is not an oral agreement,"

Pl. Opp. to Larkin at 6, but this argument contradicts the allegations in the First Amended

Complaint.  Plaintiffs allege that the parties never "signed" a written agreement reflecting the

alleged Agreement in Principle.  *Id.* ¶ 282; *accord id.* ¶ 284 ("There was no express contract");

*see also id.* ¶¶ 197, 280 ("it need not be memorialized in a written form").  Even if, as Plaintiffs

allege, "email exchanges" between Kumaran and Larkin "memorialized" the Agreement in Principle, *id.* ¶ 279, this allegation is not sufficient to satisfy the Statute of Frauds. The writing must be "subscribed," that is, signed, "by the party to be charged" with breach. N.Y. Gen. Oblig. Law § 5–701(a)(1) (2002). It is clear from the First Amended Complaint that neither Larkin, nor any other defendant signed writings reflecting the material terms of the Agreement in Principle. Indeed, Plaintiffs allege that Kumaran repeatedly asked Larkin to sign documents in connection with material aspects of the alleged Agreement in Principle, but Larkin "blanket refused to sign and agree to any terms." *Id*. ¶ 201; *see id.* ¶¶ 189, 192 (describing Larkin "withholding signature on various agreements and regulatory registrations"), 197 (alleging that Plaintiffs performed "hundreds of hours" of services "without . . . signed agreements"), 200.

Plaintiffs further argue that the Agreement in Principle "is not subject to any statute of frauds." Pl. Opp. to Larkin at 6. Specifically, Plaintiffs argue that the Court should apply Delaware law to "the portion" of the Agreement in Principle involving "Larkin's two years of capital to the hedge fund" because "the parties entered into [a] bilateral deal to form a Delaware LLC." Pl. Opp. to Larkin at 5. And, Plaintiffs broadly contend, pursuant to the Delaware Limited Liability Act, agreements concerning Delaware LLCs are "not barred by the Statute of Frauds." *Id.* (citing Del. Code tit. 6 § 18-101(9)).

The Court cannot simply decide to apply Delaware law to a "portion" of an alleged oral agreement without any allegation or indication that the parties understood and intended the contract to operate that way. Plaintiffs allege that much of the Agreement in Principle had nothing to do with Kumaran's Delaware hedge fund. Plaintiffs also specifically allege that they bring their "breach of contract" claims "under New York State law," FAC ¶ 1, and that the parties formed and performed the Agreement in Principle in New York, *id.* ¶¶ 25, 164, 165. Moreover,

the prior, written contracts between the parties were governed by New York law.  *See* EULA at 17 ("EULA shall be governed and construed exclusively in accordance with the domestic laws of the State of New York . . . ."); Settlement Agreement at 7 ("This Agreement shall be governed by the laws of the State of New York.").  The First Amended Complaint does not even clearly allege that Larkin knew Kumaran's hedge fund would be a Delaware LLC, but only that Larkin agreed to help fund and manage "the Delaware LLC."  FAC ¶ 141.

In any event, Plaintiffs provide no authority for the proposition that, applying Delaware law, the Agreement in Principle is not subject to the Statute of Frauds.  Plaintiffs cite a Delaware statute that plainly applies only to the "operating agreement" of a Delaware LLC—the contract that governs the "conduct of its business."  § 18-101(9).  Plaintiffs do not suggest that the Agreement in Principle is the "operating agreement" of Kumaran's hedge fund, nor could Plaintiffs plausibly maintain such a position.  As noted above, Plaintiffs allege that "material components" of the Agreement in Principle had nothing to do with Nefertiti.  FAC ¶¶ 141, 142.  Rather, much of the alleged oral contract concerned promises that Plaintiffs would disclose "IP" and provide "services" to Northland and Hedge "in exchange for" various kinds of payments.  *Id.*  The aspects of the Agreement in Principle concerning Nefertiti were Larkin's alleged promises to help launch the fund, and were not a framework for the daily "conduct of its business."  § 18-101(9).  There is no support for Plaintiffs' broad contention that any agreement involving, in any respect, a Delaware LLC is exempt from the Statute of Frauds.  Accordingly, because the Agreement in Principle clearly violates the Statute of Frauds, the Court must dismiss Plaintiffs' claims for breach of the Agreement in Principle.

C.  <u>Plaintiffs Fail To State Claims for Fraudulent Inducement and Rescission.</u>

Plaintiffs assert claims against all Defendants for fraudulent inducement to enter into the

Settlement Agreement (Claim Two) and for fraudulent inducement to enter into the Agreement in

Principle (Claim Eleven).  Plaintiffs allege that they would not have agreed to release their

claims if Defendants did not "misrepresent" and "conceal" that they had created the "clone OBT

Book" based on Plaintiffs' software and strategies.  FAC ¶¶ 117, 213.  Similarly, Plaintiffs argue

that they would not have "disclose[d] further IP" and "provide[e] services" but for "Larkin's

representations" under the alleged Agreement in Principle.  *Id*. ¶ 290.  Defendants argue that the

Court must dismiss the claims for fraudulent inducement because they are duplicative of the

contract claims.  Under New York Law, Plaintiffs fail to state independent claims for the tort of

fraudulent inducement.

The Court must dismiss as duplicative a claim for fraudulently inducing a party to enter

into a contract if the alleged misrepresentations constitute merely a breach the contract itself.

*See Project Cricket Acquisition, Inc. v. FCP Inv'rs VI, L.P.*, 159 A.D.3d 600, 601, 74 N.Y.S.3d

517 (2018) ("fraudulent inducement claim . . . dismissed as duplicative of the breach of contract

claims to the extent it is based on the falsity of the representations and warranties made in the

[contract]"); *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996).

Specifically, misrepresentations of future intent to perform under the contract are not actionable.

*See Wyle Inc. v. ITT Corp.*, 130 A.D.3d 438, 439 (1st Dep't 2015).  To state a distinct cause of

action for fraudulent inducement, a plaintiff must allege "misrepresentations of present fact" and

those misrepresentations "must be 'collateral to the contract.'"  *Id.* (quoting *Orix Credit Alliance*

*v Hable Co.*, 256 AD2d 114, 115 (1st Dep't 1998)).

Plaintiffs' allegations of fraudulent inducement to enter the Settlement Agreement fail to

state a distinct cause of action.  In the same provision as the release of claims, the Settlement

Agreement required Northland and Hedge to "warrant" and "represent" that they did not and would not "use, duplicate, reverse engineer or otherwise misappropriate any Timetrics Software" or "strategies learned" from Plaintiffs.  Settlement Agreement ¶ 4.  Thus, the fraudulent inducement claim, based on the alleged misrepresentations about the OBT Book, are "based on the falsity of the representations and warranties made" in the Settlement Agreement.  *Project Cricket*, 159 A.D.3d at 601.  Even if the alleged misrepresentations about the OBT Book were "misrepresentations of present fact," they were not, in any sense, "collateral or extraneous to the terms of" the Settlement Agreement.  *Alpha Capital Anstalt v. Oxysure Systems, Inc.*, 252 F. Supp. 3d 332, 339 (S.D.N.Y. 2017).

The Court likewise must dismiss Plaintiffs' claims for fraudulent inducement to enter into the Agreement in Principle.  These claims are based entirely on Larkin's allegedly false promises to perform—or cause Northland and Hedge to perform—the terms of the Agreement in Principle.  *See* FAC ¶¶ 155–57, 290, 294.  Plaintiffs specifically allege that Larkin's behavior in connection with the Agreement in Principle was "fraudulent" because he "had no intention" of performing.  *Id.* ¶ 157.  However, New York law is clear that Plaintiffs cannot sustain a claim for fraudulent inducement based on "a misrepresented intent to perform."  *Hawthorne Grp., LLC v. RRE Ventures*, 7 A.D.3d 320, 323–34 (1st Dep't 2004); *see also Brown v. Brown*, 12 A.D.3d 176, 176 (1st Dep't 2004) (holding that "claims for . . . fraud are precluded by the fact that a simple breach of contract claim may not be considered a tort unless a legal duty independent of the contract – i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself – has been violated").

Relatedly, Plaintiffs fail to state a claim for rescission of paragraph four of the Settlement Agreement (Claim Thirteen).  Plaintiffs allege that, because the Settlement Agreement was

allegedly "procured by fraud," the provision of the Settlement Agreement containing the broad release of Plaintiffs' claims and terminating the prior contracts between the parties is "null and void." FAC ¶ 305. Rescission, however, is a remedy, not a claim. Because the Court dismisses Plaintiffs' claims alleging that the Settlement Agreement was procured by fraud, Plaintiffs are not entitled to that remedy.

D.   Plaintiffs Fail To State Claims for Common Law Fraud and Aiding and Abetting.

The third claim in the First Amended Complaint is a claim against all of the defendants for "common law fraud." Plaintiffs allege that, in 2014 and 2015, all of the defendants participated in creating the OBT Book, "in express breach of the EULA, Timetrics NDA and other engagement letters," and lied about it or concealed it from Plaintiffs as "part of an ongoing scheme" to cheat Plaintiffs out of their fair share of the profits from trades made with the benefit of Plaintiffs' trading software and strategies. FAC ¶¶ 220–23. Plaintiffs also assert claims against Lothrop and Bramante for aiding and abetting fraud in connection with the creation of the alleged OBT book (Claim Sixteen). FAC ¶¶ 317–320.

The Court must dismiss these claims insofar as the alleged conduct took place before the parties executed the 2016 Settlement Agreement, which contained a broad release of claims. "It is well established in New York that 'a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between the parties.'" *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 581 (S.D.N.Y. 1993) (quoting *Skluth v. United Merchants & Manufacturers, Inc.*, 163 A.D.2d 104, 559 N.Y.S.2d 280, 282 (1st Dep't 1990). The Settlement Agreement provides that Plaintiffs "hereby release, discharge and acquit" Northland and Hedge, as well as their "employees, directors, officers, agents," "from any and all claims" of "any kind or nature whatsoever, *whether known or*

*unknown*, which the Parties may have, or claims they may have had, or now has or claims to have, from the beginning of the world to the date of this Agreement."  Settlement Agreement at 3 (emphasis added); *see id.* at 5–6 (the parties "understand that this is a FULL, COMPLETE and FINAL release" of "all claims" they "may have").  Plaintiffs stress that they did not learn of the alleged OBT Book until after they executed the Settlement Agreement, but that is immaterial. The Court has already rejected Plaintiffs' argument that the release was invalid.  Plaintiffs chose to execute a broad release of claims, including claims that might have existed but were unknown to Plaintiffs at the time they signed the Settlement Agreement.

Plaintiffs also fail to state claims for common law fraud and aiding and abetting based on Defendants' alleged conduct after the Settlement Agreement, in connection with the Agreement in Principle.  The Court must dismiss these claims against Northland, Hedge, Lothrop, and Bramante.  All of the post-settlement interactions were with Larkin alone.  Indeed, Plaintiffs repeatedly and consistently allege that Larkin concealed the Agreement in Principle from the management and employees at Northland and Hedge, including Lothrop and Bramante.  FAC ¶¶ 19, 22, 156, 158, 169.  Plaintiffs insist that Lothrop and Bramante are liable for their role in "using" and "conceal[ing]'" the "OBT clone" [ECF #26-1 at 7].  But Plaintiffs must allege fraud claims with particularity.  *See First Capital Asset Management*, 385 F.3d at 179; Fed. R. Civ. P. 9(b).  Plaintiffs' only specific allegation about post-settlement use of the OBT Book is that Larkin generally admitted that he "had continued to utilize" it and promised to "reinstate" payments to Plaintiffs.  FAC ¶ 143.  That allegation is not sufficient to "give rise to a strong inference of fraudulent intent" on the part of Lothrop and Bramante.  *First Capital Asset Management*, 385 F.3d at 179.  Moreover, as the Court explained above, Plaintiffs' allegations

about Larkin's post-settlement conduct, in connection with the Agreement in Principle, are not actionable as fraud.  *See Brown*, 12 A.D.3d 176.

E.   Plaintiffs Fail To State Claims for Breach of the Timetrics NDA.

Plaintiffs allege that all of the defendants breached the Timetrics NDA by creating and using the OBT Book (Claim Twelve).  FAC ¶ 298–301.  Defendants argue that Plaintiffs released any claims for breach of the Timetrics NDA under the Settlement Agreement.  Plaintiffs respond that the Timetrics NDA remained in force after the Settlement Agreement and that Defendants continued to violate it.

As with their fraud claims, Plaintiffs' claims for breach of the Timetrics NDA are largely precluded by the broad release of claims under the 2016 Settlement Agreement.  In particular, the Timetrics NDA prohibits reverse engineering Plaintiffs' software.  Timetrics NDA at 2.  But Plaintiffs specifically allege that Defendants created the OBT Book in 2014 and 2015.  *See* FAC ¶¶ 8, 9, 95.  Thus, when Plaintiffs executed the 2016 Settlement Agreement, they released any future claims based on Defendants' alleged 2014 and 2015 efforts to reverse engineer Plaintiffs' hedging program.

To be sure, Plaintiffs also assert that, "[t]o this date, Defendants have continued to retain" and use Plaintiffs' "IP" in violation of the Timetrics NDA.  FAC ¶ 202.  However, Plaintiffs specifically allege that Defendants "incurred significant losses" when they "tried to take over the [hedging] program" with their copycat OBT Book, *id.* ¶¶ 108, 109, and immediately "needed to obtain Plaintiff's unique updates and strategies," *id.* ¶ 19.  Plaintiffs allege that Kumaran, in fact, disclosed new "proprietary information," and Defendants "implemented" the newly-disclosed, "upgrade[d] . . . hedging strategies."  *Id.* ¶¶ 17, 162.  Plaintiffs offer no specific allegations about breach of the Timetrics NDA after the Settlement Agreement, and there is no reason for the Court

to credit Plaintiffs' purely conclusory assertion that the Timetrics NDA somehow governed the disclosure of the new information. *Id.* ¶ 163; *see Edwards*, 938 F.3d at 12 (the district court is "not required to credit conclusory allegations or legal conclusions"). Thus, accepting the well-pleaded factual allegations in the First Amended Complaint as true, the Court concludes that Plaintiffs have failed to allege any post-settlement use of the original "IP" to which the Timetrics NDA applied.

F.   Plaintiffs Fail To Allege any Trade Secrets with Sufficient
      Particularity To State Claims for Misappropriation.

Plaintiffs assert claims for misappropriation of trade secrets against Larkin, Lothrop, Northland, and Hedge under the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*. ("DTSA"), and under New York law. Defendants argue that Plaintiffs fail adequately to allege the existence of any trade secrets. Plaintiffs respond that they pleaded their trade secrets with sufficient particularity.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)); *see* 18 U.S.C. § 1839(3) (defining trade secret as "formulas, designs, . . . programs, or codes" that the owner has "taken reasonable measures to keep . . . secret" and that "derives independent economic value . . . from not being generally known"). To succeed on a claim for misappropriation of trade secrets under New York law, a plaintiff must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Faiveley Transport*, 559 F.3d at 117 (quoting *North Atlantic Instruments*, 188 F.3d at 43–44).

Similarly, under the DTSA, a plaintiff must show "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (quoting *In re Document Technologies Litigation*, 2017 WL 2895945, at *5 (S.D.N.Y. July 6, 2017)); *see* 18 U.S.C. § 1839(5).

"[T]o survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value." *Elsevier Inc.*, 2018 WL 557906, at *4. The plaintiff must allege more than "conclusory statements that simply restate the elements of a trade secret." *Id.* at *6. While a plaintiff need not reveal details of the trade secret, it is not enough to "simply list general categories of information." *Id.*; *see also*, *e.g.*, *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 448 (S.D.N.Y. 2019); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020) (holding that a complaint's description of alleged trade secrets merely "'resemble . . . broad categories of information' and are 'vague,' which, by itself, constitutes a reason to dismiss the claims"), *aff'd*, (2d Cir. Dec. 11, 2020).

The claims for misappropriation of trade secrets fail because Plaintiffs "failed to identify their alleged secrets with 'sufficient particularity.'" *Zirvi*, 433 F. Supp. 3d at 465 (quoting *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015)). In the First Amended Complaint, Plaintiffs define the "IP" that Defendants allegedly misappropriated as "risk management tools, hedging strategies, designs, models, processes, techniques, algorithms, hedging methodologies, graphical interfaces, decision support tools,

Timetrics Software and other Confidential Information."  FAC ¶ 15; *see id.* ¶ 48 (defining

Timetrics Software as "a proprietary suite of various enterprise risk management and analytic

technologies, the underlying quantitative processes and analytical engines, methods, techniques,

for hedging and managing risk, and mathematical algorithms developed by Kumaran for use in

creating new hedging strategies" in Defendants' field).  Courts have found that similarly

"[g]eneral allegations regarding 'confidential information' and 'processes' simply do not give

rise to a plausible trade secrets claim."  *Elsevier Inc.*, 2018 WL 557906, at *6; *see also*, *e.g.*,

*Zirvi*, 433 F. Supp. 3d at 465; *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *4

(S.D.N.Y. July 10, 2019); *Big Vision*, 1 F. Supp. 3d at 259.  The Settlement Agreement and

EULA, incorporated into the pleading by reference, offer no greater specificity.  *See* EULA at 2

(defining Timetrics Software and Timetrics Property as "methodologies," "formulae," and "know

how," among other vague terms).  Although Plaintiffs tack on many synonyms, and stress that

their "IP" is confidential and valuable, Plaintiffs' allegations clearly boil down to lists of "general

categories of information," *Elsevier Inc.*, 2018 WL 557906, at *6, which are not sufficiently

particularized to state a claim for misappropriation.

G. Plaintiffs' Claim for Breach of Fiduciary Duty Fails Because the Purported Duty is Predicated on a Void Agreement.

Plaintiffs assert a claim against Larkin for breach of fiduciary duty based on his actions in

connection with the Agreement in Principle.  Specifically, Plaintiffs allege that Larkin "owes

Kumaran a fiduciary duty of good faith" because, as part of the alleged Agreement in Principle,

he agreed to become a member of Nefertiti.  FAC ¶ 312.  They allege that Larkin breached this

duty because he refused to sign "NDAs directly with the new entity," failed to comply with

alleged registration requirements, and threatened to disclose confidential information, among

other alleged breaches.  *Id.* ¶¶ 141, 313–15.  Defendants argue that the Court should dismiss this

claim because the alleged Agreement in Principle is void under the Statute of Frauds.
Defendants are correct.  As the Court explained in detail above, accepting the well-pleaded
factual allegations in the First Amended Complaint as true, the alleged Agreement in Principle
violates the Statute of Frauds.  Thus, the source of Larkin's alleged duty is void.  Accordingly,
the Court must dismiss Plaintiffs' claim for breach of fiduciary duty.

## H.   Plaintiffs Fail To State any Other Claims on which Relief May Be Granted.

Plaintiffs fail to state claims for misappropriation of confidential information (Claim Six),
unjust enrichment (Claim Seven), and breach of the covenant of good faith and fair dealing
(Claim Nine).  These claims are duplicative of Plaintiffs' contract claims, and Plaintiffs
allegations do not support independent claims.  As the district court ruled in dismissing another
case that Plaintiff brought asserting similar claims, *A Star Grp., Inc. v. Manitoba Hydro*, 2014
WL 2933155, at *7 (S.D.N.Y. June 30, 2014), *aff'd*, 621 F. App'x 681 (2d Cir. 2015), claims for
misappropriation of confidential information, unjust enrichment, and breach of the covenant of
good faith and fair dealing must be dismissed where those claims are duplicative of contract
claims.[2]  *See also Reed Construction Data Inc. v. McGraw–Hill Cos., Inc.*, 745 F. Supp. 2d 343,
353 (S.D.N.Y. 2010) (a claim for misappropriation of confidential information "must spring from
circumstances extraneous to, and not constituting elements of, the contract"); *Coty, Inc. v.
L'Oreal S.A.*, 320 Fed. App'x 5, 6 (2d Cir. Mar. 31, 2009) ("[I]t is black-letter law in New York
that recovery on an equitable theory of unjust enrichment is not permitted where the matter at
issue is covered" by contract); *Bear, Stearns Funding Inc. v. Interface Group–Nevada, Inc.*, 361
F. Supp. 2d 283, 298 (S.D.N.Y. 2005) ("breach of the implied covenant of good faith and fair

---

[2] In *A Star Grp., Inc. v. Manitoba Hydro*, Plaintiff The A Star Group, Inc. (Timetrics) asserted fifteen claims for, *inter alia*, breach of contract, misappropriation of trade secrets, and unjust enrichment against a different former business partner.  2014 WL 2933155, at *1.  The judge in that case likewise found that Plaintiff failed to state any claim on which relief could be granted.

dealing is redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim of breach of an express provision of the underlying contract."); *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388–89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

Plaintiffs likewise fail to state claims for promissory estoppel (Claim Eight) and for the misappropriation of Kumaran's skills and labor (Claim Fourteen) based on Defendants' alleged "non-payment of the various compensations contemplated in the Agreement in Principle."  FAC ¶¶ 308–309.  These claims are entirely duplicative of Plaintiffs' claims for breach of the Agreement in Principle.  *See Brown*, 12 A.D.3d at 176.  The Court has already explained that the Agreement in Principle is void under the Statute of Frauds, and Plaintiffs cannot assert quasi-contractual claims to circumvent the Statute of Frauds.  *Zeising v. Kelly*, 152 F. Supp. 2d 335, 345 (S.D.N.Y. 2001) ("Plaintiff cannot simply restate his contract claim, which is barred by the Statute of Frauds, in an attempt to obtain damages in a quasi-contractual claim.").

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss [ECF # 63] is GRANTED. Accordingly, Plaintiffs' motion for a preliminary injunction [ECF #52] and all other requests for relief [ECF #113, 120] are DENIED as moot.  The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Date:  **February 26, 2021**          **MARY KAY VYSKOCIL**
       **New York, NY**               **United States District Judge**

26